## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| P.K., *et al.*, <br> on behalf of themselves and all <br> others similarly situated, <br><br>          Plaintiffs/Petitioners, <br> v. <br><br> REX W. TILLERSON, *et al.*, <br>          Defendants/Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. _____ |

## MEMORANDUM IN SUPPORT OF REQUEST FOR PRELIMINARY INJUNCTION AND EMERGENCY MOTION FOR MANDAMUS RELIEF

Samer E. Khalaf
Abed A. Ayoub
Yolanda Rondon
AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
1705 DeSales Street, N.W., Suite 500
Washington, D.C. 20036
Tel: 202-244-2990
Skhalaf@adc.org

Karen C. Tumlin
Esther Sung
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Blvd, Suite 1600
Los Angeles, CA 90010
(213) 639-3900
tumlin@nilc.org

Justin B. Cox
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
(678) 279-5441
cox@nilc.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
 OF THE DISTRICT OF COLUMBIA
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
(202) 457-0800
aspitzer@acludc.org

Matthew E. Price  (DC Bar #996158)
Max J. Minzner (pro hac vice pending)
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Tel. 202-639-6000
Fax: 202-639-6066
mprice@jenner.com
mminzner@jenner.com

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
ojadwat@aclu.org

Cody H. Wofsy
Spencer E. Amdur
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
cwofsy@aclu.org
samdur@aclu.org

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

    A.    The Diversity Visa Program. ........................................................................ 3

    B.    The Executive Order and the State Department's Illegal Policy. ............... 4

    C.    Plaintiffs. ...................................................................................................... 7

ARGUMENT ...................................................................................................................... 9

I.     Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction ..................... 10

II.    Plaintiffs are Likely to Succeed on the Merits of Their APA Claim. ............................. 11

    A.    The Statute and Regulations Require That Consular Officials Issue Visas to Individuals, Like Plaintiffs, Who Are Statutorily Eligible To Receive Them. .......................................................................................................... 12

           1.    The Government May Refuse a Visa Only Upon a Ground Set Forth in the Governing Law and Regulations. ........................................... 12

           2.    Denying an Immigrant Visa on Account of the Applicant's Nationality Violates the Law. ................................................................... 14

           3.    The Executive Order Only Limits Entry, Not Visa Issuance. ................... 14

III.   Plaintiffs are Likely To Succeed on the Merits of Their Mandamus Claim ..................... 19

    A.    The District Court Has Mandamus Jurisdiction to Require Consular Officials to Act on Diversity Visa Applications ................................................ 19

    B.    The Requirements for Mandamus Relief Are Met. ...................................... 21

IV.   The Balance of the Equities and the Public Interest Support Preliminary Relief. ............. 23

CONCLUSION .................................................................................................................... 23

## TABLE OF AUTHORITIES*

<span style="font-variant: small-caps">CASES</span>

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ......................................11

*Association of Civilian Technicians, Montana Air Chapter No. 29 v. Federal Labor Relations Authority*, 22 F.3d 1150 (D.C. Cir. 1994)......................................21

*Christensen v. Harris County*, 529 U.S. 576 (2000) ....................................................18

*Coraggioso v. Ashcroft*, 355 F.3d 730 (3d Cir. 2004) ...........................................10, 20

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011) ............................................................10

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *cert. granted* 137 S. Ct. 2080 (2017)..........................................................................................................5, 16, 18

*\*Iddir v. INS*, 301 F.3d 492 (7th Cir. 2002) ...................................................... 4, 10-11, 19, 20, 21

*In re Medicare Reimbursement Litigation*, 414 F.3d 7 (D.C. Cir. 2005) ....................................21

*\*International Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc), *cert. granted* 137 S. Ct. 2080 (2017)..........................................5, 16

*\*International Refugee Assistance Project v. Trump*, No. 17-cv-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017), *aff'd in part, rev'd in part*, 857 F.3d 554 (4th Cir.) (en banc), *cert. granted*, 137 S. Ct. 2080 (2017) ..............................14, 16

*\*Keli v. Rice*, 571 F. Supp. 2d 127 (D.D.C. 2008) ...........................................4, 10, 20

*Mogu v. Chertoff*, 550 F. Supp. 2d 107 (D.D.C. 2008) ..................................................10

*Mohamed v. Gonzales*, 436 F.3d 79 (2d Cir. 2006)..........................................................10

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016) ......................................22

*Nken v. Holder*, 556 U.S. 418 (2009) ..........................................................................23

*Nyaga v. Ashcroft*, 323 F.3d 906 (11th Cir. 2003) ............................................................10

*Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33 (D.C. Cir. 1974)..........................................................................................................18

*\*Panescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999).........................................10, 20

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*Patel v. Reno*, 134 F.3d 929 (9th Cir. 1997) ........................................................... 19

*\*Przhebelskaya v. U.S. Bureau of Citizenship & Immigration Services*, 338 F.
    Supp. 2d 399 (E.D.N.Y. 2004) .................................................................. 10, 20

*Scales v. INS*, 232 F.3d 1159 (9th Cir. 2000) .......................................................... 18

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011) ............................................ 21

*State v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 2989048 (D. Haw. July
    13, 2017) ............................................................................................................ 5

*Trump v. Hawaii*, No. 16-1540, 2017 WL 3045234 (U.S. July 19, 2017) ................. 5

*Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) ........... 2, 4, 5

*United States v. Monzel*, 641 F.3d 528 (D.C. Cir. 2011) ......................................... 22

**STATUTES**

5 U.S.C. § 706(2)(A) ................................................................................................. 11

8 U.S.C. § 1152(a)(1)(A) ................................................................................. 2, 14, 22

8 U.S.C. § 1153(c)(1) ......................................................................................... 2, 21

8 U.S.C. § 1153(c)(1)(A) ........................................................................................... 21

8 U.S.C. § 1153(c)(2) ........................................................................................... 12-13

8 U.S.C. § 1153(e)(2) ................................................................................................ 21

8 U.S.C. § 1154(a)(1)(I)(ii)(II) ............................................................................... 1, 4

8 U.S.C. § 1182 ......................................................................................................... 13

8 U.S.C. § 1182(a) ............................................................................................... 13, 22

8 U.S.C. § 1182(a)(1) ................................................................................................ 13

8 U.S.C. § 1182(a)(2) ................................................................................................ 13

8 U.S.C. § 1182(a)(3) ................................................................................................ 13

8 U.S.C. § 1182(a)(4) ................................................................................................ 13

