**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| P.K., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-cv-1533 (TSC) |
| | ) | |
| | ) | |
| REX W. TILLERSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

This case involves the State Department's application of President Trump's Executive Order No. 13,780 ("Executive Order") to individuals who have applied for diversity immigrant visas in the fiscal year 2017 ("FY 2017"). Plaintiffs—citizens of Yemen and Iran—allege that Rex W. Tillerson, in his official capacity as Secretary of State, and fifty State Department consular officials (collectively, "Defendants"), have unlawfully refused or failed to process Plaintiffs' diversity immigrant visa applications based on their citizenship in one of the countries subject to the Executive Order's entry ban. (*See* ECF No. 46 ("Am. Compl.")).[1] Before this court is Plaintiffs' Motion for Preliminary Injunction and Emergency Motion for Mandamus Relief. (ECF Nos. 2, 2-1 ("Mot.")). The court heard oral argument on August 21, 2017, and at Plaintiffs' request, held an emergency status conference on September 19, 2017. Upon

---

[1] Plaintiffs' original complaint was filed on August 3, 2017. (*See* ECF No. 1). On September 21, 2017, Plaintiffs requested leave to file their First Amended Petition for Mandamus and First Amended Complaint for Injunctive and Declaratory Relief. (*See* ECF No. 44). The court granted Plaintiffs' motion on September 22, 2017. (*See* Minute Order (9/22/2017)). The Amended Complaint includes additional plaintiffs and revised class allegations, but does not alter the nature of Plaintiffs' claims.

consideration of the parties' filings, the oral arguments of counsel, and for the reasons stated herein, Plaintiffs' motion for a preliminary injunction and emergency mandamus relief is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.  **The Diversity Visa Program**

Congress created the diversity visa program under the Immigration and Nationality Act ("INA") to allow for more immigration to the United States from countries with traditionally low rates of immigration.  *See* 8 U.S.C. §§ 1153(c)(1)(B)(ii), 1153(c)(1)(E)(ii).  The program permits the State Department to issue up to 50,000 visas to individuals from specified countries.[2]  8 U.S.C. § 1151(e).  Millions of people enter the lottery every year.  Those selected for the program are not guaranteed to receive a visa—only the opportunity to apply for one.

Those wishing to obtain a visa through the diversity visa program must enter the visa lottery by filing a petition.  *See* 22 C.F.R. § 42.33(b)(3).  The State Department randomly selects lottery applicants to become "selectees" of the program.  *Id.* § 42.33(c).  Selectees may then submit an application and complete an interview with State Department consular officers. Provided that an applicant is statutorily eligible, that there is a visa number available for the applicant, and that processing is complete by the end of the fiscal year, the statute directs the State Department to issue immigrant visas, allowing the applicant and their immediate family to live and work in the United States and become lawful permanent residents.  *See* 8 U.S.C. § 1201(g); 22 C.F.R. §§ 40.6, 42.33(f).  If an applicant is issued a visa by September 30, 2017 (the

---

[2] The statute makes available up to 55,000 diversity visas annually, but 5,000 of those are reserved for aliens covered by the Nicaraguan Adjustment and Central American Relief Act of 1997.  *See* Pub. L. No. 105–100, 111 Stat. 2193 (1997).

end of the fiscal year), he or she has six months within which to enter the United States. *See* 8

U.S.C. § 1201(c)(1).

## B. **The Executive Order and the Supreme Court Decision**

President Trump issued the Executive Order on March 6, 2017. The Executive Order

expired on September 24, 2017.[3] The Executive Order imposed a 90-day suspension on entry

into the United States for nationals of six countries—Iran, Libya, Somalia, Sudan, Syria, and

Yemen. Section 2(c) of the Executive Order provides:

> (c) To temporarily reduce investigative burdens on relevant agencies during the
> review period described in subsection (a) of this section, to ensure the proper review
> and maximum utilization of available resources for the screening and vetting of
> foreign nationals, to ensure that adequate standards are established to prevent
> infiltration by foreign terrorists, and in light of the national security concerns
> referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f)
> and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry
> into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and
> Yemen would be detrimental to the interests of the United States. I therefore direct
> that the entry into the United States of nationals of those six countries be suspended
> for 90 days from the effective date of this order, subject to the limitations, waivers,
> and exceptions set forth in sections 3 and 12 of this order.

Protecting the Nation from Foreign Terrorist Entry into the United States, Exec. Order No.