8 U.S.C. § 1182(f) ......................................................................................... 15, 16, 17

8 U.S.C. § 1201(c)(1) ................................................................................................. 4

8 U.S.C. § 1201(g) ................................................................................................7, 13

8 U.S.C. § 1201(h) .....................................................................................................23

28 U.S.C. § 1361 ........................................................................................................19

**OTHER AUTHORITIES**

22 C.F.R. § 40.6 ..............................................................................2, 12, 14, 18, 22

22 C.F.R. § 42.33(a)(1) .............................................................................................10

22 C.F.R. § 42.81(a) ......................................................................................12, 18, 21

Brief for Appellants, *IRAP v. Trump*, 857 F.3d 554 (4th Cir. Mar. 24, 2017) (No.
    17-1351), ECF No. 36 ...................................................................................17

Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary
    Injunction and/or Temporary Restraining Order of the Executive Order, at 21-
    22, No. 17-CV-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017), 2017 WL
    1047713 ..............................................................................................................16

Defendants' Memorandum in Opposition to Plaintiff's Motion for a Temporary
    Restraining Order at 28, *Hawaii v. Trump*, CV No. 17-0015, _ F. Supp. 3d __,
    2017 WL 1011673 (D. Haw. Mar. 15, 2017), ECF No. 145 ...............................16

Dep't of Homeland Security, Frequently Asked Questions on Protection the
    Nation from Foreign Terrorist Entry into the United States,
    https://www.dhs.gov/news/2017/06/29/frequently-asked-questions-protecting-
    nation-foreign-terrorist-entry-united-states ........................................................5

Executive Order 13,780, 82 Fed. Reg. 13,209 (March 6, 2017), amended by 82
    Fed. Reg. 27,965 (June 14, 2017).........................................................................1

Executive Order 13769, issued January 27, 2017.........................................................4

Kate M. Manuel, Cong. Research Serv., R44743, *Executive Authority to Exclude
    Aliens: In Brief* (2017).......................................................................................18

U.S. Dep't of State, Visa Bulletin for July 2016 (June 8, 2016),
    https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2016/visa-bulletin-for-july-
    2016.html (lasted visited July 31, 2017)      1, 4, 11

## INTRODUCTION

Plaintiffs are non-citizens who have a once-in-a-lifetime opportunity to become Americans that the government is unlawfully blocking. Plaintiffs took part in the diversity visa lottery program, under which 50,000 individuals a year are able to immigrate to the United States. They were extremely fortunate to be selected to apply for immigrant visas this fiscal year. For the diversity visas to be issued in the current fiscal year, more than 19.3 million individuals and their derivatives entered the lottery, from which fewer than 84,000 were chosen for the opportunity to apply for one of 50,000 visas.[1]  Provided that they meet the eligibility requirements for the visa and are in fact issued visas, Plaintiffs' selection entitles them to immigrate to the United States, become permanent residents, and eventually apply for citizenship.

This opportunity, though, comes with an important deadline: their immigrant visas must be issued by the end of this fiscal year, that is, by September 30, 2017. 8 U.S.C. § 1154(a)(1)(I)(ii)(II). If their visas are not issued by that date, Plaintiffs will effectively and irretrievably lose their chance to immigrate. The State Department, however, is refusing to adjudicate their visa applications and issue visas to those who are statutorily eligible because each Plaintiff comes from one of the six countries subject to the 90-day temporary *entry* ban set forth in Section 2(c) of Executive Order 13,780, 82 Fed. Reg. 13,209 (March 6, 2017), amended by 82 Fed. Reg. 27,965 (June 14, 2017) (the "Order" or "Executive Order").[2] However, the

---

[1] U.S. Dep't of State, Visa Bulletin for July 2016 (June 8, 2016), https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2016/visa-bulletin-for-july-2016.html (lasted visited July 31, 2017).  As the Department of State explains, more than 50,000 applicants are selected because some lottery winners cannot or do not pursue their cases to visa issuance. *See id.*

[2] As is typical among diversity visa applicants—given the program's goal of providing an alternative to family- or employer-based visas for individuals from historically-underrepresented

1

Executive Order does not require or authorize the State Department's policy, and the policy violates the controlling statute and regulations.

In this litigation, Plaintiffs do not seek permission to enter the United States prior to the expiration of the Order's entry ban. They also do not ask this Court to decide the validity of the Executive Order. That issue is currently pending before the United States Supreme Court. Instead, they request only that Defendants comply with the statute and *process their visa applications* under the ordinary rules and procedures as required by law before the September 30 deadline.

Defendants' obligation to process the applications, and issue visas to those statutorily eligible to receive them, is clear under the statute and regulations and is not altered by the Executive Order.  The State Department is required by statute to issue visas to winners of the diversity visa lottery who meet the statutory criteria for eligibility, 8 U.S.C. § 1153(c)(1) (stating that diversity immigrants "shall be allotted visas each fiscal year"); 22 C.F.R. § 40.6 (consular official may refuse a visa "only upon a ground specifically set out in the law or implementing regulations."), and it is expressly forbidden from refusing to do so on account of an applicant's nationality. 8 U.S.C. § 1152(a)(1)(A) (providing that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's … nationality," except as expressly authorized by Congress).  Neither the Executive Order nor the statutes on which it relies, Section 212(f) of the Immigration and Nationality Act, 8 U.S.C. § 1182(f), and Section 215(a) of the Immigration and Nationality Act, 8 U.S.C. § 1185(a),

---

countries—Plaintiffs do not have relationships with individuals or entities in the United States that would exempt them from the entry ban under decisions enjoining portions of the Executive Order. *See Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2088 (2017) (per curiam).

purports to prohibit Defendants from issuing visas that the governing statutes and regulations otherwise require to be issued.  The Executive Order and statutes suspend only *entry*.

Despite the clarity of the statutes, regulations, and the Executive Order, Defendants have instituted a policy to prohibit the issuance of Plaintiffs' visa applications based on an unsustainable reading of the Order.  Defendants' policy is spelled out in a State Department cable that requires the refusal of applications even from individuals who are statutorily entitled to receive diversity immigrant visas.  Because that policy violates the statute and its implementing regulations, and is not authorized by the Executive Order, Plaintiffs are entitled to a declaratory judgment, a writ of mandamus, and injunctive relief requiring Defendants to comply with the statute and process the visas as required by law.