13780, 82 Fed. Reg. 13209, 13213 (2017). The Executive Order was challenged on

constitutional and statutory grounds in several different courts, and by the end of March, two

injunctions prohibited the enforcement of Section 2(c). Two U.S. Courts of Appeals—the Fourth

Circuit and the Ninth Circuit—largely upheld both injunctions. *See Int'l Refugee Assistance*

*Project v. Trump*, 857 F.3d 554 (4th Cir. 2017), *cert. granted*, 137 S. Ct. 2080 (2017); *Hawaii v.*

*Trump*, 859 F.3d 741 (9th Cir. 2017), *cert. granted sub nom. Trump v. Int'l Refugee Assistance*

*Project*, 137 S. Ct. 2080 (2017). The government filed a petition for certiorari in *International*

---

[3] On September 25, 2017, President Trump signed a revised version of the Executive Order. The
court agrees with Plaintiffs that the revised version does not impact this litigation.

*Refugee Assistance Project (IRAP)*, as well as applications to stay the preliminary injunctions entered by the lower courts.

On June 26, 2017, the U.S. Supreme Court granted the government's petition for certiorari, and granted, in part, the government's motions to stay the preliminary injunctions pending resolution of the merits.[4]   *Trump*, 137 S. Ct. at 2087.  The Court granted a stay of the injunctions as applied to section 2(c) of the Executive Order "with respect to foreign nationals who lack any bona fide relationship with a person or entity in the United States." *Id*.  The Court left the injunctions in place "with respect to respondents and those similarly situated"—that is, those who had relationships with people or entities in the United States "whose rights might be affected if those foreign nationals were excluded." *Id*.  The Court reasoned that "[d]enying entry to [a foreign national with no connection to the United States at all] does not burden any American party by reason of that party's relationship with the foreign national." *Id*. at 2088.  In addition, the court noted that "the Government's interest in enforcing § 2(c), and the Executive's authority to do so, are undoubtedly at their peak when there is no tie between the foreign national and the United States." *Id*.

**C.   The State Department's Implementation of the Executive Order**

Two days after the Supreme Court's decision, the State Department issued guidance to its consular officers regarding the Executive Order's impact on visa issuance.  With respect to diversity visas, the State Department advised consular officers to "first determine whether the

---

[4] The Court originally scheduled oral argument for the first session of October Term 2017.  *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2086 (2017).  However, after the President signed the revised Order on September 25, the Supreme Court vacated the scheduled oral argument and ordered the parties to address whether the revised Order and the expiration of the most recent Executive Order rendered the cases moot.  *Trump v. Int'l Refugee Assistance Project*, 2017 WL 2405595, at *1 (U.S. Sept. 25, 2017).

applicant is eligible for the DV [(diversity visa)], without regard to the [Executive Order]."
(ECF No. 2-2 ("State Department Cable") at 3).  Next, if an applicant is "found otherwise
eligible," the consular officer was instructed to determine "whether the applicant is exempt from
the [Executive Order]'s suspension of entry provision" or "qualifies for a waiver."  (*Id.*).  Lastly,
consular officers were advised that applicants who were not exempt from the Executive Order's
suspension of entry provision and who did not qualify for a waiver should be refused a visa:

> c.) DV applicants who are not exempt from the [Executive Order]'s suspension of
> entry provision and who do not qualify for a waiver should be refused [pursuant to]
> 221(g) [of the INA] and the consular officer should request an advisory opinion
> from VO/L/A following current guidance in 9 FAM 304.3-1.

(*Id.*).

### D. Plaintiffs[5]

Plaintiffs are four individuals—Hamed Sufyan Othman Almaqrami, Aliakbar Nowzari
Golsefid, Farzad Abdollahi Zadeh, and Aiman Alsakkaf—and their immediate family members,
who are from countries affected by section 2(c) of the Executive Order.  (*See* Am. Compl. ¶¶ 12–
19).  Almaqrami and Alsakkaf are from Yemen, and Golsefid and Zadeh are from Iran.  (*Id.* ¶¶
12–13, 16, 19).  Almaqrami, Golsefid, and Zadeh were selected as diversity lottery winners in
May 2016.  (*Id.* ¶¶12–13, 16, 36).  Alsakkaf was selected as a diversity lottery winner in July
2016.  (*Id.* ¶¶ 19, 36).  Plaintiffs have submitted their visa applications and have completed their
consular interviews.  (*See id.* ¶¶ 37, 38, 40, 41).  However, on various dates since the Supreme
Court's June 26, 2017 decision and the State Department's June 28, 2017 cable, Plaintiffs have