A preliminary injunction is appropriate. The September 30 deadline is rapidly approaching and the traditional standards for interim equitable relief are met. Plaintiffs are likely to succeed in their claim because the statutory requirements are clear and mandatory and nothing in the Executive Order alters their right to have their visa applications adjudicated and to have visas issued if they are found to be statutorily eligible. Defendants' policy will, if left in place, irreparably harm Plaintiffs by eliminating their chance to immigrate to the United States once the prohibition on entry in the Executive Order's entry ban expires on its own terms in late September. In contrast, there is no harm to the government from simply processing the visas as required by statute.

## FACTUAL BACKGROUND

### A. The Diversity Visa Program.

Congress created the diversity visa program to allow for more immigration from countries with traditionally low rates of immigration to the United States. The Attorney General

is required to identify states and regions of the world with low rates of admission and allocate a

fixed number of immigrant visas at random among applicants from those places. *Iddir v. INS*,

301 F.3d 492, 494 (7th Cir. 2002). The process is intensively competitive. For visas to be issued

in the current fiscal year, more than 19.3 million people entered a lottery to be selected to apply

for 50,000 visas—a success rate of a quarter of one percent.[3] Once selected in the lottery,

applicants finalize their applications and complete the interview and other procedural steps.

Provided that they are eligible and that processing is complete by the end of the fiscal year, they

will then receive visas that allow them to immigrate to the United States and become lawful

permanent residents. 8 U.S.C. § 1154(a)(1)(I)(ii)(II) (diversity visa winners "shall remain

eligible to receive such visa only through the end of the specific fiscal year for which they were

selected."); *Keli v. Rice*, 571 F. Supp. 2d 127, 132 (D.D.C. 2008). The current fiscal year ends on

September 30, 2017. Once issued, the visa is valid for six months. 8 U.S.C. § 1201(c)(1) ("An

immigrant visa shall be valid for such period, not exceeding six months."). Upon receiving an

immigrant visa, Plaintiffs in this case would have until early 2018 to enter the United States. The

exact date will depend on when they receive their visas.

## B. The Executive Order and the State Department's Illegal Policy.

President Trump issued the Executive Order on March 9, 2017. Section 2(c) suspends for

90 days the right to enter the United States for nationals of six countries: Iran, Libya, Somalia,

Sudan, Syria, and Yemen.[4] The Executive Order was quickly challenged on constitutional

---

[3] U.S. Dep't of State, Visa Bulletin for July 2016 (June 8, 2016),
https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2016/visa-bulletin-for-july-2016.html (lasted visited July 31, 2017).
[4] The Executive Order is a modified version of Executive Order 13769, issued January 27, 2017, which was challenged and enjoined almost immediately. *See Trump*, 137 S. Ct. at 2083. The United States abandoned that litigation, revoked the prior order, and issued the current Executive Order as a replacement.

4

grounds on several different litigation tracks. By the end of March, two injunctions prohibited

the enforcement of Section 2(c), the provision including the entry ban. *See Trump*, 137 S. Ct. at

2084-85. Both injunctions were affirmed in relevant part on appeal. *International Refugee*

*Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc), *cert. granted* 137 S. Ct.

2080 (2017); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *cert. granted* 137 S. Ct. 2080

(2017). The government sought review in the Supreme Court. While the petition for certiorari

was pending, the President issued a memorandum regarding the Executive Order, indicating that

the 90-day entry ban provision would become effective on the date the injunctions in the

litigation were lifted or stayed. *See Trump*, 137 S. Ct. at 2085.

On June 26, 2017, the Supreme Court granted certiorari and partially granted a stay of the

injunction. The Court stayed the injunctions on the entry restrictions of Section 2(c), allowing the

entry ban to go into effect, only as to those who do not "have a credible claim of a bona fide

relationship with a person or entity in the United States." *Id.* at 2088.  Consistent with the scope

of the Executive Order and its restriction, the Supreme Court did not discuss visa issuance.[5]

Following the Supreme Court's decision, the United States has begun the process of

implementing the portions of the Executive Order that are not currently enjoined. On June 28,

---

[5] A district court held that qualifying family relationships include "grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins" along with the other family relationships the government had previously acknowledged qualify: a parent (including parent-in-law), spouse, child, adult son or daughter, fiancé(e), son-in-law, daughter-in-law, and sibling, whether whole or half. *State v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 2989048, at *10 (D. Haw. July 13, 2017); Dep't of Homeland Security, Frequently Asked Questions on Protection the Nation from Foreign Terrorist Entry into the United States, https://www.dhs.gov/news/2017/06/29/frequently-asked-questions-protecting-nation-foreign-terrorist-entry-united-states.  The Supreme Court declined to stay that aspect of the district court's order, which has been appealed to the Ninth Circuit. *Trump v. Hawaii*, No. 16-1540, 2017 WL 3045234 (U.S. July 19, 2017).

2017, the State Department issued a cable directed to all diplomatic and consular posts

discussing the visa procedures to be followed after the June 29, 2017, implementation date of the

Executive Order.  *See* Declaration of Matthew E. Price (attached as Exhibit A) ¶ 2 & Ex. A

thereto (emphasis added).With respect to diversity visas, the cable provides consular officials the

following instructions:

> 8. (SBU) For Diversity Visa (DV) applicants already scheduled for interviews
> falling after the E.O. implementation date of 8:00 p.m. EDT June 29, 2017, post
> should interview the applicants.  Posts should interview applicants following
> these procedures:
>
>> a.) *Officers should first determine whether the applicant is eligible for the
>> DV, without regard to the E.O.*  If the applicant is not eligible, the
>> application should be refused according to standard procedures.
>>
>> b.) *If an applicant is found otherwise eligible, the consular officer will need
>> to determine during the interview whether the applicant is exempt from the
>> E.O.'s suspension of entry provision* (see paragraphs 10-13), and if not,
>> whether the applicant qualifies for a waiver (paragraphs 14 and 15).
>>
>> c.) *DV applicants who are not exempt from the E.O.'s suspension of entry
>> provision and who do not qualify for a waiver should be refused* 221(g) and
>> the consular officer should request an advisory opinion from VO/L/A
>> following current guidance in 9 FAM 304.3-1.
>
> Based on the Department's experience with the DV program, we anticipate that
> very few DV applicants are likely to be exempt from the E.O.'s suspension of
> entry or to qualify for a waiver.  [Consular Affairs] will notify DV applicants
> from the affected nationalities with scheduled interviews of the additional criteria
> to allow the potential applicants to determine whether they wish to pursue their
> application.
>
> 9.  (SBU) The Kentucky Consular Center (KCC) will continue to schedule
> additional DV-2017 appointments for cases in which the principal applicant is
> from one of these six nationalities.  While the Department is mindful of the
> requirement to issue Diversity Visas prior to the end of the Fiscal
> Year on September 30, direction and guidance to resume normal processing of
> visas following the 90-day suspension will be sent [in a separate cable].