---

[5] Plaintiffs' original Complaint named four individual plaintiffs.  (*See* ECF No. 1 ¶¶ 11–18, 34–
40).  In the month and a half since this litigation began, three of those original plaintiffs and their
families have been issued diversity immigrant visas.  Accordingly, those plaintiffs, Radad Fauiz
Furooz, (*see* ECF No. 32); P.K., N.H., M.K.1 and M.K.2, (*see* ECF No. 39); and Afshin Asadi
Sorkhab, Neda Heidari Dehkordi, Y.S.1, Y.S.2, and Y.S.3, (*see* ECF No. 42) voluntarily
dismissed their claims without prejudice.

been notified by the State Department that they were ineligible for diversity visas unless they could demonstrate a bona fide relationship with the United States.  (*Id.* ¶¶ 37, 39, 40, 41). Plaintiffs were unable to do so and therefore remained ineligible for a visa during the State Department's implementation of the Executive Order.  (*Id.*).

E.  **Plaintiffs' Requested Relief**

Plaintiffs claim that (1) the State Department's policy of applying the Executive Order's ban to visa issuance is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and (2) in applying the policy, consular officers violated their clear, non-discretionary duty to issue diversity visas to applicants who are statutorily eligible.  (Am. Compl. at 15–17).  Accordingly, Plaintiffs ask this court to issue an order: (1) enjoining the State Department from implementing the policy set forth in its cable; and (2) requiring consular officers to process Plaintiffs' applications pursuant to the statute.  (Mot. at 10).

On September 11, 2017, Defendants filed a status report indicating that the State Department is likely to reach the statutory cap of 50,000 visas before September 30, 2017 (ECF No. 40 ("Defs. Status Report") at 1).  Plaintiffs subsequently sought additional relief, requesting that this court, in light of the State Department's allegedly illegal interpretation of the Executive Order, order the State Department to: (1) process the diversity visas of and/or issue diversity visas to eligible applicants who had previously been refused under the Executive Order under the program for FY 2017, even in excess of the statutory cap and/or past the statutory deadline; or (2) issue diversity visas to eligible 2017 applicants who had been refused under the Executive Order under the program for fiscal year 2018 ("FY 2018").  (ECF No. 43 ("Pls. Mot. Em. Conf.") at 3–4).  In a Status Update filed on September 21, Plaintiffs requested that, in the

alternative, the court order the State Department to "reserve any unused visa numbers until after the [Supreme Court's decision]."  (ECF No. 45 at 5).

## II.   LEGAL STANDARD

### A.  <u>Preliminary Injunction Standard</u>

In order to prevail on a motion for a preliminary injunction, the movant must show that: "[1] he is likely to succeed on the merits, [2] . . . he is likely to suffer irreparable harm in the absence of preliminary relief, [3] . . . the balance of equities tips in his favor, and [4] . . . an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren,* 553 U.S. 674, 689–90 (2008) (citations omitted).  "[T]he standard for obtaining an injunction is significantly heightened when a plaintiff requests affirmative injunctive relief." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014) (citing *Bradshaw v. Veneman,* 338 F. Supp. 2d 139, 144 (D.D.C. 2004)).

### B.  <u>Mandamus Standard</u>

The mandamus statute grants district courts "jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  Mandamus relief is proper only if: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting *Power v. Barnhart,* 292 F.3d 781, 784 (D.C. Cir. 2002)).  The remedy of mandamus is "'a drastic one, to be invoked only in extraordinary circumstances.'" *Power*, 292 F.3d at 784 (quoting *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34 (1980)).

III.    **ANALYSIS**

The court finds that, for the reasons detailed below, the Supreme Court's June 26, 2017 Order precludes the court from granting most of the injunctive and mandamus relief Plaintiffs request.  The court will, however, grant the alternative relief Plaintiffs request and order the State Department to reserve any unused visa numbers until after the Supreme Court's ultimate decision in *Trump*.