*See* Price Decl., Ex. A (emphasis added).

The policy reflected in this cable violates the statute and regulations. Consular officials are instructed to decide first whether the applicant "is eligible for" a diversity visa, "without regard to the Executive Order." Under the statutes and regulations, if that determination is made, then the visa should issue. Yet the cable goes on to direct that consular officials should *refuse* a visa to statutorily eligible individuals if they fall within the Executive Order's restrictions on *entry*. The reference in paragraph 8(c) of the cable to "221(g)" is a reference to 8 U.S.C. § 1201(g), which provides: "No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa. . ." The State Department's policy, therefore, is that the Executive Order makes individuals covered by the Order ineligible to receive a diversity visa. That policy is contrary to law and should be enjoined. Relatedly, instructing consular officials to refuse visas to applicants who are "otherwise eligible" violates a mandatory duty imposed by the Immigration and Nationality Act. As a result, mandamus relief is also appropriate and the Court should direct the issuance of visas to Plaintiffs and other similarly situated individuals who are statutorily eligible to receive them.

## C.  Plaintiffs.

Plaintiff P.K. is a national of Iran and was selected in the diversity visa lottery for FY2017. Declaration of P.K. (attached as Exhibit B) ¶ 5. A mechanical engineer with 18 years of work experience, he wants to immigrate to the United States with his wife, Plaintiff N.H., and their minor children, Plaintiffs M.K.1 and M.K.2. *Id.* ¶¶ 2-3. He believes that his children will have a better life in the United States. *Id.* He had twice previously entered the diversity lottery and was not selected. *Id.* ¶ 4. Because there is no United States embassy in Iran, all four members of the family were required to travel to Yerevan, Armenia for their interview, a trip that

involved substantial time and financial cost. *Id.* ¶ 7. The State Department website indicates that his visa application is in "Administrative Processing" and he is not aware of any reason he cannot be issued a visa apart from the policy at issue in this case. *Id.* ¶ 9.

Plaintiff Afshin Asadi Sorkhab is also a national of Iran and was selected in the diversity visa lottery for FY2017. Declaration of Afshin Asadi Sorkhab (attached as Exhibit C) ¶ 5. A trained chemical engineer, he wants to immigrate to the United States with his wife, Plaintiff Neda Dehkordi, and their 16 year old daughter, their 7 year old daughter, and their two month old son, Plaintiffs Y.S.1, Y.S.2 and Y.S.3. *Id.* ¶ 3. The family was required to travel to Abu Dhabi in the United Arab Emirates for their interview in December 2016, requiring significant time and financial investment. *Id.* ¶¶ 7, 9. After his infant son was born in May 2017, the family was required to return to the embassy in Abu Dhabi. The State Department website indicates that his visa application is in "Administrative Processing" and he is not aware of any reason he cannot be issued a visa apart from the policy at issue here. *Id.* ¶ 11.

Plaintiff Hamed Sufyan Othman Almaqrami is a Yemeni national who was selected as a diversity lottery winner on May 3, 2016. Declaration of Hamed Sufyan Othman Almaqrami (attached as Exhibit D) ¶¶ 2,3. Mr. Almaqrami has a master's degree in linguistics and is currently a Ph.D. student in linguistics at Annamalai University in India. *Id.* ¶ 2. His interview was at the U.S. Embassy in Kuala Lumpur, Malaysia on May 25, 2017. *Id.* ¶ 4. At great expense, he traveled from India, where he is living for his doctoral studies, to Yemen to retrieve all of the necessary documents, and then came back to India for additional documents. *Id.* He waited for five weeks in Malaysia. *Id.* He spent nearly $3,000, which he borrowed from friends, in order to gather documents, travel to Malaysia, pay the visa processing fees, and stay there for the five weeks after the interview and two weeks before the interview. *Id.* ¶ 5. He may not be awarded

my Ph.D. on time because he was absent for so long. *Id.* He did not understand why he was not

issue a visa, until he received a letter from the State Department on July 12, 2017, stating: "a visa

applicant from one of the six affected countries who does not have a credible claim of a bona

fide relationship with a person (i.e., a close familial relationship) in the United States or of a

bona fide relationship with an entity in the United States (which relationship is formal,

documented, and formed in the ordinary course, rather than to evade the Executive Order) is

ineligible for a visa." *Id.* ¶ 6.  He does not have any family in the United States, and is

concerned that he will now be treated as ineligible for a visa. *Id.*

Plaintiff Radad Fauiz Furooz is a Yemeni national who was selected as a diversity lottery

winner on May 4, 2016. Declaration of Radad Fauiz Furooz (attached as Exhibit E) ¶¶ 2,3. Mr.

Furooz has graduated high school and is currently studying educational technology at Ibb

University in Yemen. *Id.* ¶ 2. His interview was at the U.S. Embassy in Kuala Lumpur, Malaysia

on May 25, 2017. *Id.* ¶ 4. In June 2017, the U.S. Embassy called and told him to come for a

second interview. *Id.* ¶ 6. That interview took place on June 21, 2017. *Id.* ¶ 6. On July 7, 2017,

he received a letter from the U.S. Embassy returning his passport without a visa. The letter stated

that his case would remain in administrative processing, and that he would be notified when the

Embassy could proceed with his case. *Id.* ¶ 7. The reason given was: "due to nationality from one

of 6 countries affected by EO13780 sec 2(c)." *Id.* The letter says the application was "refused

under section 221(g) pending administrative processing." *Id.* ¶ 8.

### ARGUMENT

To obtain a preliminary injunction, a party must show that (1) it is likely to succeed on

the merits of the claim; (2) it is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of the equities tips in its favor, and (4) a preliminary injunction is in the

public interest. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). These requirements are met here and the Plaintiffs are entitled to a preliminary injunction prohibiting the State Department from carrying out the policy set forth in its cable and requiring consular officials to process their visa applications pursuant to the statute.