A.    **The Supreme Court's Order Precludes Granting the Majority of Plaintiffs' Requested Relief**

A preliminary injunction is designed "to preserve the relative positions of the parties until a trial on the merits can be held."  *Tex. Children's Hosp.*, 76 F. Supp. 3d at 235 (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)).  Here, Plaintiffs request that the court alter the status quo by: (1) finding that the State Department's policy set forth in its cable is illegal; (2) enjoining the State Department from implementing the policy; and (3) ordering the State Department to process and issue visas despite the Executive Order and the Supreme Court's order.  (Mot. at 10; Pls. Mot. Em. Conf. at 3–4).  The court declines to alter the status quo and grant these specific requests for injunctive and mandamus relief while the legality of the Executive Order is currently before the Supreme Court.  *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1044 (D.C. Cir. 2014) (affirming the denial of a preliminary injunction enjoining the government's force-feeding protocol where "the Supreme Court [could] later determine[ ] that the petitioners' claims lacked merit.").

Plaintiffs argue that the Supreme Court's stay of the injunctions in *Trump* does not preclude the court from granting the relief they request, since the issue before the Supreme Court is "entirely about the ability to enter the country" and "the claims before the Supreme Court are distinct from the issues here."  (ECF No. 26 ("Pls. Rep.") at 7, 8).  In support of these arguments,

Plaintiffs cite to sentences throughout the Court's Order in *Trump* that discuss entry into the United States, rather than the issuance of visas.  (*Id*. at 7).  Plaintiffs also argue that the cases before the Supreme Court only "consider whether the Executive Order violates the Establishment Clause, the Immigration and Nationality Act, whether the scope of injunctive relief ordered by the lower court was appropriate, and whether the cases are now moot."  (*Id*. at 8).

However, the court agrees with Defendants that "the Supreme Court is currently considering the validity of the Executive Order, and . . . has already balanced the equities in determining how that Order may be implemented pending its consideration." (ECF No. 24 ("Defs. Opp.") at 15).  Although it did not explicitly address this issue, the Supreme Court appears to have considered the Executive Order's implementation with respect to both entry and visa issuance.

In the two cases before the Supreme Court, appellate courts upheld the lower courts' injunctions as to section 2(c) of the Executive Order.  In *IRAP*, the Fourth Circuit held that section 2(c) "likely violates the Establishment Clause."  *IRAP*, 857 F.3d at 605.  In *Hawaii*, the Ninth Circuit held that portions of the Executive Order, including section 2(c), likely exceeded the President's authority under the INA.  *Hawaii*, 859 F.3d at 779.  The Supreme Court ordered the injunctions in *IRAP* and *Hawaii* to remain in place for parties "similarly situated to Doe, Dr. Elshikh, and Hawaii."  *Trump*, 137 S. Ct. at 2088.  The two individual plaintiffs found to be entitled to injunctive relief—Doe #1 and Dr. Elshikh—are individuals whose injuries and standing arose solely from the Executive Order's likely effect on their family members' abilities to obtain visas.  John Doe #1, one of the plaintiffs in *IRAP*, is "a lawful permanent resident of the United States" whose wife, at the time Doe #1 sought an injunction, was "currently awaiting her

consular interview" in order to *obtain a visa*.[6]  *IRAP*, 857 F.3d at 582.  Similarly, Dr. Elshikh,

one of the plaintiffs in *Hawaii*, is an American citizen who alleged that "[the Executive Order]

will prevent his mother-in-law from *obtaining a visa* to reunite with her family" in the United

States.  *Hawaii*, 859 F.3d at 762 (emphasis added).  In light of the fact that the Supreme Court

ordered that individuals "similarly situated" to Doe #1 and Dr. Elshikh, with a bona fide

relationship to the United States, were exempt from the Executive Order, it necessarily follows

that an individual without a bona fide relationship is not exempt from the Executive Order, even

with respect to visa issuance.[7]

Moreover, the Ninth and Fourth Circuits, in upholding the lower courts' injunctions,

specifically mentioned the issuance of visas.  In *Hawaii*, the Ninth Circuit found that "Plaintiffs

have shown a likelihood of success on the merits of their claim that Section 2(c) of the Order, in

*suspending the issuance of immigrant visas* and denying entry based on nationality, exceeds the

restriction of § 1152(a)(1)(A) [of the INA]."  *Hawaii*, 859 F.3d at 779 (emphasis added).  The

Fourth Circuit, although ultimately declining to decide whether the Executive Order violates the

INA, noted that "[s]ection 2(c)'s 'short pause' on entry effectively halts *the issuance of visas* for

ninety days."  *IRAP*, 857 F.3d at 583 (emphasis added).  Similarly, the lower courts drew no

distinction between entry and visa issuance when they enjoined enforcement of the Executive