## I.   Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction

Plaintiffs face the imminent prospect of an injury that cannot later be cured. The regulation governing diversity visas states that "[u]nder no circumstances may a consular officer issue a visa or other documentation to an alien after the end of the fiscal year during which an alien possesses diversity visa eligibility." 22 C.F.R. § 42.33(a)(1). The end of the fiscal year is September 30, 2017. "Though unforgiving, this strict interpretation of the diversity visa statute has been adopted by every Circuit Court to have addressed the issue." *Mogu v. Chertoff*, 550 F. Supp. 2d 107, 109 (D.D.C. 2008); *see also Mohamed v. Gonzales*, 436 F.3d 79, 81 (2d Cir. 2006) ("Despite the harsh consequences of this result, we are compelled, as our sister circuits have recognized, to apply the unambiguous language of the operative statutory framework."); *Coraggioso v. Ashcroft*, 355 F.3d 730, 733-34 (3d Cir. 2004); *Nyaga v. Ashcroft*, 323 F.3d 906, 914-15 (11th Cir. 2003). A recognized exception to the statutory bar is where the visa applicant seeks *and obtains* injunctive relief before the year concludes. *Compare Przhebelskaya v. U.S. Bureau of Citizenship & Immigration Servs.*, 338 F. Supp. 2d 399, 405 (E.D.N.Y. 2004) (injunction issued prior to end of fiscal year) *and Panescu v. INS*, 76 F. Supp. 2d 896, 898-99 (N.D. Ill. 1999) (same) *with Keli*, 571 F. Supp. 2d at 135 (denied as moot on the grounds that injunctive relief had not been sought prior to the end of the year); *See Coraggioso*, 355 F.3d at 734 n.8 (finding statutory bar to relief but noting that had petitioner "sought relief prior to the expiration of the 1998 fiscal year, our analysis may have been different"); *Iddir*, 301 F.3d at 501

n.2 ("It would be a different case had the district court ordered the INS to adjudicate the

appellants' status while the INS maintained the statutory authority to issue the visas.").

No subsequent judgment will make up for a lost immigrant visa due to the expiration of

the fiscal year. Absent court intervention, Plaintiffs will lose their chance, after the Executive

Order's temporary entry ban expires in late September, to come to the United States and start a

new life. The extremely low odds of selection in the lottery make it very unlikely the opportunity

will occur again. The injury to their employment and educational prospects alone would be

sufficient injury to make this lost opportunity adequate irreparable harm to support an injunction.

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Plaintiffs' inability

to obtain driver's licenses likely causes them irreparable harm by limiting their professional

opportunities."). When combined with the myriad other benefits of American citizenship—

benefits that led 19.3 million people to enter a lottery for 50,000 visas[6]—the irreparable harm

requirement is easily met in this case.

## II.    Plaintiffs are Likely to Succeed on the Merits of Their APA Claim.

The Administrative Procedure Act permits district courts to set aside final agency actions

if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). The policy set forth in the cable is contrary to law and must be set

aside. First, the governing statute and regulations require the government to issue visas to the

plaintiffs because Plaintiffs are statutorily eligible for visas.  Nothing authorizes the State

Department to impose additional eligibility requirements for an immigrant visa that are nowhere

to be found in the statutes Congress wrote.  Second, the State Department cable illegally

---

[6] U.S. Dep't of State, Visa Bulletin for July 2016 (June 8, 2016),
https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2016/visa-bulletin-for-july-2016.html (lasted visited July 31, 2017).

discriminates by making national origin relevant to the decision to issue immigrant visas that Congress has authorized. Congress specifically prohibited the denial of immigrant visas on the basis of nationality, except as it specifically provided in statute. Finally, to the extent that Defendants claim to be implementing the Executive Order, their reliance is misplaced. The plain text of the Executive Order, consistent with the authorizing statute, only limits entry and does not prohibit visa issuance.

 **A.**   **The Statute and Regulations Require That Consular Officials Issue Visas to Individuals, Like Plaintiffs, Who Are Statutorily Eligible To Receive Them.**

   **1.**   **The Government May Refuse a Visa Only Upon a Ground Set Forth in the Governing Law and Regulations.**

 The statute and governing regulations impose an affirmative obligation on Defendants to adjudicate visa applications and to issue diversity immigrant visas to those eligible to receive them. 22 C.F.R § 42.81(a) states "[w]hen a visa application has been properly completed and executed . . , the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law. Every refusal must be in conformance with the provisions of 22 CFR 40.6."

 Section 40.6, in turn, states that "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations." 22 C.F.R § 40.6. Thus, unless plaintiffs are ineligible under the statute or regulations, these regulations entitle them to receive visas.

 The INA does impose a statutory limit on visa eligibility, but it does not apply to the Plaintiffs in this case. First, a diversity immigrant visa recipient must satisfy certain educational or employment criteria: he or she must have a high school education or at least two years of work experience in an occupation that requires at least two years of training or experience. 8 U.S.C.

12

Case 1:17-cv-01533-TSC   Document 2-1   Filed 08/03/17   Page 18 of 31

§ 1153(c)(2). Second, a diversity immigrant visa recipient may not be inadmissible under 8 U.S.C. § 1182:

> No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law . . .

8 U.S.C. § 1201(g). The operative language of this section is a cross-reference to Section 212 of the INA, 8 U.S.C. § 1182. Subsection (a) provides a list of individuals who "are ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a). Such grounds include, for example, health-related grounds, *id.* § 1182(a)(1); criminal grounds, *id.* § 1182(a)(2); national security grounds arising from the applicant's own conduct, *id.* § 1182(a)(3); grounds arising from concerns that the applicant will be a public charge, *id.* § 1182(a)(4); and certain other grounds. *See generally id.* § 1182(a). If a diversity visa applicant falls within one of Subsection (a)'s grounds for inadmissibility, or does not satisfy the educational/work requirement for a diversity visa, then the applicant can be refused. Otherwise, a diversity visa must be issued.

The policy set forth in the State Department cable violates these statutes and regulations because it imposes an additional requirement for visa issuance that is nowhere to be found in the statutes and regulations: namely, that an applicant be a national of a country other than Iran, Yemen, Somalia, Sudan, Syria or Libya. Thus, the cable instructs consular officials to "first determine whether the applicant is eligible for the DV, without regard to the E.O. [barring entry of nationals of those six countries] ... If an applicant is found otherwise eligible, the consular officer will need to determine during the interview whether the applicant is exempt from the E.O.'s suspension of entry provision (see paragraphs 10-13), and if not, whether the applicant qualifies for a waiver (paragraphs 14 and 15).... DV applicants who are not exempt from the

E.O.'s suspension of entry provision and who do not qualify for a waiver should be refused

221(g)…" Price Decl. ¶ 2 & Ex. A thereto.  The policy set forth in the cable violates the law

because it instructs consular officials to refuse an immigrant visa on a ground other than those

specifically set forth in the "law or implementing regulations."  22 C.F.R § 40.6.