---

[6] On June 24, 2017, the Supreme Court received a letter from counsel for Doe #1 indicating that his wife received an immigrant visa on or about June 22, 2017.  *See Trump*, 137 S. Ct. at 2086 n.1.  The Court found that this development "[did] not affect [its] analysis of the stay issues in [the cases before it]."  *Id.*

[7] Plaintiffs argue that the Supreme Court's decision does not impact this case, as the decision has no preclusive effect because Plaintiffs were not parties in the cases before the Court.  (Pls. Rep. at 7).  This argument is inapposite.  Two of the plaintiffs before the Supreme Court are individuals whose injuries, similar to the Plaintiffs in this case, arose from the Executive Order's effect on visa issuance.  Thus, it appears that the Supreme Court's decision also applies to the Plaintiffs in this case.

Order, finding that the Executive Order impermissibly delayed both issuance of visas and entry into the United States for individuals from the affected countries.  The Supreme Court thus considered these findings when it granted the government's applications for stays of the injunctions, and the Court's order precludes this court from determining the legality of the State Department's implementation of the Executive Order.

The court is unconvinced by Plaintiffs' argument that "no future development in the Supreme Court litigation will have an impact on this case." (Pls. Rep. at 8).  As explained above, the Supreme Court's decision to stay the injunctions appeared to consider the Executive Order's applicability to visa issuance.  Until the Supreme Court rules on the legality of the Executive Order, this court must abide by the Supreme Court's order, and therefore Plaintiffs' request for relief is denied.

**B.   The Court is Not Precluded from Granting Plaintiffs' Alternative Relief**

If the Supreme Court strikes down the Executive Order, Plaintiffs will be without a remedy, since the State Department has advised that it has reached the statutory allotment of diversity visas for FY 2017 and the September 30 statutory deadline is near. [8]  Plaintiffs therefore request that the court order the State Department to reserve any unused FY 2017 visa numbers for processing after the Supreme Court issues a decision in *Trump*.  This court has the equitable power to grant such relief, as demonstrated in *Przhebelskaya v. U.S. Bureau of Citizenship &*

---

[8] The government argued at the emergency status conference that the State Department never applied the Executive Order to Plaintiff Almaqrami's case.  The record suggests otherwise. Documents submitted by Plaintiffs show that Almaqrami received at least three emails from the State Department regarding his eligibility for a visa under the Executive Order.  (*See* ECF No. 2-5 at 9 (Email from the U.S. Consulate to Almaqrami indicating that "[u]nder the [Supreme] Court's order, a visa applicant from one of the six affected countries who does not have a credible claim of a bona fide relationship . . . in the United States . . . is ineligible for a visa."); *see also* ECF No. 30 ("Pls. Supp. Mem.") at 3).

*Immigration Servs.*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004) and *Paunescu v. Immigration and Naturalization Serv.,* 76 F. Supp. 2d 896 (N.D. Ill. 1999).

In *Przhebelskaya*, the court used its equitable authority to compel the government to "grant plaintiffs the relief to which they would have been entitled" had the government timely processed their visa and status adjustment applications, even though the statutory visa cap had been reached.  338 F. Supp. 2d at 406.  Similarly, in *Paunescu*, the court used its mandamus authority to order the government to "process [the] plaintiffs' [visa and status adjustment] applications and to grant plaintiffs all relief to which they would have been entitled had defendants processed their applications in a timely fashion."  76 F. Supp. 2d at 903.  The court ordered such relief even though the statutory deadline had passed.  *Id.*  In both cases, the courts exercised their equitable power to order the government to process visas, even though doing so would conflict with the statutory limitations on visa issuance.

The court's authority to grant such relief is clear.  As provided above, *supra* Section II.B., mandamus jurisdiction may be invoked when: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  *Fornaro,* 416 F.3d at 69.  Plaintiffs have a right to have their visa applications processed in accordance with the INA.  *See* 22 C.F.R. § 42.81(a) ("When a visa application has been properly completed and executed before a consular officer *in accordance with the provisions of INA* . . . the consular officer *must* either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law.") (emphasis added); *see also* 22 C.F.R. § 40.6 ("A visa can be refused only upon a ground specifically set out in the law or implementing regulations.").  Indeed, State Department consular officers have a clear duty to do so.  *See* 22 C.F.R. § 42.81(a).  The Supreme Court will review the Ninth Circuit's holding that the Executive Order "likely

exceeded the President's authority under the INA." *Trump*, 137 S. Ct. at 2085.  If the Court ultimately finds that the Executive Order violated the INA, Plaintiffs' right to have their applications processed in accordance with the law will have been violated by the State Department's implementation of the Executive Order.