### 2. Denying an Immigrant Visa on Account of the Applicant's Nationality Violates the Law.

Additionally, the policy set forth in the cable directly violates Section 1152(a)(1)(A) of

the INA, which prohibits discrimination "in the issuance of an immigrant visa because" of

nationality. 8 U.S.C. § 1152(a)(1)(A). Section 3 of the cable states "applicants who are nationals

of the affected countries and who are determined to be otherwise eligible for visas" will be

refused visas if they lack a bona fide relationship or are otherwise entitled to a waiver. As

another district court has already held, the government may not adopt a policy that "would have

the specific effect of halting the issuance of visas to nationals of the Designated Countries. Under

the plain language of the statute, the barring of immigrant visas on that basis would run contrary

to § 1152(a)." *IRAP v. Trump*, No. 17-cv-0361, 2017 WL 1018235, at *9 (D. Md. Mar. 16,

2017), *aff'd in part, rev'd in part*, 857 F.3d 554 (4th Cir.) (en banc), *cert. granted*, 137 S. Ct.

2080 (2017).  Because the cable directly contravenes the statute by expressing classifying visa

applicants based on their national origin and then suspending the issuance of visas to individuals

from certain nations, it violates Section 1152(a) and is invalid under the APA.

### 3. The Executive Order Only Limits Entry, Not Visa Issuance.

The cable relies on the Executive Order to justify the policy of refusing to issue diversity

immigrant visas to individuals covered by the Executive Order.

The Court is not presented with the question of whether the President could issue an

Executive Order directing that the visas at issue in this case be denied, because the Executive

14

Order by its terms does not prohibit the issuance of visas. The Executive Order directs the suspension of *entry*. The operative language in Section 2(c) halts "the entry into the United States" of those subject to its scope. It does not impose any limit on the process of issuing a visa. Visa issuance and entry are two different matters that involve independent components of the Executive Branch and are often widely separated in time and place. For the Plaintiffs in this case, who seek eventually to immigrate to the United States on a permanent basis, the first step is receiving an immigrant visa from the relevant consular official, an employee of the State Department, at the official's office outside the United States. The second step, entry, may occur up to six months later. A visa holder must travel to the United States border and seek admission from the United States Customs and Border Protection, a component of the Department of Homeland Security.

Notably, both underlying statutes on which the Executive Order relies, INA Sections 212(f) and 215(a), reflect the distinction between entry and visa issuance. Section 212(f) provides the authority to the President only to impose restrictions on entry and does not authorize limitations on visa issuance:

> (f) Suspension of entry or imposition of restrictions by President
>
> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). Section 215(a) only provides the President the authority to regulate the process by which aliens enter or depart or attempt the United States. *See* 8 U.S.C. § 1185(a). Neither section provides the President the power to alter the visa process mandated by statute.

15

Courts likewise have recognized the distinction between visa issuance and entry. *See IRAP v. Trump*, 2017 WL 1018235, at *9 (distinguishing between Section 1182(f), which concerns *entry*, and Section 1152(a), which concerns *visa issuance*). As Circuit Judge Thacker has explained, conflating the suspension of entry with the suspension of visa issuance would create a conflict between Section 1182(f) and 1152(a):

> Reading § 1182(f) as bestowing upon the President blanket authority to carry out a suspension of entry, which involves rejecting a particular country's immigrant visa applications as a matter of course, would effectively nullify the protections in § 1152(a)(1)(A) and create an end-run around its prohibitions against discrimination. It would collapse the statutory distinction between entry and visa issuance . . . and ultimately allow the chief executive to override any of Congress's carefully crafted visa criterion or grounds for inadmissibility.

*IRAP*, 857 F.3d at 637-38 (4th Cir. 2017) (en banc) (Thacker, J., concurring).  In sum, "the § 1182(f) authority to bar entry does not extend to the issuance of immigrant visas." *IRAP*, 2017 WL 1018235, at *9; *see also Hawaii v. Trump*, 859 F.3d at 776-77 (concluding that the entry ban violates Section 1152(a) because it is "in substance" and "effectively" a ban on issuing visas).

Indeed, the government itself has insisted on the distinction between entry and visa issuance in defending the Executive Order against the claim that it violated Section 1152(a)'s non-discrimination provision.  In both the *Hawaii* and *IRAP* cases, the government contended that Section 1152(a) was not implicated, because the Executive Order *only* spoke to entry and not to visa issuance.[7]

---

[7] *See* Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction and/or Temporary Restraining Order of the Executive Order, at 21-22, No. 17-CV-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017), 2017 WL 1047713; Defendants' Memorandum in Opposition to Plaintiff's Motion for a Temporary Restraining Order at 28, *Hawaii v. Trump*, CV No. 17-0015, _ F. Supp. 3d __, 2017 WL 1011673 (D. Haw. Mar. 15, 2017), ECF No. 145.

16

Despite the clarity of the Executive Order in applying to *entry*, not *visa issuance*,

the cable conflates the two. In the Section 1, titled "Summary," the cable states (emphasis

added):

> On June 26, 2017, the Supreme Court partially lifted preliminary injunctions that
> barred the Department from enforcing section 2 of Executive Order (E.O.) 13780,
> which suspends the entry to the United States of, and the issuance of visas to,
> nationals of six designated countries.

Section 4 also claims the Executive Order "suspends for 90 days entry into the United

States of, and issuance of visas to," nationals from the six nations. Section 8 then

implements this policy by directing that those unable to enter "should be refused" visas.

*See* Price Decl., Ex. A.

Notwithstanding the plain language of both the Executive Order and the statutes on

which it is based, the government has defended its policy of refusing to issue visas to individuals

subject to the Executive Order on the ground that it would "be pointless to issue a visa to an alien

who the consular officer already knows is barred from entering the country." *See* Br. for

Appellants, at *32-33, *IRAP v. Trump*, 857 F.3d 554 (4th Cir. Mar. 24, 2017) (No. 17-1351),

ECF No. 36. But it is not pointless for Plaintiffs to receive their immigrant visa. It is a

mandatory statutory prerequisite to immigration, and it must occur by the end of the fiscal year.