In the court's view, granting this relief does not run afoul of the Supreme Court's stay; the court is merely ensuring that Plaintiffs will not be deprived of a remedy should the Supreme Court rule in their favor.  Moreover, there is no adequate alternative remedy available to Plaintiffs.  Absent relief from this court, Plaintiffs are foreclosed from receiving visas in FY 2017 due to the impending statutory deadline.  Defendants have made clear they will not issue visas past the end of the fiscal year or in excess of the statutory cap.  (*See generally* ECF No. 47 ("Defs. Resp. Status Rep.")).  Plaintiffs' only recourse would be to reenter the diversity visa lottery in future years, and it is statistically unlikely that Plaintiffs will win the lottery a second time, since millions enter the diversity lottery every year; Defendants concede that the "demand for [diversity] visas is high."  (Defs. Opp. at 3).

Accordingly, Defendants are ordered to (1) reserve any unused visa numbers for FY 2017 for processing following the Supreme Court's decision (should the Court rule in Plaintiffs' favor); and (2) report any unused visa numbers to the court by October 15.  In granting such relief, the court avoids both depriving other applicants of the chance to obtain a visa—in the case of FY 2017 lottery winners—and lessening other applicants' chances of obtaining a visa—in the case of FY 2018 lottery winners—while still addressing the potential irreparable harm that Plaintiffs face.

Defendants' latest filing does not convince this court to find otherwise.  (*See generally* Defs. Resp. Status Rep.).  In their response to Plaintiffs' September 22, 2017 status report,

Defendants argue that this case is moot because the State Department has reached the statutory cap. (*See id.* at 2–6). In two of the cases Defendants cite for this proposition, the courts did not reach the merits of the government's mootness argument. *See Agahi v. Tillerson*, Case No. 1:17-cv-01646 (D.D.C. Aug. 14, 2017), *voluntarily dismissed on September 20, 2017* (ECF No. 16-1); *Martens v. Duke*, Case No. 2:17-cv-00924 (D.N.M. Sept. 8, 2017), *voluntarily dismissed on* September 25, 2017. In the other two cases upon which Defendants rely, the defendants provided data that persuasively demonstrated that all visas were indeed used in a given fiscal year. *See Basova v. Ashcroft*, 383 F. Supp. 2d 390, 392 (E.D.N.Y. 2005) (holding the basis of the action moot where defendants persuasively demonstrated that "50,812 visas were issued in FY 2003"); *Law Office of Azita Mojarad v. Aguirre*, 2006 WL 785415, at *8 (D.D.C. Mar. 26, 2006) (finding that "the USCIS reached (and in fact exceeded) its statutory cap on H-1B visas"). In this case however, the State Department only claims to not have "any available visa *numbers*," (Defs. Resp. Status Rep. at 6), and therefore has not definitively shown that all *visas* have been issued for FY 2017. It is possible that not every applicant who currently has a visa number will receive a visa. (*See generally* Defs. Status Report). The *possibility* that the State Department has reached the statutory visa cap because it has already allotted all of the visa numbers does not necessarily render Plaintiffs' case moot.

Defendants also argue that the court is precluded from ordering the processing of visas after the statutory deadline. However, as discussed above, the court is permitted to grant this relief. Specifically, as shown in *Przhebelskaya* and *Paunescu*, the court may order the State Department to process visas past the statutory deadline where Plaintiffs have sought relief prior to the end of the fiscal year, as Plaintiffs have here. *See Przhebelskaya*, 338 F. Supp. 2d at 403;

*see also Paunescu*, 76 F. Supp. 2d at 903; *accord Coraggioso v. Ashcroft*, 355 F.3d 730, 734 n.8

(3d Cir. 2004), *as amended* (Jan. 29, 2004).  In *Przhebelskaya*, the court explicitly stated:

> When a district court orders the adjudication of an application for status adjustment based on the applicant's eligibility to receive a diversity visa, the Agency has an absolute duty to complete the adjudication and, if it finds that all of the application requirements are met, to issue the visa and grant the corresponding adjustment of status.  *Neither the expiration of the statutory deadline nor the fulfillment of the statutory quota extinguishes the Agency's obligation to comply with the court's order.*

*Przhebelskaya*, 338 F. Supp. 2d at 403 (emphasis added).  The statutory temporal and numerical

limitations on visa issuance do not bar this court from ordering the State Department to reserve

unused visa numbers for FY 2017 for future processing.