Once Plaintiffs have their immigrant visas in hand, they will be able to use them to enter the

United States once the entry ban in the Executive Order expires in late September. And, as

already explained, the rejection of their applications during the entry ban period will mean they

will lose the chance to *ever* obtain those visas. Thus, for these Plaintiffs, obtaining a visa even if

entry is temporarily barred is the opposite of "pointless."

The government has also cited the State Department Foreign Affairs Manual, claiming

an administrative practice of treating "aliens covered by exercises of the President's Section

1182(f) authority as ineligible for visas." *Id.* The Foreign Affairs Manual, however, does not justify the government's position. As an initial matter, because the Manual has not gone through the notice and comment process, it is not entitled to *Chevron* deference. Policy statements of this type have force "only to the extent that those interpretations have the 'power to persuade'." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Scales v. INS*, 232 F.3d 1159, 1166 (9th Cir. 2000) (Foreign Affairs Manual does not receive *Chevron* deference.). Unlike regulations, agencies cannot rely on them as the sole source of authority for future action. *Pacific Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974) (agencies issuing policy statements "must be prepared to support the policy just as if the policy statement had never been issued.").

In any event, the Foreign Affairs Manual conflicts with Sections 40.6 and 42.81(a), the actual regulations that do have the force of law. *See* 22 C.F.R § 42.81(a) ("When a visa application has been properly completed and executed . . . the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law. Every refusal must be in conformance with the provisions of 22 CFR 40.6.") *id.* § 40.6 ("A visa can be refused only upon a ground specifically set out in the law or implementing regulations."). These State Department regulations narrowly constrain the ability to refuse visas and do not provide room for visa refusals for other reasons, including an entry prohibition such as the one in the Executive Order. As a result, these regulations controls over the inconsistent Foreign Affairs Manual.[8]

---

[8] The history of prior prohibitions on entry under Section 212(f) also undermines the government's position. As the Ninth Circuit has recognized, the Executive Order is quite different from earlier Section 212(f) entry bans. Typically, those prohibitions were narrowly focused on specific individuals or small groups of non-citizens. "[P]rior executive orders and proclamations did not suspend classes of aliens on the basis of national origin, but instead on the basis of affiliation or culpable conduct." *Hawaii*, 859 F.3d at 778-79; *see also* Kate M. Manuel, Cong. Research Serv., R44743, *Executive Authority to Exclude Aliens: In Brief* 6–10, (2017)

\*      \*      \*

In sum, the State Department has a duty to issue diversity immigrant visas to the

individuals that Congress has deemed eligible to receive them.  It may not flout that duty by

grafting additional eligibility requirements into its review process.  And it certainly may not

refuse to issue visas to individuals on account of their nationality, when Congress has expressly

prohibited.  To the extent the State Department seeks to rely on the Executive Order to justify its

policy, that reliance is misplaced, because the Executive Order bars only *entry*, not visa issuance.

Accordingly, Plaintiffs have a strong likelihood of success on the merits of their claim that the

State Department's policy is arbitrary and capricious and in violation of law.

III.    **Plaintiffs are Likely To Succeed on the Merits of Their Mandamus Claim**

    A.    **The District Court Has Mandamus Jurisdiction to Require Consular**
        **Officials to Act on Diversity Visa Applications**

Section 1361 provides the district courts broad mandamus jurisdiction "to compel an

officer or employee of the United States or any agency thereof to perform a duty owed to the

plaintiff." 28 U.S.C. § 1361. Other circuits have held that mandamus is the appropriate path to

require immigration officials to act on visa applications, including applications by winners of the

diversity visa lottery. For example, in *Patel v. Reno*, the Court of Appeals for the Ninth Circuit

issued a writ of mandamus directed at the United States Consulate in Bombay, India and ordered

it to process a pending diversity visa application. 134 F.3d 929, 933 (9th Cir. 1997).

---

(summarizing the history of 212(f) orders). They are also indefinite. The Executive Order here
not only applies to broad groups of non-citizens, it is explicitly limited in duration for 90 days.
Whatever the merits of refusing visas to individuals permanently prohibited from entering the
United States, the situation is completely different for non-citizens who are subject to a
temporary entry ban that will expire in September 2017.

Similarly, in *Iddir v. INS*, the Seventh Circuit faced mandamus requests brought by winners of the diversity visa lottery to force action on their completed visa applications. 301 F.3d at 493. The *Iddir* court held that mandamus was an available remedy for requiring action on diversity visa applications prior to the close of the fiscal year and that the statute imposes a mandatory obligation on the government to act on these visa applications. *Id.* at 500. The Court of Appeals further concluded that because the fiscal year had expired, the agency could no longer grant a visa and relief was unavailable. *Id.*

However, *Iddir* expressly recognized the availability of mandamus relief when, as here, an injunction would issue prior to the conclusion of the fiscal year.

> It would be a different case had the district court ordered the INS to adjudicate the appellants' status while the INS maintained the statutory authority to issue the visas. In such a situation, the INS would be on notice to reserve visas and must complete the task, as ordered, before time expires. Allowing the INS to claim inability to issue visas at that point would impinge the authority of the court.

*Id.* at 501 n.2 (citations omitted). This analysis in *Iddir* is consistent with the approach in *Panescu v. INS,* 76 F. Supp. 2d 896 (N.D. Ill. 1999) and *Przhebelskaya v. U.S. Bureau of Citizenship & Immigration Servs.*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004). In both of those cases, the district court took jurisdiction, ordered a preliminary injunction prior to the expiration of the fiscal year, and entered a further order requiring that a visa be processed. *See also Coraggioso,* 355 F.3d at 734 n.8 (concluding visas should not issue but noting that had petitioner "sought relief prior to the expiration of the 1998 fiscal year, our analysis may have been different"); *Keli,* 571 F. Supp. 2d at 135-36 (denying visas because injunction was not sought prior to the end of the fiscal year).

**B.    The Requirements for Mandamus Relief Are Met.**

Plaintiffs seeking mandamus must demonstrate a clear and indisputable right to relief, that the government agency or official is violating a clear duty to act, and no adequate alternative remedy exists. *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005). In this case, all three prongs are present.