The court finds that the Plaintiffs have demonstrated: (1) a clear right to relief; (2) that

the State Department has a clear duty to act; and (3) that there is no other adequate remedy

available to them.  *Fornaro,* 416 F.3d at 69.  Accordingly, the court orders the State Department

to report, by October 15, the number of visa numbers returned unused for FY 2017, and to hold

those visa numbers to process Plaintiffs' visa applications in the event the Supreme Court finds

the Executive Order to be unlawful.

### i.    The Doctrine of Consular Non-Reviewability Does Not Bar Relief

Defendants argue that this court is barred from reviewing "a consular officer's decision to

deny a visa" and "the timing or pace of administrative processing" of visa applications.  (Defs.

Opp. at 20).  As Plaintiffs point out, however, the doctrine of consular non-reviewability does

not apply where the government has not made a final visa decision.  *See Nine Iraqi Allies Under*

*Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d

268, 291–92 (D.D.C. 2016) (holding that the doctrine of consular non-reviewability did not

apply where plaintiffs' visa applications were not formally refused, but were held in

"administrative processing"); *see also Patel v. Reno*, 134 F.3d 929, 932–33 (9th Cir. 1997) (affirming the granting of mandamus relief where plaintiff's application had only been "provisional[ly] refused"); *Maramjaya v. U.S. Citizenship & Immigration Servs.*, 2008 WL 9398947, at *4 (D.D.C. Mar. 26, 2008) (holding that the doctrine of consular non-reviewability did not apply where the "case ha[d] not procedurally progressed to the point where consular immunity would bar judicial review").

Based on Plaintiffs' latest status update, it does not appear that their applications have been finally refused.  Golsefid received an email on August 24 encouraging him to "send [documents to show that he has a bona fide relationship with the United States] as soon as possible before September 13, 2017."  (ECF No. 45-1 at 17).   On August 15, Zadeh received notification that "the administrative processing on [his] file has been completed," but that he needed to submit additional documents, including documents demonstrating a bona fide relationship with the United States.  (ECF No. 45-2 at 7–8).  Alsakkaf received a form from the State Department indicating that he had been determined ineligible for a visa due to the Executive Order, and instructing him to send information demonstrating "a relationship that would qualify [him] for a visa issuance."  (ECF No. 45-3 at 6–7).  On September 15, Almaqrami did receive a letter indicating that the State Department would "not be able to issue [him] a visa." (ECF No. 45-4 at 2–4).  However, at the emergency status conference on September 19, Defendants' counsel maintained that Almaqrami *may* not receive a visa because of the 50,000 visa-statutory cap.  Counsel did not indicate that he would definitely not receive a visa (although it admittedly appears unlikely), therefore it appears that Almaqrami's visa application is pending as well.  Moreover, the September 22, 2017 Declaration of Chloe Dybdahl, an attorney adviser in the Legal Affairs, Advisory Opinions Division of the Visa Office, Bureau of Consular Affairs,

does not definitively indicate that Plaintiffs' applications have been finally refused.  (*See generally* ECF No. 47-1).  The State Department's most recent communications with Plaintiffs, coupled with its representations to the court, strongly suggest that Plaintiffs' visa applications have not been finally refused.

Even if Plaintiffs' applications have been finally refused, the doctrine of consular non-reviewability does not apply because Plaintiffs challenge the State Department's policy, not the discretion of a specific consular officer in applying the policy.  *See e.g.*, *Patel*, 134 F.3d at 931–32 ("However, when the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists."); *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985) (holding that the court had jurisdiction where appellants "charge that the general Operations Instruction promulgated by the INS violates [the INA]").  Here, Plaintiffs do not contest a specific consular officer's decision to deny a specific applicant a visa based on the Executive Order.  Instead, Plaintiffs challenge the legality of the State Department's policy of applying the Executive Order to the issuance of diversity visas, and thus the doctrine of consular non-reviewability bars neither their claims nor the relief they seek.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction and emergency mandamus relief is GRANTED in part and DENIED in part.

A corresponding order will issue separately.

Date:  September 29, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

17