With respect to the diversity visa program, Congress has imposed a set of non-discretionary obligations on the government. These create the necessary right to relief. Section 1153 mandates that, subject to the statutory limitations, "diversity immigrants shall be allotted visas each fiscal year." 8 U.S.C. § 1153(c)(1). The use of the word "shall" is repeated throughout the provisions relating to diversity visas. *See, e.g., id.* § 1153(c)(1)(A) ("The Attorney General *shall* determine. . ." (emphasis added)); *id.* § 1153(e)(2) ("Immigrant visa numbers made available under subsection (c) (relating to diversity immigrants) *shall* be issued to eligible qualified immigrants . . ." (emphasis added)). Consistent with its plain meaning, the D.C. Circuit has recognized that this such statutory language imposes an obligation to act. "As we have repeatedly noted, 'shall' is usually interpreted as the language of command." *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (internal quotations marks omitted); *Ass'n of Civilian Technicians, Mont. Air Chapter No. 29 v. Fed. Labor Relations Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive."). The Seventh Circuit held in *Iddir* that this repeated use of mandatory language entitles the plaintiffs to have their applications processed according to the statute. *Iddir*, 301 F.3d at 500.

The government also has a duty to act. Consular officials *must* adjudicate a visa application. *See* 22 C.F.R § 42.81(a) ("When a visa application has been properly completed and

executed . . . the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law. Every refusal must be in conformance with the provisions of 22 CFR 40.6."). In *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry*, the court held that the consular failure to act in a timely matter on special immigrant visas where applicants faced hardship was reviewable and mandamus relief was available. 168 F. Supp. 3d 268, 295-96 (D.D.C. 2016).

Moreover, the statute and implementing regulations expressly limit the government's ability to refuse visas. 8 U.S.C. § 1182(a) outlines a range of statutory grounds for inadmissibility, which make one ineligible to receive a visa. However, these provisions are exclusive. 22 C.F.R. § 40.6 states that a consular official may refuse a visa "only upon a ground specifically set out in the law or implementing regulations." And national origin is specifically prohibited as a basis to deny visas. 8 U.S.C. § 1152(a)(1)(A) (providing that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's … nationality," except as expressly authorized by Congress). As argued above, neither the statute nor the Executive Order justifies denying these visas. As a result, the government must process the visas consistent with its statutory obligations.

Plaintiffs also have no adequate alternative remedy. The approaching September 30 deadline precludes options other than relief in this litigation. Only expedited action by this court in the form of a preliminary injunction and then an ultimate order on mandamus can preserve the rights of the Plaintiffs. Furthermore, aside from Plaintiffs' argument regarding APA review of the State Department policy, no viable alternative legal path is obviously available. The D.C. Circuit has recognized that mandamus relief may be appropriate if direct review is not available. *United States v. Monzel*, 641 F.3d 528, 544 (D.C. Cir. 2011) (dismissing an appeal but permitting

mandamus to proceed as a result). If Plaintiffs were to wait, the statutory deadline may bar any later action. Due to both the time constraints and legal restrictions on review, no adequate alternative to mandamus exists.

## IV.     The Balance of the Equities and the Public Interest Support Preliminary Relief.

The balance of the equities and the public interest also support the requested injunction. As the Supreme Court has noted in the related context of stay requests, "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Granting the requested injunction would impose no injury on the government or the public.  As noted above, in the course of processing Plaintiffs' visa applications the government will assess whether Plaintiffs should be denied their visas on any legitimate ground, including national security grounds.  Moreover, Plaintiffs would still be subject both to the Executive Order's temporary ban on entry and, thereafter, to the government's authority to refuse admission even to individuals who have visas, if they are found to be inadmissible.   8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted" if, upon arrival, "he is found to be inadmissible under this chapter"). Simply processing Plaintiffs' visa applications according to law will prevent a severe and irreparable injury to Plaintiffs without injuring the government or the public at all.

## CONCLUSION

Plaintiffs seek only to hold defendants to the requirements of the immigration laws. Despite the temporary ban on their entry to the United States, Plaintiffs are legally entitled to receive their immigrant visas. They are likely to succeed on the merits of their claim for both

declaratory and mandamus relief and will suffer irreparable harm if the fiscal year ends before

they receive their visas. This court should issue a preliminary injunction to preserve their rights.


July 31, 2017

Samer E. Khalaf (pro hac vice pending)
Abed A. Ayoub
Yolanda Rondon
AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
1705 DeSales Street, N.W., Suite 500
Washington, D.C. 20036
Tel: 202-244-2990
Skhalaf@adc.org


Karen C. Tumlin
Esther Sung
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Blvd, Suite 1600
Los Angeles, CA 90010
(213) 639-3900
tumlin@nilc.org
sung@nilc.org


Justin B. Cox
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
(678) 279-5441
cox@nilc.org


Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN CIVIL LIBERTIES UNION
  OF THE DISTRICT OF COLUMBIA
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
202-457-0800
aspitzer@acludc.org

Respectfully submitted,

Matthew E. Price  (DC Bar # 996158)
Max J. Minzner (pro hac vice pending)
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Tel. 202-639-6000
Fax: 202-639-6066
mprice@jenner.com
mminzner@jenner.com


Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org


Cody H. Wofsy
Spencer E. Amdur
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org


*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| P.K., *et al.,* ) | |
| ) | |
| on behalf of themselves and all ) | No. _____ |
| others similarly situated, ) | |
| ) | |
| Plaintiffs/Petitioners, ) | |
| v. ) | |
| ) | |
| REX W. TILLERSON, *et al.*, ) | |
| ) | |
| Defendants/Respondents. ) | |
| ) | |
| _____ ) | |

**[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION AND**
**EMERGENCY MOTION FOR MANDAMUS RELIEF**

Upon consideration of Plaintiffs' Motion for Preliminary Injunction and Emergency

Motion for Mandamus Relief dated July 31, 2017, the memoranda of law and exhibits submitted

in support and in opposition thereto, and the entire record herein, it is hereby

**ORDERED** that Plaintiffs' Motion for Preliminary Injunction and Emergency Motion

for Mandamus Relief, dated July 31, 2017, is

**GRANTED**; it is further

**ORDERED** that

A.     The State Department and its employees, officers, and agents are enjoined from

implementing the policy of refusing diversity visas to applicants from Iran, Syria, Sudan,

Somalia, Yemen, and Libya notwithstanding their statutory eligibility;

1

B.      Defendants John Does #1-50, who are consular officials responsible for adjudicating diversity visa applications and issuing diversity visas, are directed to adjudicate diversity immigrant visa applications and issue diversity immigrant visas to all visa applicants from Iran, Syria, Sudan, Somalia, Yemen, and Libya who are statutorily eligible to receive a diversity visa before September 30, 2017.


Date: _____                          _____

                                             United States District Judge