# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| P.K., *et al.*, | ) | |
| on behalf of themselves and all | ) | |
| others similarly situated, | ) | Civil Action No. 1:17-cv-01533-TSC |
|  | ) | |
| Plaintiffs/Petitioners, | ) | |
| v. | ) | |
|  | ) | |
| REX W. TILLERSON, *et al.*, | ) | |
| Defendants/Respondents. | ) | |

## MEMORANDUM IN OPPOSITION
## TO MOTION TO DISMISS

Samer E. Khalaf
Abed A. Ayoub
Yolanda Rondon
AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
1705 DeSales Street, N.W., Suite 500
Washington, D.C. 20036
Tel: 202-244-2990
Skhalaf@adc.org

Karen C. Tumlin
Esther Sung
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Blvd, Suite 1600
Los Angeles, CA 90010
(213) 639-3900
tumlin@nilc.org

Justin B. Cox
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
(678) 279-5441
cox@nilc.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
  OF THE DISTRICT OF COLUMBIA
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
(202) 457-0800
aspitzer@acludc.org

Matthew E. Price  (DC Bar #996158)
Max J. Minzner (pro hac vice)
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Tel. 202-639-6000
Fax: 202-639-6066
mprice@jenner.com
mminzner@jenner.com

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
ojadwat@aclu.org

Cody H. Wofsy
Spencer E. Amdur
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
cwofsy@aclu.org
samdur@aclu.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................ 2

    A.    The Diversity Visa Program. ................................................... 2

    B.    Defendants' Unlawful Policy. .................................................. 3

    C.    Plaintiffs' Lawsuit And The Preliminary Injunction. ............. 5

    D.    Recent Developments. .............................................................. 6

ARGUMENT ...................................................................................................... 7

I.    This Case Presents A Live Controversy Because Plaintiffs Continue To Seek Relief That This Court Can Provide. .................................................................. 7

    A.    The End of Fiscal Year 2017 Does Not Moot This Case Or Bar Plaintiffs From Obtaining Relief. ......................................... 7

        1.    Defendants' Argument Confuses Mootness With The Merits. ................... 8

        2.    Ordering Relief After The End Of The Fiscal Year Is Both Permissible And Proper In This Case. ................... 9

        3.    The Precedents And "Venerable Principles" Cited By Defendants Do Not Bar Relief Here. ......................... 12

        4.    The Supreme Court's Failure To Reach The Merits In Trump Does Not Affect The Force Of This Court's September Order. ........................ 16

        5.    The Court May Enter Any Necessary Order Nunc Pro Tunc. ................... 18

    B.    The Expiration of EO-2 Does Not Moot This Case. ............... 19

    C.    Plaintiffs Retain A Live Stake In This Case Notwithstanding EO-3. ................... 20

        1.    Plaintiffs Are Exempt From EO-3 Because They Will Be Entitled To The Issuance Of Visas Nunc Pro Tunc. ................... 20

        2.    Plaintiffs Would Retain A Live Stake In This Case Even If They Were Not Exempt From EO-3. ................... 23

II.    The Doctrine of Consular Nonreviewability Does Not Apply. ......................... 25

i

A.  The Court Should Not Revisit Its Prior Rulings. ....................................................25

B.  Consular Nonreviewability Does Not Apply Because Plaintiffs' Visa Applications Still Have Not Been Adjudicated On The Merits............................26

   1.  Consular Nonreviewability Does Not Apply When No Consular Decision Has Been Rendered.....................................................26

   2.  No Consular Decision Has Been Rendered In Plaintiffs' Cases...............27

C.  Consular Nonreviewability Does Not Apply Because Plaintiffs Challenge A General Administrative Policy, Not An Exercise Of Discretion. ....................28

III.  Plaintiffs Have A Cause Of Action Under Both The APA And The Mandamus Act...........................................................................................................................30

A.  Plaintiffs Have An APA Cause Of Action Under § 706(2). ................................30

B.  Plaintiffs Have Satisfied The Conditions For Mandamus Relief As Well. ..........33

IV.  Defendants' Policy Of Refusing To Process Plaintiffs' Visa Applications Is Unlawful. .................................................................................................................34

A.  The Government May Refuse a Visa Only Upon a Ground Set Forth in the Governing Law and Regulations. ..........................................................................35

B.  Defendants' Policy Bars Issuance Of Visas Based On An Impermissible Ground. ...................................................................................................................36

C.  Defendants' Defense Of Their Policy Fails. .........................................................37

   1.  Section 1182(f) Does Not Make Covered Individuals Ineligible For Visas...............................................................................................38

   2.  In Any Event, EO-2 Does Not Order Defendants To Suspend Visa Issuance...........................................................................................41

CONCLUSION.......................................................................................................................43

# TABLE OF AUTHORITIES*

*Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017)...........................................41

*Ahmed v. DHS*, 328 F.3d 383 (7th Cir. 2003)...........................................................................9, 12

*Alliance To Save Mattaponi v. Army Corps of Engineers*, 515 F. Supp. 2d 1
    (D.D.C. 2007) ..........................................................................................................................31, 32

*American Hospital Ass'n v. Price*, 867 F.3d 160 (D.C. Cir. 2017) ...............................................15

*Antone v. Block*, 661 F.2d 230 (D.C. Cir. 1981)............................................................................15

*Assassination Archives & Research Center v. CIA*, 48 F. Supp. 2d 1 (D.D.C.
    1999) ...............................................................................................................................................25

*Beshir v. Holder*, 10 F. Supp. 3d 165 (D.D.C. 2014) ....................................................................33

*Carrillo-Gonzalez v. INS*, 353 F.3d 1077 (9th Cir. 2003) ...............................................................9

*Castaneda-Gonzalez v. INS*, 564 F.2d 417 (D.C. Cir. 1977).........................................................40

*\*Chafin v. Chafin*, 568 U.S. 165 (2013) ..............................................................................8, 9, 23

*Chun v. Powell*, 223 F. Supp. 2d 204 (D.D.C. 2002) ....................................................................30

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821)......................................................................16

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ...................................................................................15

*Coraggioso v. Ashcroft*, 355 F.3d 730 (3d Cir. 2004) ..............................................................9, 12

*Corley v. United States*, 556 U.S. 303 (2009)........................................................................39, 40

*Crystal Clear Communications, Inc. v. Southwestern Bell Telephone Co.*, 415
    F.3d 1171 (10th Cir. 2005) ..........................................................................................................17

*Delta Data Systems Corp. v. Webster*, 744 F.2d 197 (D.C. Cir. 1984) ....................................22, 23

*Edwards v. INS*, 393 F.3d 299 (2d Cir. 2004) ..............................................................................23

*\*Ethyl Corp. v. Browner*, 67 F.3d 941 (D.C. Cir. 1995).........................................................18, 22

*Floersheim v. Engman*, 494 F.2d 949 (D.C. Cir. 1973)................................................................18

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016)........................................... 31

*Garcia v. Baker*, 765 F. Supp. 426 (N.D. Ill. 1990) ........................................................................30

*Hawaii v. Trump*, No. 17-50, _ F. Supp. 3d _, 2017 WL 4639560 (D. Haw. Oct. 17, 2017), *appeal docketed*, No. 17-17168 (9th Cir. Oct. 24, 2017) ........................................24

*Herbert v. Architect of Capitol*, 920 F. Supp. 2d 33 (D.D.C. 2013)...........................................29

*Hi-Tech Pharmacal Co. v. U.S. FDA*, 587 F. Supp. 2d 1 (D.D.C. 2008) .....................................32

*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017)......................................................21

**Iddir v. INS*, 301 F.3d 492 (7th Cir. 2002).................................................................................3

*In re Thornburgh*, 869 F.2d 1503 (D.C. Cir. 1989) ......................................................................14

*INS v. Pangilinan*, 486 U.S. 875 (1988) ................................................................................14, 15

**International Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985) ......................................................................................................................28

*IRAP v. Trump*, No. 17-361, _ F. Supp. 3d _, 2017 WL 4674314 (D. Md. Oct. 17, 2017), *appeal docketed*, No. 17-2231 (4th Cir. Oct. 20, 2017) ................................................24

*Kaufman v. Mukasey*, 524 F.3d 1334 (D.C. Cir. 2008) ...............................................................33

**Keli v. Rice*, 571 F. Supp. 2d 127 (D.D.C. 2008) ......................................................................13

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)...............................................................................28

*Knox v. SEIU*, 567 U.S. 298 (2012)..............................................................................................23

*Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50 (2004) ....................................................39

*Kremens v. Bartley*, 431 U.S. 119 (1977) ....................................................................................20

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996).............................................................25, 26

*Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) ......................................29

*Lemon v. Kurtzman*, 411 U.S. 192 (1973) ...................................................................................16

*Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990) .................................................................7

*Malyutin v. Rice*, 677 F. Supp. 2d 43 (D.D.C. 2009), *aff'd*, No. 10-5015, 2010 WL 2710451 (DC Cir. July 6, 2010)..............................................................................................30

*Mansur v. Albright*, 130 F. Supp. 2d 59 (D.D.C. 2001) ....................................................30

*Maramjaya v. USCIS*, No. Civ. A. 06-2158, 2008 WL 9398947 (D.D.C. Mar. 26, 2008) ..................................................................................................................................27

*Maxcell Telecom Plus, Inc. v. FCC*, 815 F.2d 1551 (D.C. Cir. 1987)...........................23

*McElroy Electronics Corp. v. FCC*, 990 F.2d 1351 (D.C. Cir. 1993)............................23

*Miller v. Christopher*, 96 F.3d 1467 (D.C. Cir. 1996), *judgment aff'd sub nom.*
*Miller v. Albright*, 523 U.S. 420 (1998).....................................................................8

*Mitchell v. Overman*, 103 U.S. 62 (1880)......................................................................18

*Mulligan v. Schultz*, 848 F.2d 655 (5th Cir. 1988) ........................................................29

*Mwasaru v. Napolitano*, 619 F.3d 545 (6th Cir. 2010)....................................................9

*Natonal Association of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d
1272 (D.C. Cir. 2005) ...............................................................................................31, 33

*New York v. Cathedral Academy*, 434 U.S. 125 (1977) .................................................13

*\*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the*
*United States v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016) ......................................26, 27, 33

*\*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ......................30, 31

*\*NRLB v. SW General, Inc.*, 137 S. Ct. 929 (2017)........................................................39

*Nyaga v. Ashcroft*, 323 F.3d 906 (11th Cir. 2003)......................................................9, 13

*Office of Consumers' Counsel v. FERC*, 826 F.2d 1136 (D.C. Cir. 1987)....................23

*Orlov v. Howard*, 523 F. Supp. 2d 30 (D.D.C. 2007)....................................................33

*Pasternack v. NTSB*, 596 F.3d 836 (D.C. Cir. 2010)....................................................19

*\*Patel v. Reno*, 134 F.3d 929 (9th Cir. 1997) ...........................................27, 29, 33, 34

*\*Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999)..........................................10, 23

*Powell v. McCormack*, 395 U.S. 486 (1969) ...............................................................8, 9

*\*Przhebelskaya v. USCIS*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004) ...............................10

*Rees v. City of Watertown*, 86 U.S. (19 Wall.) 107 (1873)............................................16

*Rust v. Sullivan*, 500 U.S. 173 (1991)...........................................................................43

*Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999) ........................................................26

*Saleh v. Holder*, 84 F. Supp. 3d 135 (E.D.N.Y. 2014) ................................................................29

*Salzer v. FCC*, 778 F.2d 869 (D.C. Cir. 1985) ............................................................................22

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ................................................................................20

*Trump v. Hawaii*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017) ...........................6, 7, 17

*Trump v. IRAP*, 137 S. Ct. 2080 (2017) ................................................................................3, 5, 12

*Trump v. IRAP*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017) ......................................7

*Valentini v. Shinseki*, 860 F. Supp. 2d 1079 (C.D. Cal. 2012) .....................................................31

*Van Ravenswaay v. Napolitano*, 613 F. Supp. 2d 1 (D.D.C. 2009) .............................................29

*Zhang v. USCIS*, No. 05 Civ. 4086, 2005 WL 3046440 (S.D.N.Y. Nov. 8, 2005) .....................29

**STATUTES**

5 U.S.C. § 551(13) ........................................................................................................................32

5 U.S.C. § 706(2) ..........................................................................................................................30

5 U.S.C. § 706(2)(A) .................................................................................................16, 31, 33, 37

8 U.S.C. § 1152(a)(1)(A) ..............................................................................................................37

8 U.S.C. § 1153(c)(2) ...................................................................................................................35

8 U.S.C. § 1154(a)(1)(I)(ii)(II) ......................................................................................................7

8 U.S.C. § 1182 ......................................................................................................................36, 38

8 U.S.C. § 1182(a)(1) ...................................................................................................................36

8 U.S.C. § 1182(a)(2) ...................................................................................................................36

8 U.S.C. § 1182(a)(3)(C)(i) ..........................................................................................................41

8 U.S.C. § 1182(a)(4)(B)(i) ..........................................................................................................39

8 U.S.C. § 1182(a)(7) ...................................................................................................................36

8 U.S.C. § 1182(f) .........................................................................................................................41

8 U.S.C. § 1182(*l*)(1) ...................................................................................................................41

8 U.S.C. § 1201(c)(1) ........................................................................................................3

8 U.S.C. § 1201(g) ..............................................................................................36, 38, 41

28 U.S.C. § 1361 .............................................................................................................16

**OTHER AUTHORITIES**

22 C.F.R § 40.6 .........................................................................................................35, 37

22 C.F.R § 42.81(a) ...................................................................................................35, 36

4A Op. O.L.C. 133, 140 (1979) .....................................................................................43

Additional Requirements in the Case of Certain Nonimmigrant Aliens, 45 Fed.
    Reg. 24,436 (Apr. 9, 1980) .....................................................................................43

Bureau of Consular Affairs, *Alert: Court Order on Presidential Proclamation on*
    *Visas* (Oct. 10, 2017) ..............................................................................................24

Helene Cooper, *Chad's Inclusion in Travel Ban Could Jeopardize American*
    *Interests, Officials Say*, N.Y. Times (Sept. 26, 2017),
    https://www.nytimes.com/2017/09/26/world/africa/chad-travel-ban-american-
    interests.html ...........................................................................................................24

Executive Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979) ..............................42

Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017) ....................3, 42, 43

Executive Order No. 13,769, 82 Fed Reg. 8977 (Jan. 27, 2017) ..............................3, 43

Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 24, 2017) ...............................19, 20

1 Joseph Story, *Commentaries on Equity Jurisprudence* (W.H. Lyon Jr. ed., 14th
    ed. 1918) ....................................................................................................................16

Suspension of Privilege to Transport Aliens to the United States, 63 Fed. Reg.
    56,869 (Oct. 23, 1998) .............................................................................................41

U.S. Dep't of State, *Visa Bulletin for July 2016* (June 9, 2016),
    https://tinyurl.com/zcxsuay ........................................................................................3

## INTRODUCTION

Plaintiffs literally won the lottery when they were selected to apply for immigrant visas and, if legally eligible, move their families to the United States.  In the wake of the President's suspension of *entry* from Plaintiffs' home countries, however, the Defendant officials adopted an unlawful policy of refusing to process Plaintiffs' *visa* applications under the applicable legal standards.  Plaintiffs brought suit, arguing that this policy violated the governing statutes and regulations and that it had no foundation in the President's order.  This Court declined to immediately compel Defendants to process Plaintiffs' visa applications, reasoning that such an intervention would intrude on a field that the Supreme Court had, for the moment, occupied.  But the Court ordered Defendants to hold visa numbers available for Plaintiffs, even after the end of the Fiscal Year, so that Plaintiffs could obtain relief if their view of the law prevails.  Now that the Supreme Court has left the field, the Court should deny Defendants' motion to dismiss; resolve Plaintiffs' claims on the merits; and ensure that Plaintiffs obtain the visa numbers held in reserve for them.

First, this case is plainly not moot.  Plaintiffs want Defendants to process their visa applications under the merits-based criteria—without regard to their nationalities, and without regard to the fiscal-year deadline already addressed by this Court's preliminary injunction.  Defendants refuse to do that.  That means the dispute is still live.  Furthermore, for the reasons already given in this Court's September opinion, the end of Fiscal Year 2017 is no impediment to reaching the merits here.  Neither is the expiration of the relevant Executive Order—which, if relevant at all, only eliminates the legal theory Defendants have so far used to justify their refusal to process Plaintiffs' applications.

Defendants' other justiciability arguments fare no better. This Court has already ruled that consular nonreviewability does not apply in this case; Defendants do not engage with the grounds for that holding or offer any persuasive reason to revisit it. And Defendants' arguments that Plaintiffs lack a cause of action under the Administrative Procedure Act and the Mandamus Act both misunderstand the statutory standards and misapply them to this case.

After clearing away all of this debris, the Court should hold that Plaintiffs have stated a valid claim for relief on the merits. That conclusion requires only three steps. First, as this Court held in September, Defendants may refuse to issue a visa only by invoking a ground identified in the applicable body of law. Second, nationality is not such a valid ground. Third, it does Defendants no good to recast their policy as resting on 'the fact that Plaintiffs are suspended from entry'—rather than the fact of their nationalities—because entry-suspension is also not a permissible ground for denying visas, and EO-2 does not even instruct Defendants to deny visas.

In sum, Defendants' policy of refusing to process Plaintiffs' visa applications on their merits contravenes the Immigration and Nationality Act (INA) and breaches a clear duty owed to Plaintiffs. If the Court denies Defendants' motion to dismiss, Plaintiffs will promptly move for summary judgment to ensure that their visa applications are lawfully processed as soon as possible.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Diversity Visa Program.

Congress created the diversity visa program to allow for more immigration from countries with traditionally low rates of migration to the United States. Under this program, the Attorney General is required to identify countries and regions with low rates of admission and allocate a certain number of immigrant visas at random among applicants from those places.

*Iddir v. INS*, 301 F.3d 492, 494 (7th Cir. 2002).  The sheer number of applicants makes the process intensely competitive.  For Fiscal Year 2017, more than 19.3 million people entered the lottery, and 83,910 of them were selected to apply for a visa—a success rate of a half of one percent.[1]  Once selected in the lottery, applicants finalize their applications and complete the screening process, the interview and other procedural steps.  During this period, the State Department periodically allocates and re-allocates "visa numbers" (representing a potential visa) to applicants in an effort to ensure an approximate yield of 50,000 actual visas issued at the end of the process.[2]  Eligible applicants whose cases are processed by the end of the fiscal year (September 30) receive visas that allow them to immigrate and become lawful permanent residents.  Once issued, the visa is generally valid for six months. *See* 8 U.S.C. § 1201(c)(1).

> **B.  Defendants' Unlawful Policy.**

The policy at issue in this case arose in the wake of Executive Order 13,780 ("EO-2"), 82 Fed. Reg. 13,209 (Mar. 6, 2017), issued by President Trump on March 9, 2017.  Section 2(c) of that Order suspended entries into the United States by nationals of six countries—Iran, Libya, Somalia, Sudan, Syria, and Yemen—for ninety days.[3]  Although Section 2(c) of EO-2 was initially enjoined by multiple courts, the Supreme Court stayed those injunctions in part on June 26, 2017—allowing EO-2's entry ban to go into effect with respect to many people, including Plaintiffs.  *See Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017).

---

[1] U.S. Dep't of State, *Visa Bulletin for July 2016* (June 9, 2016), https://tinyurl.com/zcxsuay.
[2] Defendants do not, however, enforce a strict cap of 50,000 visas.  Rather, like a school that must estimate how many offers of admission to make, they sometimes produce a cohort larger than intended.  *See* ECF No. 45 at 4 (setting out government statistics for recent years).
[3] EO-2 is a modified version of Executive Order 13,769, issued January 27, 2017, which was challenged and enjoined almost immediately. *See Trump v. IRAP*, 137 S. Ct. 2080, 2083 (2017). The United States abandoned that litigation, revoked the prior order, and issued EO-2 as a replacement.

Defendants then adopted the policy at issue here, casting it as a means of implementing

the newly-effective EO-2.  On June 28, 2017, the State Department issued a cable to all consular

posts outlining new visa issuance procedures.  *See* ECF No. 2-2.  With respect to diversity visas,

the cable instructs as follows:

> 8. (SBU) For Diversity Visa (DV) applicants already scheduled for interviews
> falling after the E.O. implementation date of 8:00 p.m. EDT June 29, 2017, post
> should interview the applicants.  Posts should interview applicants following
> these procedures:
>
> > a.) *Officers should first determine whether the applicant is eligible for the
> > DV, without regard to the E.O.*  If the applicant is not eligible, the
> > application should be refused according to standard procedures.
> >
> > b.) *If an applicant is found otherwise eligible, the consular officer will need
> > to determine during the interview whether the applicant is exempt from the
> > E.O.'s suspension of entry provision* (see paragraphs 10-13), and if not,
> > whether the applicant qualifies for a waiver (paragraphs 14 and 15).
> >
> > c.) *DV applicants who are not exempt from the E.O.'s suspension of entry
> > provision and who do not qualify for a waiver should be refused* 221(g) and
> > the consular officer should request an advisory opinion from VO/L/A
> > following current guidance in 9 FAM 304.3-1.
>
> Based on the Department's experience with the DV program, we anticipate that
> very few DV applicants are likely to be exempt from the E.O.'s suspension of
> entry or to qualify for a waiver.  [Consular Affairs] will notify DV applicants
> from the affected nationalities with scheduled interviews of the additional criteria
> to allow the potential applicants to determine whether they wish to pursue their
> application.
>
> 9.  (SBU) The Kentucky Consular Center (KCC) will continue to schedule
> additional DV-2017 appointments for cases in which the principal applicant is
> from one of these six nationalities.  While the Department is mindful of the
> requirement to issue Diversity Visas prior to the end of the Fiscal
> Year on September 30, direction and guidance to resume normal processing of
> visas following the 90-day suspension will be sent [in a separate cable].

*Id.*  This policy establishes a special procedure for issuing visas to diversity-applicants whose

countries of origin are subject to entry suspension under EO-2.  Under that procedure,

Defendants first determine whether such a diversity-visa applicant is "otherwise eligible," setting

4

EO-2 aside.  *Id.*  But even if the applicant *is* otherwise eligible, she is then "refused" a visa unless and until she can establish that EO-2 does not bar her entry.  *Id.*  Thus, anyone who is subject to EO-2's entry ban is categorically barred from obtaining a visa.

### C.    Plaintiffs' Lawsuit And The Preliminary Injunction.

Plaintiffs are four nationals of Iran and Yemen who won the diversity-visa lottery for Fiscal Year 2017, together with their immediate family members.[4]  All promptly submitted their visa applications and completed their consular interviews.  *See* ECF No. 49 ("PI Op.") at 5.  But, pursuant to the policy described above, each was treated as ineligible for a visa—without respect to the merits of their applications or the statutory and regulatory criteria.  Fearing that their applications would not be processed on the merits before the end of the Fiscal Year, when their eligibility would ordinarily expire, Plaintiffs brought suit on August 3, 2017.[5]  Plaintiffs moved for class certification and sought a preliminary injunction that same day.  *See* ECF Nos. 2, 3.  The operative complaint asks the Court to, among other things, issue a writ of mandamus compelling Defendants to process their visa applications notwithstanding the challenged policy; enjoin Defendants from implementing that policy; and enjoin Defendants to "place Plaintiffs in the same position they would have been but for the government's illegal conduct."  ECF No. 46 ("Am. Compl.") at 17-18.

On September 29, 2017, this Court granted Plaintiffs' preliminary injunction motion in part and denied it in part.  Because the Supreme Court's stay order in *Trump v. IRAP*, 137 S. Ct. 2080 (2017), remained in effect, the Court found it inappropriate to address the merits of this

---

[4] Mr. Almaqrami and Mr. Alsakkaf are from Yemen, and Mr. Golsefid and Mr. Zadeh are from Iran.  *See* PI Op. 5.
[5] Mr. Almaqrami was an original plaintiff, alongside others who have since voluntarily dismissed their claims.  The other three plaintiffs joined the suit on September 22, 2017.  *See* PI Op. 5 n.5.

case and compel Defendants to process Plaintiffs' visa applications. *See* PI Op. 11. Instead, the

Court "grant[ed] the alternative relief Plaintiffs request[ed] and order[ed] the State Department to

reserve any unused visa numbers until after the Supreme Court's ultimate decision in *Trump*."

*Id.* at 8; *see also id.* at 15 (directing Defendants to "hold those visa numbers to process Plaintiffs'

visa applications in the event the Supreme Court finds the Executive Order to be unlawful").

This remedy, the Court explained, would "address[] the potential irreparable harm that Plaintiffs

face." *Id.* at 13. It did so by ensuring that if Plaintiffs' legal claims are vindicated, neither the

end of the Fiscal Year, nor an argument that available visa numbers have been exhausted, would

prevent them from immigrating to this country. *See id.* at 15. The Court also ordered

Defendants to report the number of unused visa numbers for Fiscal Year 2017 by October 15,

two weeks after the end of the fiscal year. *See id.*

### D.    Recent Developments.

On October 15, 2017, Defendants reported that 27,241 visa numbers had been returned

unused, and that they had issued 49,976 visas for Fiscal Year 2017—confirming that, by any

measure, an adequate number of visas remain available for the Fiscal Year 2017 program. *See*

ECF No. 52-1 ¶ 5.[6] On October 20, Defendants filed their motion to dismiss.

On October 24, 2017 (ten days ago), the Supreme Court held that both of the provisions

of EO-2 at issue in the cases pending before it had "expired by their own terms." *Trump v.*

*Hawaii*, No. 16-1540, 2017 WL 4782860, at *1 (U.S. Oct. 24, 2017). The Court therefore

vacated the lower courts' orders enjoining those provisions and remanded for them to dismiss the

---

[6] Defendants had represented on September 23 that they were "out of available diversity-visa
numbers" because they had "been allocated up to the statutory maximum of 50,000," and that
this case was therefore "moot." ECF No. 47 at 1-2.

cases as moot.  *Id.*; *see also Trump v. IRAP*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017) (same as to one of the two challenged sections).

## ARGUMENT

I.    **This Case Presents A Live Controversy Because Plaintiffs Continue To Seek Relief That This Court Can Provide.**

A case is not moot if the plaintiffs "continue to have a 'personal stake in the outcome.'" *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 478 (1990) (citation omitted).  Plaintiffs have a profound personal stake in this case: They want Defendants to process their visa applications on the merits, making real their once-in-a-lifetime chance to become Americans.  Defendants steadfastly refuse to do so.  That is the definition of a "live" dispute, foreclosing any claim of mootness.

Defendants nonetheless assert that the passing of the Fiscal Year and the expiration of EO-2 each moot this case—because each, they say, makes it impossible for this Court to grant effective relief.  They are wrong on both counts.

A.    **The End of Fiscal Year 2017 Does Not Moot This Case Or Bar Plaintiffs From Obtaining Relief.**

Defendants' principal mootness argument rests on 8 U.S.C. § 1154(a)(1)(I)(ii)(II) (hereinafter "subclause (II)"), which specifies that lottery-winners are "eligible" to receive diversity visas "only through the end of the specific fiscal year for which they were selected."  But Defendants' argument about subclause (II) confuses mootness, a question of jurisdiction, with the legal merits of Plaintiffs' claims to relief.  As explained below, subclause (II) does not sap the parties' dispute of practical consequence, so it cannot moot the case.  And rightly understood—as an argument about the merits of Plaintiffs' claims—Defendants' subclause (II) argument simply fails.

### 1.    Defendants' Argument Confuses Mootness With The Merits.

Defendants' central argument is that, because Plaintiffs' statutory "eligib[ility]" under subclause (II) is limited to Fiscal Year 2017, this Court lacks legal authority to order relief now. *See* ECF No. 53-1 ("Mot.") at 8-10.  But, first, that is not a mootness argument.  Mootness, like standing, concerns "whether a plaintiff's injury would be likely to be redressed *if the requested relief were granted.*"  *Miller v. Christopher*, 96 F.3d 1467, 1470 (D.C. Cir. 1996), *judgment aff'd sub nom. Miller v. Albright*, 523 U.S. 420 (1998).  Defendants are not claiming that the relief Plaintiffs have sought from this Court would do Plaintiffs no good—nor could they claim that.  Rather, Defendants are simply making a legal argument about the scope of this Court's equitable authority and how it should be exercised in light of subclause (II).  That question has nothing to do with mootness or jurisdiction.

The Supreme Court has underscored this point repeatedly, most recently in *Chafin v. Chafin*, 568 U.S. 165 (2013).  In *Chafin*, a father sought a court order, pursuant to the Child Abduction Convention, "re-returning" his child to the United States (after she had been "returned" to Scotland).  As the Court explained, the mother "argue[d] that th[e] case [was] moot because the District Court *lacks the authority* to issue a re-return order either under the Convention or pursuant to its inherent equitable powers."  *Id.* at 174 (emphasis added). The Court continued: "But that argument—which goes to the meaning of the Convention and the legal availability of a certain kind of relief—confuses mootness with the merits."  *Id*.  As long as an order in the father's favor could benefit him, and as long as the father's claim was not "so implausible that it is insufficient to preserve jurisdiction," the case was not moot.  *Id.*

*Powell v. McCormack*, 395 U.S. 486 (1969), stands for the same proposition.  *See Chafin*, 568 U.S. at 174.  In *Powell*, the plaintiff's only surviving claim sought backpay, and the

defendants argued that he had brought that claim in the wrong court—meaning that, according to the defendants, the court had no authority to grant him any relief.  395 U.S. at 500.  But there, too, the Supreme Court rejected the defendants' claim that this state of affairs mooted the case, explaining that defendants' argument "confuse[d] mootness with whether [the plaintiff] has established a right to recover."  *Id.*

The same analysis holds here.  Whether this Court can properly order the relief Plaintiffs seek, in light of subclause (II), is a pure merits question concerning "equitable principles" and the "legal availability of a certain kind of relief" under the circumstances.  *Chafin*, 568 U.S. at 174.  It does not affect whether Plaintiffs would benefit from such an order, so it has no bearing on mootness or the Court's jurisdiction.

Defendants cite three circuit cases holding a dispute moot based on subclause (II).  *See* Mot. 8-9.  None explains how its analysis is consistent with *Powell* and *Chafin*, however, and two of the three are distinguishable.  *See Nyaga v. Ashcroft*, 323 F.3d 906, 913 (11th Cir. 2003) (finding diversity-visa claim moot because it was "merely a means" to obtaining a discretionary adjustment of status for which plaintiff had become ineligible); *Mwasaru v. Napolitano*, 619 F.3d 545, 547 (6th Cir. 2010) (also involving adjustment of status).  On the other side of the ledger, three circuits have correctly recognized that subclause (II) raises merits issues, not mootness ones.  *See Ahmed v. DHS*, 328 F.3d 383, 388-89 (7th Cir. 2003); *Coraggioso v. Ashcroft*, 355 F.3d 730 (3d Cir. 2004); *Carrillo-Gonzalez v. INS*, 353 F.3d 1077 (9th Cir. 2003).

### 2.  Ordering Relief After The End Of The Fiscal Year Is Both Permissible And Proper In This Case.

Rightly understood, Defendants' argument is simply that subclause (II) makes relief in this case legally unwarranted.  Even if they broke the law by refusing to process Plaintiffs' applications, Defendants say, the Court should afford no remedy because they sat on the

9

applications through the end of Fiscal Year 2017—which is to say, because they got away with it.  Unsurprisingly, courts have rebuffed such efforts to convert the wrong itself into a reason it cannot be remedied.  They have consistently held—as this Court did—that they "may order the State Department to process visas past the statutory deadline where Plaintiffs have sought relief prior to the end of the fiscal year, as Plaintiffs have here."  PI Op. 14-15 (citing, inter alia, *Przhebelskaya v. USCIS*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004), and *Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999)).

That rule is eminently fair and rooted in settled legal principles.  As this Court previously explained, *Przhebelskaya* and *Paunescu* provide the most relevant guidance here.  In those cases, as in this one, the lottery-winners conscientiously sought judicial relief *before* the end of the Fiscal Year, and thus in their capacity as eligible visa recipients.  And in *Przhebelskaya* and *Paunescu*, as in this case, the courts granted injunctive relief to the plaintiffs *before* the end of the Fiscal Year.  *See Przhebelskaya*, 338 F. Supp. 2d at 402; *Paunescu*, 76 F. Supp. 2d at 898. Having laid those predicates, both courts recognized their power to make their orders effective by compelling adjudication after the end of the Fiscal Year, "even though doing so would conflict with the statutory limitations on visa issuance."  PI Op. 12; *see id.* at 15 ("*Neither the expiration of the statutory deadline nor the fulfillment of the statutory quota extinguishes the Agency's obligation to comply with the court's order.*" (quoting *Przhebelskaya*, 338 F. Supp. 2d at 403 (emphasis added by this Court))).

This Court's September 29 order is, for all relevant purposes, the same as the predicate orders in *Przhebelskaya* and *Paunescu*.  As the Court explained at that time, the point of preliminary relief is "to preserve the relative positions of the parties until a trial on the merits can be held."  PI Op. 8 (quoting *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 235 (D.D.C.

10

2014)).  The Court's order did that by laying a foundation for later adjudication of the Plaintiffs'

visa applications, if appropriate, even after the end of the Fiscal Year.  *See id.* at 13 (explaining

that the order "address[ed] the potential irreparable harm that Plaintiffs face" through the

imminent lapsing of their eligibility).  Defendants now contend that subclause (II) bars any post-

deadline relief, notwithstanding the Court's order.  But if Defendants were right about that, the

order would *not* have frozen the status quo, as the Court intended; indeed, the order would have

had no effect at all.  The Court should not accept a theory that renders its own order a month ago

pointless.[7]

That the Court ordered Defendants to hold visa numbers in reserve for future processing,

rather than to adjudicate Plaintiffs' applications immediately, makes no difference.  *Contra* Mot.

12-14.  The Court reasonably crafted that equitable relief to accommodate the pendency of the

*Trump* litigation in the Supreme Court.  As the Court explained, the Supreme Court had already

decided how EO-2 could and could not be implemented "pending [the Supreme Court's]

consideration" of the *Trump* cases—including "with respect to … visa issuance."  PI Op. 9.  The

Court therefore concluded that addressing the merits of Plaintiffs' claims in September (and

ordering the processing of visas if appropriate) would trench on a field that the Supreme Court

had, for the moment, occupied.  *See id.* at 8.  Thus, in deference to the Supreme Court, this Court

stayed its hand with respect to ordering actual visa processing, and instead "order[ed] the State

Department to reserve any unused visa numbers until after the Supreme Court's ultimate

---

[7] As explained below, the parties disagree as to whether the Court's order was conditioned on a
merits victory by the *Trump* plaintiffs.  *Infra*, at 16.  But it is important to appreciate that, under
the Government's theory of *Przhebelskaya* and *Paunescu*, that condition is beside the point.
Their theory is that there can be no post-deadline relief unless a court "*compel[s] adjudication
… within the fiscal year.*"  Mot. 13 (emphasis added by Defendants); *see id.* at 17.  And under
that theory, this Court's September 29 order was a dead letter, lacking any possible legal effect.

decision in *Trump*." PI Op. 8. In so doing, the Court "mold[ed] its decree to meet the exigencies of the particular case." *Trump v. IRAP*, 137 S. Ct. at 2087. But Defendants are in no position to complain about that calculated departure from the *Przhebelskaya*/*Paunescu* template. After all, it only *benefited* them, by sparing them the prospect of issuing visas that might have turned out to have been legally unjustified if they won in the Supreme Court (and if the Court addressed visa issuance in its opinion). This Court's restraint and its efforts to accommodate Defendants should not bar the resolution of Plaintiffs' claims on the merits now that the Supreme Court has left the field.

Put otherwise, if Defendants are right that *Przhebelskaya* and *Paunescu* stand for "[a] court's inherent authority to vindicate its orders," Mot. 13, this Court has no less authority to vindicate its September 29 order by insisting that Defendants process their visa applications, even after the Fiscal Year, if Plaintiffs establish their entitlement to relief on the merits. The manifest point of that order, after all, was to ensure that Plaintiffs would obtain visas if (but only if) they were legally entitled to them.

### 3. The Precedents And "Venerable Principles" Cited By Defendants Do Not Bar Relief Here.

None of the allegedly contrary authority cited by Defendants bars relief in this case. Although Defendants point to several cases denying relief based on subclause (II), they can point to none in which relief has ever been denied to a lottery-winner who secured a judicial order compelling adjudication or freezing the status quo before the end of the Fiscal Year. Indeed, most of the cases on which Defendants rely go out of their way to distinguish cases like this one. *See, e.g.*, *Ahmed*, 328 F.3d at 387 (explaining that under Seventh Circuit precedent, "the case would have been different if it had been filed before the end of the visa year … and if the district court had acted within that time period"); *Coraggioso*, 355 F.3d at 734 n.8 (noting that if

petitioner had "sought relief prior to the expiration of the 1998 fiscal year, our analysis may have

been different," and that "[t]he Seventh Circuit has explicitly approved" cases to that effect);

*Nyaga*, 323 F.3d at 915 n.7 (acknowledging that *Paunescu* is "arguably distinguishable"); *Keli v.

Rice*, 571 F. Supp. 2d 127, 135 (D.D.C. 2008) (distinguishing between cases in which courts had

"order[ed] any injunctive relief *before* the applicable fiscal year ended" and those in which they

had not).  In any event, after invoking that line of cases, Defendants concede that *Paunescu* and

*Przhebelskaya* "may appear to provide an exception to this rule"— a significant

understatement—and decline to argue that *Paunescu* and *Przhebelskaya* were wrongly decided.

Mot. 12; *see id.* at 12-14.  Defendants instead embrace those cases as valid exercises of a court's

"inherent power."  *Id.* at 14.  Because, as explained above, the posture of this case is not

materially different from the posture of those (*supra*, at 10), the other subclause (II) cases cited

by Defendants are irrelevant here.

 Defendants' "venerable principles" about law and equity do not help them either (Mot.

10-11).  As the Supreme Court has explained, "equitable remedies are a special blend of what is

necessary, what is fair, and what is workable."  *New York v. Cathedral Acad.*, 434 U.S. 125, 129

(1977).  This Court's tailored injunction is a case in point.  In late September, the Court was

faced with an acute, practical problem: (1) Plaintiffs alleged they were being denied a once-in-a-

lifetime chance to become Americans based on illegal discrimination; (2) that wrong threatened

to become permanent without some action by the Court; (3) and yet, in the Court's view,

Plaintiffs' claims could not properly be resolved while the *Trump* litigation was before the

Supreme Court.  As explained above, the Court permissibly resolved the predicament by

ordering Defendants to set aside visa numbers for Plaintiffs so that their applications can be

processed if and when Plaintiffs are vindicated on the merits.  *Supra*, at 11.  That is a classic

equitable judgment, and none of Defendants' authority bars the Court from now making it effective.

Defendants contend that the Court's equitable powers are far more limited, relying principally on *INS v. Pangilinan*, 486 U.S. 875 (1988). *Pangilinan* involved a group of Filipino nationals who "filed [for U.S. citizenship] more than 30 years after the deadline" established by a since-expired naturalization statute. *Id.* at 884. The Ninth Circuit nonetheless approved their naturalization as a matter of "equity." *Id.* at 883. In the language stressed by Defendants, the Supreme Court rebuked the lower courts for "disregard[ing] statutory and constitutional requirements and provisions" and "creat[ing] a remedy in violation of law." *Id.* at 883 (quotation marks omitted).

There are two problems with Defendants' reliance on *Pangilinan*. First, Defendants' literalistic reading of the quoted language proves too much: It would invalidate the results in *Przhebelskaya* and *Paunescu*, which Defendants accept. *See supra*, at 13. Second, the Court's admonitions in *Pangilinan* can only be understood in the context of that highly unusual case. "The only form of relief specifically disapproved by the *Pangilinan* Court," the D.C. Circuit has explained, "was the lower courts' asserted 'power to make someone a citizen of the United States.'" *In re Thornburgh*, 869 F.2d 1503, 1517 (D.C. Cir. 1989); *see id.* at 1517 n.21 ("The *Pangilinan* Court understandably focused only on the constitutional and statutory limitations on the power of courts to confer citizenship").[8] Whatever the proper scope of *Pangilinan*, it clearly

---

[8] In fact, just after the language Defendants quote, the *Pangilinan* Court identified as the "more fundamental[]" point that "the power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers." *Pangilinan*, 486 U.S. at 883-84. Here, Plaintiffs do not invoke the specific and unique power to confer citizenship (since transferred out of the judiciary altogether, *see* 8 U.S.C. §1421(a)); rather, they invoke those "generally applicable equitable powers," asking only that their visa applications be processed in accordance with law. *Id.*

did not address the circumstance of an alien who (a) files for an immigration benefit long before the relevant deadline, (b) suffers an illegal refusal to process his application, (c) seeks judicial relief well before the deadline, and (d) obtains a judicial intervention at a time when he remains eligible to receive it.  This Court would pay *Pangilinan* "no respect" by "extend[ing] [it] far beyond the circumstances for which [it] [was] designed."  *Cooper v. Harris*, 137 S. Ct. 1455, 1481 (2017).

Defendants also extract a snippet from *American Hospital Association v. Price*, 867 F.3d 160 (D.C. Cir. 2017), stating that a court "may not order parties to break the law."  *Id.* at 167.  But, once again, Defendants' wooden reading of that language is at odds with their acceptance of *Przhebelskaya* and *Paunescu*.  *See supra*, at 13.   And more fundamentally, *American Hospital*, like *Pangilinan*, did not address a charge of agency lawlessness that was leveled at a time when remedying it *required no legal violation*.  Rather, the plaintiffs sought relief compelling an agency to clear a backlog of hundreds of thousands of administrative appeals that had already accumulated.  The D.C. Circuit faulted the District Court for "command[ing] the Secretary to perform an act . . . without evaluating whether performance was *possible*," or, at least, possible without settling the pending cases *en masse*.  *Id.* at 162; *see id.* at 168.  In contrast, Plaintiffs seek only an act that was legally owed to them all along—the lawful processing of their visa applications—and that Defendants have had the resources to perform at any time.[9]

Of course, Plaintiffs do not deny the importance of heeding the "public policy established by Congress" in formulating equitable remedies.  *Pangilinan*, 486 U.S. at 883.  But "[i]n equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities

---

[9] *Antone v. Block*, 661 F.2d 230 (D.C. Cir. 1981), is even further afield (Mot. 12).  *Antone* simply held that a district court may not issue relief under the APA based on agency conduct that does not violate the APA in the first place.  *See id.* at 235.

inescapably involved in reconciling competing interests." *Lemon v. Kurtzman*, 411 U.S. 192, 201 (1973). That means taking account of the fact that Congress did not *only* enact subclause (II)'s rule for determining "eligib[ility]." It *also* prescribed that courts "shall … hold unlawful and set aside" agency action that is "arbitrary, capricious, … or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and gave courts mandamus authority to "compel an officer … to perform a duty owed to the plaintiff," 28 U.S.C. § 1361. Plaintiffs invoked the latter provisions long before there was any doubt as to their eligibility under subclause (II). By holding that Plaintiffs may obtain relief from unlawful action because (but only because) they sought it during their eligibility period, the Court sensibly reconciled Congress's multiple prescriptions. Defendants' exhortations to "follow[] the law," by contrast, fail to engage the problem at all. Mot. 10.[10]

### 4.     The Supreme Court's Failure To Reach The Merits In *Trump* Does Not Affect The Force Of This Court's September Order.

Defendants also argue that because the Supreme Court did not find EO-2 to be unlawful, but instead vacated the lower courts' rulings as moot, this Court's September order requiring them to hold visa numbers for later processing does not apply. Mot. 17; *see* PI Op. 15 (directing Defendants to "hold [] visa numbers to process Plaintiffs' visa applications in the event the Supreme Court finds the Executive Order to be unlawful"). But this argument gets matters

---

[10] Defendants' nineteenth-century cases (Mot. 10) are legally and factually inapposite. *See, e.g.*, *Rees v. City of Watertown*, 86 U.S. (19 Wall.) 107, 122 (1873) (barring a court from levying a tax on citizens in violation of "due process of law"). These opinions' "general expressions, [like those] in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.). And Defendants' quotations from Joseph Story are incomplete and misleading. *Compare* Mot. 10 (ascribing to Story the view that "equity is 'compelled to stop where the letter of the law stops'"), *with* 1 Joseph Story, *Commentaries on Equity Jurisprudence* 15 (W.H. Lyon Jr. ed., 14th ed. 1918) ("a Court of Equity … is *often* compelled to stop where the letter of the law stops" (emphasis added)).

backwards: The fact that the Supreme Court wiped out the challenges to EO-2 clears the way for this litigation to proceed.  Resolution of Plaintiffs' claims now could not possibly intrude on the Supreme Court's consideration of potentially related issues.

In any event, Defendants' blinkered reading of this Court's September order makes no sense.  In its opinion, this Court repeatedly indicated its intent to defer any processing of visas while the *Trump* cases were *before* the Supreme Court.  *See, e.g.*, PI Op. 8 ("The court will, however, grant the alternative relief Plaintiffs request and order the State Department to reserve any unused visa numbers *until after the Supreme Court's ultimate decision in Trump*.") (emphasis added).[11]  The Court's later reference to a favorable outcome in *Trump* is understandable and readily explained: Because the Court believed the question of visa issuance (as well as entry) was before the Supreme Court, *see* PI Op. 11, it anticipated that the Supreme Court's decision would resolve the merits questions in this case one way or the other.  That understandable premise proved incorrect when the Supreme Court disposed of the cases while "express[ing] no view on the merits."  *Trump v. Hawaii*, 2017 WL 4782860, at *1.  But Defendants do not even attempt to explain why the non-merits resolution of the *Trump* cases should foreclose Plaintiffs' cases from being heard, with or (as it turns out) without guidance from the Supreme Court.  They offer only their hairsplitting reading of this Court's order, which the Court can and should reject.  *See, e.g.*, *Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415

---

[11] *See also* PI Op. 11 ("Plaintiffs therefore request that the court order the State Department to reserve any unused FY 2017 visa numbers for processing *after the Supreme Court issues a decision in Trump*. This court has the equitable power to grant such relief ...." (emphasis added)); *id.* at 8 ("The court declines to alter the status quo and grant [Plaintiffs'] specific requests for injunctive and mandamus relief *while the legality of the Executive Order is currently before the Supreme Court*." (emphasis added)); *accord* ECF No. 45 at 5 (Plaintiffs' suggestion that "[w]hile Plaintiffs believe that the pending litigation in the Supreme Court is irrelevant to this case, if the Court disagrees, it could also reserve any unused visa numbers until after that case is resolved").

F.3d 1171, 1178 (10th Cir. 2005) (discerning the "inten[t]" of a "district court's order" by "[v]iewing the order as a whole and in context"); *see also Floersheim v. Engman*, 494 F.2d 949, 954 (D.C. Cir. 1973) (a court is "uniquely qualified to interpret its own order").

## 5.    The Court May Enter Any Necessary Order Nunc Pro Tunc.

For the reasons set forth above—and as the Court has already indicated—the passing of Fiscal Year 2017 is no obstacle to the relief that Plaintiffs seek.  *See* PI Op. 15.  The Court can and should enter an order nunc pro tunc directing Defendants to process Plaintiffs' visa applications.  As the D.C. Circuit has explained, "An order nunc pro tunc (literally 'now for then') is an equitable remedy traditionally used to apply a court's own order or judgment retroactively."  *Ethyl Corp. v. Browner*, 67 F.3d 941, 945 (D.C. Cir. 1995).  Such orders are "available in order to promote fairness to the parties, and as justice may require."  *Id.* (quoting *Weil v. Markowitz*, 898 F.2d 198, 200 (D.C. Cir. 1990)).  They are particularly appropriate "where the delay in rendering a judgment or a decree arises from the act of the court," "the intricacy of the questions involved," or "any other cause not attributable to the laches of the parties."  *Mitchell v. Overman*, 103 U.S. 62, 64-65 (1880).

Here, Plaintiffs sought relief nearly two months before the end of the Fiscal Year, ensuring that the preliminary-injunction motion was fully briefed 43 days before their eligibility allegedly lapsed under subclause (II).  This Court found it appropriate to postpone resolution of the merits until after the Fiscal Year.  *See* PI Op. 11.  But if the Court concludes that an order actually compelling visa processing needed to issue *before* that time in order to coexist with subclause (II), the Court has the power (indeed, the "duty") to enter such an order retroactively and "see that the parties shall not suffer by the delay."  *Mitchell*, 103 U.S. at 65; *see also supra*, at 8 (explaining that Defendants' subclause (II) arguments do not go the Court's jurisdiction).

With such an order in place, this case would become identical to *Przhebelskaya* and *Paunescu*, both of which Defendants accept as good law. Without such an order, this Court's September 29 assurance that it was preserving the status quo is rendered hollow, and the Court's preliminary injunction is functionally indistinguishable from a decision totally rejecting their claims.

## B.    The Expiration of EO-2 Does Not Moot This Case.

Defendants also argue that this case is moot because, in light of EO-2's expiration, "the basis for Defendants' alleged unlawful action no longer exists." Mot. 15. This argument misunderstands the nature of Plaintiffs' challenge. As Defendants concede, Plaintiffs' complaint "does not challenge Executive Order No. 13,780 [i.e., EO-2] itself." Mot. 3; *see* PI Op. 6. Rather, Plaintiffs challenge Defendants' policy of refusing to process their visa applications, even though that refusal violated the relevant statute and regulations and was not authorized by EO-2. Defendants continue to defend their refusal to process the visa applications as authorized by EO-2. Thus, even though EO-2 has expired, Defendants' justification for their actions, based on EO-2, persist. Consequently, Plaintiffs' claims cannot possibly be moot.[12]

To the extent Defendants may be arguing that their refusal to process Plaintiffs' applications is now justified by the President's *new* entry suspension, *see* Mot. 15-16 (discussing that order), that is wrong. Because Defendants justified their policy solely based on EO-2 at the time they applied it to Plaintiffs, Proclamation 9645, 82 Fed. Reg. 45,161 ("EO-3"), issued on September 24, cannot retroactively supply a new foundation for those decisions. Rather, for purposes of this case, Defendants' policy rises or falls with their claim that it faithfully and lawfully implemented EO-2. *See, e.g.*, *Pasternack v. NTSB*, 596 F.3d 836, 839 (D.C. Cir. 2010)

---

[12] In contrast, the plaintiffs in the *Trump* cases before the Supreme Court *did* challenge EO-2 itself.

("Under 'well-established *Chenery* principles,' we cannot uphold the [agency's] decision on a basis not relied upon by the [agency]." (discussing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  For that reason, "the revised version [i.e., EO-3] does not impact this litigation."  PI Op. 3 n.3.[13]

### C.    Plaintiffs Retain A Live Stake In This Case Notwithstanding EO-3.

Finally, it is worth noting a mootness argument that Defendants wisely do *not* make: that EO-3's entry suspension prevents this Court from granting effectual relief to Plaintiffs if they prevail.  For two independent reasons, EO-3 poses no such obstacle.

### 1.    Plaintiffs Are Exempt From EO-3 Because They Will Be Entitled To The Issuance Of Visas Nunc Pro Tunc.

First, if Plaintiffs are vindicated on the merits and obtain their visas, they will not be subject to EO-3 at all.  EO-3 applies "only to foreign nationals of the designated countries who … d[id] not have a valid visa on the applicable effective date."  EO-3, § 3(a)(i), 82 Fed. Reg. at 45,167.  In the case of Plaintiffs, that effective date is September 24, 2017.  *See id.* § 7(a), 82 Fed. Reg. at 45171.  But if Defendants had not subjected Plaintiffs to their unlawful policy of suspending visa adjudications, Plaintiffs would have obtained their visas well before September 24.  Accordingly, if Plaintiffs prevail here, they will be entitled to the issuance of visas that are effective before that date.  Such relief is the only way to place them "in the same position they would have been but for the government's illegal conduct."  Am. Compl. at 18 ¶ C; *see id.* ¶ 1.

---

[13] It is not clear what lesson Defendants seek to draw from *Kremens v. Bartley*, 431 U.S. 119 (1977), but it is entirely unlike this case.  *Contra* Mot. 16.  *Kremens* rested on constitutional avoidance (whereas Plaintiffs have raised no constitutional claims), and it considered a legislative change that afforded the plaintiffs everything they had sought in court (whereas Plaintiffs have received nothing).  *See Kremens*, 431 U.S. at 128-129.

Plaintiff Zadeh's case is representative.  He applied for a visa in May 2016, shortly after his selection in the lottery, and was interviewed roughly a year later.  *See* ECF No. 45-2 ("Zadeh Decl.") ¶¶ 4-5.  On August 15, 2017, he was told that he had successfully cleared "administrative processing," but that his application had been frozen ("temporarily refused") because of the policy challenged here.  *Id.* at Ex. A; *accord* ECF No. 47-1 ("Dybdahl Decl.") ¶ 7.  Given that timetable, there is little doubt that, but for Defendants' unlawful policy, Plaintiff Zadeh would have received a valid visa by September 24.  In any event, at this stage of the litigation, "[t]he relevant facts are those alleged in the complaint, taken in the light most favorable to the plaintiff and with all reasonable inferences drawn in his favor."  *Hurd v. District of Columbia*, 864 F.3d 671, 675 (D.C. Cir. 2017).  Plaintiffs allege they were factually qualified for diversity visas and that they would already have received those visas by September 22, when the amended complaint was filed.  *See* Am. Compl. ¶¶ 7, 35.  In each of Plaintiffs' cases, as in Plaintiff Zadeh's, administrative processing was actually complete significantly earlier.[14]

Plaintiffs are therefore entitled to backdated visas that allow them to take advantage of EO-3's grandfather provision.  Appropriate effective dates could include their individual administrative-processing dates (which are readily available to Defendants in their database, *see* Dybdahl Decl. ¶¶ 2-3); the dates Plaintiffs filed suit (August 3 and September 22, 2017); and the date of the preliminary injunction motion (August 3, 2017).[15]

---

[14] *See* Dybdahl Decl. ¶ 5 (Plaintiff Almaqrami completed processing on September 11, 2017); *id.* ¶ 6 (Plaintiff Golsefid and family completed processing in June 2017); *id.* ¶ 7 (Plaintiff Zadeh and family completed processing on August 15, 2017); *id.* ¶ 8 (Plaintiff Alsakkaf completed processing on August 9, 2017).

[15] The Court need not resolve the question of the relevant date at this stage, as all precede EO-3's effective date.

This form of "make whole" relief is warranted under the governing law in this circuit. As noted above, giving an order retroactive effect ("nunc pro tunc") is a traditional equitable power. *See supra*, at 18. And as the D.C. Circuit has explained, its case-law has "extended the traditional doctrine [of nunc pro tunc] to embrace agency conduct, where necessary to put the victim of agency error 'in the economic position it would have occupied but for the error.'" *Ethyl Corp*., 67 F.3d at 945 (quoting *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 206–07 (D.C. Cir. 1984)).

*Ethyl*'s analysis is particularly instructive here. In that case, the EPA had erroneously withheld a waiver required for Ethyl to sell a fuel additive; specifically, it had rebuffed the company's application on a legally irrelevant ground. *Id.* at 941-42. The D.C. Circuit ordered the EPA to grant the waiver, but it went further than that. As the court explained, the unwarranted *delay* in Ethyl's obtaining the waiver had "an important collateral consequence": It rendered Ethyl ineligible for a grandfather provision under another regulation that exempted "additive[s] already registered on [the regulation's effective] date." *Id.* at 942. Faced with that inequity, the court concluded that "a complete remedy for Ethyl requires that the registration be treated as taking effect on approximately the date it would have occurred if EPA had acted lawfully." *Id.* at 945. And the court therefore "order[ed] EPA to register [the additive] as of November 30, 1993," a date roughly two years in the past. *Id.* at 942.

Every element of that analysis applies to the erroneous suspension of Plaintiffs' visa applications, which threatens a "collateral consequence" (subjection to EO-3) far more harmful than the loss of regulatory exemption in *Ethyl*.[16] Furthermore, although the D.C. Circuit has not

---

[16] Although *Ethyl* offers a powerful example, the D.C. Circuit has applied the same doctrine in many other cases. *See, e.g.*, *Salzer v. FCC*, 778 F.2d 869, 875–76 (D.C. Cir. 1985) (ordering

had occasion to apply the nunc pro tunc doctrine in immigration cases, other courts have routinely done so. *See, e.g.*, *Edwards v. INS*, 393 F.3d 299, 308-09 (2d Cir. 2004) ("The equitable remedy of nunc pro tunc (literally 'now for then') relief has a long and distinguished history in the field of immigration law. … Courts, [as well as agencies], have relied on the doctrine, in order to return aliens to the position in which they would have been, but for a significant error in their immigration proceedings."); *see also Paunescu*, 76 F. Supp. 2d at 903 (ordering defendants "to process plaintiffs' applications and to grant plaintiffs *all relief to which they would have been entitled* had defendants processed their applications in a timely fashion") (emphasis added).  Thus, if Plaintiffs prevail on the merits, EO-3 will not interfere with their plans to immigrate to the United States.

> ## 2. Plaintiffs Would Retain A Live Stake In This Case Even If They Were Not Exempt From EO-3.

In the alternative, even if Plaintiffs *were* subject to EO-3 by its terms, the issuance of their immigrant visas would remain of significant value to them—precluding any finding of mootness.  *See Chafin*, 568 U.S. at 177 ("[E]ven the availability of a 'partial remedy' is 'sufficient to prevent a case from being moot.'"); *Knox v. SEIU*, 567 U.S. 298, 307-08 (2012) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.").  That is so for two reasons.

*First*, EO-3 may never take effect.  So far, both courts to consider the question have invalidated it as unconstitutional or otherwise unlawful, and enjoined it in whole or in part.  *See*

---

reinstatement of dismissed licensing applications nunc pro tunc because a deadline had passed); *McElroy Elecs. Corp. v. FCC*, 990 F.2d 1351, 1353 (D.C. Cir. 1993) (same); *Maxcell Telecom Plus Inc. v. FCC*, 815 F.2d 1551, 1560 (D.C. Cir. 1987) (same); *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 206–07 (D.C. Cir. 1984) (directing agency to reselect a winning contractor nunc pro tunc); *Office of Consumers Counsel v. FERC*, 826 F.2d 1136, 1139 (D.C. Cir. 1987) (ordering agency to adopt a retroactive remedy).

*IRAP v. Trump*, No. 17-361, _ F. Supp. 3d _, 2017 WL 4674314 (D. Md. Oct. 17, 2017), *appeal docketed*, No. 17-2231 (4th Cir. Oct. 20, 2017); *Hawaii v. Trump*, No. 17-50, _ F. Supp. 3d _, 2017 WL 4639560 (D. Haw. Oct. 17, 2017), *appeal docketed*, No. 17-17168 (9th Cir. Oct. 24, 2017).  Both cases are pending on appeal, and the course of further litigation is unpredictable.  At a minimum, however, it is a distinct possibility that Plaintiffs will be able to enter the United States, even if EO-3 applies to them, because its entry ban will be permanently or preliminarily enjoined at the time they seek to immigrate.  In fact, if Plaintiffs had their visas in hand, they could benefit from the preliminary injunction imposed by the U.S. District Court for the District of Hawaii and enter today.[17]  Plaintiffs do not challenge the validity of EO-3 here, but the prospect of its invalidation in other fora means that Plaintiffs have a good chance of using any visas they obtain through this litigation.

*Second*, although EO-3 imposes an indefinite travel suspension, that suspension may be lifted as to some countries within the validity period of visas issued because of this case (which is typically six months).  EO-3 itself mandates a report justifying any continued ban within six months of the order's issuance, and the national security advisor has indicated that the ban could be lifted as to at least one country within "a couple of months."[18]  Notably, Sudan has already been removed from the list of covered countries in the transition from EO-2 to EO-3—meaning that some members of the putative class, whose applications have been suspended under the

---

[17] *See* Bureau of Consular Affairs, *Alert: Court Order on Presidential Proclamation on Visas* (Oct. 10, 2017) ("In light of [the *Hawaii*] order, visa applicants who are nationals of Chad, Iran, Libya, Syria, Yemen, and Somalia are not subject to any of the restrictions or limitations under the Presidential Proclamation, regardless of whether they have a credible claim of a bona fide relationship with a person or entity in the United States.").

[18] Helene Cooper, *Chad's Inclusion in Travel Ban Could Jeopardize American Interests, Officials Say*, N.Y. Times (Sept. 26, 2017), https://www.nytimes.com/2017/09/26/world/africa/chad-travel-ban-american-interests.html.

challenged policy, could enter immediately, with or without EO-3, if Defendants issued their

visas.  Plaintiffs thus have a real interest in preserving their chance to come to this country by

ensuring that their visa applications are processed on the merits.

## II.    The Doctrine of Consular Nonreviewability Does Not Apply.

This Court considered and rejected Defendants' appeal to the consular nonreviewability

doctrine in September.  Specifically, the Court held that doctrine inapplicable for two reasons:

(1) because Plaintiffs' visa applications have not been the subject of consular decisions at all;

and (2) because Plaintiffs challenge a general policy rather than a specific exercise of consular

discretion.  *See* PI Op. 16-17.  The Court should not revisit either holding.  But if it does, it

should reaffirm both.

### A.    The Court Should Not Revisit Its Prior Rulings.

Defendants give the Court no substantial reason to reopen the question of consular

nonreviewability in this case.  Absent some significant change, "the *same* issue presented a

second time in the *same case* in the *same court* should lead to the *same result*."  *LaShawn A. v.

Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (explaining the basis for the law-of-the-case

doctrine).  In light of Defendants' failure to identify any intervening developments, the Court can

and should simply adhere to its prior analysis of the issues that Defendants now ask to relitigate.

*Cf. Assassination Archives & Research Ctr. v. CIA*, 48 F. Supp. 2d 1, 13 (D.D.C. 1999)

(explaining, in the context of a motion for reconsideration, that a party is not entitled to "an

opportunity to reargue facts and theories upon which a court has already ruled").

Defendants suggest that it is appropriate to reconsider because, according to a decades-

old Eighth Circuit case involving a preliminary injunction, "different findings or conclusions

might be warranted after a trial on the merits."  Mot. 18 (quoting *Indep. Fed'n of Flight*

25

*Attendants v. Trans World Airlines*, 655 F.2d 155, 159 (8th Cir. 1981)).  But there has been no

"trial on the merits" here, such as might generate new evidence or warrant new ultimate

conclusions of law based on those new facts.  Rather, Defendants ask the Court to dismiss this

case on the pleadings, as a matter of law.  They therefore make only legal arguments that they

made (or, at a minimum, could have made) before.  Under these circumstances, there is no

reason for the Court to answer the same purely legal question two different ways within a matter

of months.  *See LaShawn A.*, 87 F.3d at 1393 ("Inconsistency is the antithesis of the rule of

law.").  The Court should therefore decline to take up Defendants' renewed nonreviewability

arguments at all.

### B.  Consular Nonreviewability Does Not Apply Because Plaintiffs' Visa Applications Still Have Not Been Adjudicated On The Merits.

If the Court does address reviewability again, however, it should confirm both of its prior

holdings.  The Court first held that consular immunity "does not apply" because "the government

has not made a final visa decision" in Plaintiffs' cases.  PI Op. 15.  As explained below, the

Court correctly stated the legal rule and correctly applied it to this case.

### 1.  Consular Nonreviewability Does Not Apply When No Consular Decision Has Been Rendered.

As Judge Kessler recently explained at length, "the doctrine of consular nonreviewability

is not triggered until a consular officer has made a *decision* with respect to a particular visa

application."  *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the

United States v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) ("*Nine Iraqi Allies*"); *see* PI Op.

15 (following *Nine Iraqi Allies*).  That limitation is rooted in the purposes of the

nonreviewability doctrine: In light of "the political nature of *visa determinations*," "a consular

official's *decision to issue or withhold a visa* is not subject to judicial review."  *Saavedra Bruno*

*v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (emphasis added).  But "[w]hen the

Government simply declines to provide a decision in the manner provided by Congress, it is not

exercising its prerogative to grant or deny applications." *Nine Iraqi Allies*, 168 F. Supp. 3d at

290-91.  Accordingly, such refusals to process applications are reviewable, even when a consular

officer's ultimate judgment on an application's merits is not.  *See id.*; *see also Patel v. Reno*, 134

F.3d 929, 932 (9th Cir. 1997) (holding that "jurisdiction exists to consider whether the consulate

has the authority to suspend the visa applications"); *Maramjaya v. USCIS*, No. Civ. A. 06-2158,

2008 WL 9398947, at *4 (D.D.C. Mar. 26, 2008) (holding that the doctrine of consular

nonreviewability did not apply where the "case ha[d] not procedurally progressed to the point

where consular immunity would bar judicial review").

### 2.    No Consular Decision Has Been Rendered In Plaintiffs' Cases.

As this Court already determined, this case falls squarely within the exception to

nonreviewability described above.  *See* PI Op. 16-17.  Specifically, in its September order, the

Court considered the parties' arguments and explained that Plaintiffs' applications had not "been

finally refused," but rather remain "pending."  *Id.*  In their memorandum, Defendants do not

contest that determination or attempt to identify any intervening development.  It is thus

undisputed that consular officers have still never rendered final decisions on Plaintiffs' cases.

The only conceivable development since the Court resolved this issue in September is the

end of the fiscal year.  But Defendants do not argue that they "finally refused" Plaintiffs'

applications on that basis, and for good reason.  *First*, this Court's September injunction makes

the passage of that deadline unavailable as a ground for denying visas to Plaintiffs.  The Court

instructed Defendants to "reserve any unused visa numbers for FY 2017 for processing following

the Supreme Court's decision"—*i.e.*, after the end of the Fiscal Year.  PI Op. 13.  If Defendants

27

now said they "finally refused" Plaintiffs' applications because the Fiscal Year ended, they

would be saying that they flouted the Court's injunction.  *Second*, Defendants' position with

respect to subclause (II) is *not* that consular officers use it as a basis for rendering adverse

decisions on visa applications, but rather that all pre-deadline applications expire automatically

by operation of law.  *See* Mot. 8-10.  They are in no position to argue, then, that they rendered

consular decisions on Plaintiffs' applications, applying their discretion over immigration matters,

after September 30.

### C.  Consular Nonreviewability Does Not Apply Because Plaintiffs Challenge A General Administrative Policy, Not An Exercise Of Discretion.

This Court also correctly ruled that the consular nonreviewability doctrine has no

application here for a second reason: "Plaintiffs challenge the State Department's policy, not the

discretion of a specific consular officer in applying the policy."  PI Op. 17.  That holding should

also be reaffirmed.

The D.C. Circuit has addressed this exact issue, and it drew precisely the same distinction

as this Court.  Specifically, in *International Union of Bricklayers & Allied Craftsmen v. Meese*,

761 F.2d 798 (D.C. Cir. 1985) ("*Bricklayers*"), the court of appeals acknowledged *Kleindienst v.*

*Mandel*, 408 U.S. 753 (1972)—which Defendants term the "seminal" case supporting their view

(Mot. 19)—and explained that it "concerned challenges to a decision by a consular officer on a

particular visa application."  761 F.2d at 801.  In *Bricklayers*, by contrast, the plaintiffs "d[id] not

challenge a particular determination in a particular case of matters which Congress has left to

executive discretion," but rather took issue with "internal agency guidelines" for processing visa

applications.  *Id.* at 800-01.  The *Bricklayers* court concluded that *Mandel* "ha[d] no application"

to that scenario.  *Id.* at 801.  "The federal courts have jurisdiction over this type of case," the

court explained, "to assure that the executive departments abide by the legislatively mandated

28

procedures." *Id.* at 801; *see also Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469 (D.C. Cir. 1995) (resolving on the merits a nationality-discrimination challenge to a State Department policy of refusing to process visa applications), *vacated on other grounds*, 519 U.S. 1 (1996); *Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988) (consular nonreviewability does not apply where plaintiffs "are not challenging the discretion of consuls" in applying regulations but rather "the authority of the Secretary of State" to issue them).

Here, too, Plaintiffs challenge a State Department policy of general application, rather than any case-specific judgments about their visa applications. In fact, Defendants do not even argue that Plaintiffs' challenge falls outside of *Bricklayers*' ambit—because, notwithstanding this Court's prime reliance on that case (PI Op. 17), Defendants decline to mention it at all. They are likewise silent about *Patel v. Reno*, 134 F.3d 929 (9th Cir. 1997), which, as this Court recognized, is to the same effect. *See* PI Op. 17. Defendants' silence about this Court's grounds for rejecting their position all but concedes the correctness of the Court's prior analysis.[19]

Rather than engaging with the controlling precedent on-point, Defendants offer context-free quotations from a litany of district-court cases involving fact-bound complaints about visa decisions. *See* Mot. 20-22. A review of each of these cases will show that, in context, not one is inconsistent with the distinction between policy-based claims and individualized disputes that this Court and the D.C. Circuit have drawn.[20] But even if their dicta could be read to suggest a

---

[19] Because the Court already made very clear the centrality of *Bricklayers* and *Patel* to its thinking, Defendants should not be permitted to address these cases for the first time on reply. *See, e.g.*, *Herbert v. Architect of Capitol*, 920 F. Supp. 2d 33, 44 (D.D.C. 2013) ("[I]t is well-established that the Court need not consider arguments raised for the first time on reply").
[20] *See Van Ravenswaay v. Napolitano*, 613 F. Supp. 2d 1, 3 (D.D.C. 2009) (plaintiff claimed charge of drug trafficking was "based on completely wrong information"); *Zhang v. USCIS*, No. 05 CIV 4086, 2005 WL 3046440, at *2-3 (S.D.N.Y. Nov. 8, 2005) (plaintiff insisted his marriage was "bona fide"); *Saleh v. Holder*, 84 F. Supp. 3d 135, 138 (E.D.N.Y. 2014) (plaintiff

rule inconsistent with *Bricklayers*, that would make no difference; *Bricklayers* would necessarily prevail over any such suggestion.

In sum, because consular officials have not rendered final decisions in Plaintiffs' cases, and because Plaintiffs challenge a general policy rather than an exercise of discretion, consular nonreviewability does not apply.

## III.    Plaintiffs Have A Cause Of Action Under Both The APA And The Mandamus Act.

In their final effort to avoid adjudication on the merits, Defendants argue that, in order to state a claim under the APA or the mandamus statute, Plaintiffs must "point to a plainly defined duty of the State Department to readjudicate their visa applications by the end of the fiscal year." Mot. 22; *see id.* at 22-25 (Section IV).  But neither statute imposes the requirement Defendants imagine, and Plaintiffs have a valid cause of action under each.

### A.    Plaintiffs Have An APA Cause Of Action Under § 706(2).

Defendants first argue that Plaintiffs' APA claim must fail because, according to Defendants, it does not "assert[] that an agency failed to take a *discrete* agency action that it is *required* to take."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004) ("*SUWA*"). This argument rests on a simple misunderstanding of Plaintiffs' APA claim.  Plaintiffs brought suit under 5 U.S.C. § 706(2), not § 706(1).[21] In other words, they challenge agency action, not

---

refused to provide "requested additional documentation"); *Mansur v. Albright*, 130 F. Supp. 2d 59, 60 (D.D.C. 2001) (plaintiff objected to discretionary visa revocation that was based on new "information" received by State Department); *Chun v. Powell*, 223 F. Supp. 2d 204, 206 (D.D.C. 2002) (plaintiff objected to denial of visitor visa based on insufficient proof of "strong ties to a residence abroad"); *Garcia v. Baker*, 765 F. Supp. 426, 427 (N.D. Ill. 1990) (plaintiff objected to visa denial based on finding of prior immigration fraud); *Malyutin v. Rice*, 677 F. Supp. 2d 43, 46–47 (D.D.C. 2009) (plaintiff objected to visa denial based on insufficient ties to his home country), *aff'd*, No. 10-5015, 2010 WL27104551 (D.C. Cir. July 6, 2010).
[21] Section 706(1) directs courts to "compel agency action unlawfully withheld or unreasonably delayed."  Section 706(2) directs them to "hold unlawful and set aside agency action" that is

agency inaction.  *See* Am. Compl. ¶ 54.  And as courts have consistently recognized, "*SUWA* addresses only attempts to 'compel agency action' pursuant to § 706(1) and does not reach claims encompassed within § 706(2)."  *All. To Save Mattaponi v. Army Corps of Engineers*, 515 F. Supp. 2d 1, 10 (D.D.C. 2007); *see, e.g.*, *Valentini v. Shinseki*, 860 F. Supp. 2d 1079, 1097 (C.D. Cal. 2012) ("the holding in *SUWA* is inapplicable to challenges under § 706(2)(A)"); *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1124 (D. Mont. 2016) ("The analysis in *SUWA* does not apply to § 706(2)(A) claims.").[22]

Defendants' misunderstanding of Plaintiff's claim undermines their entire argument that Plaintiffs have not met their burden. A challenger under § 706(1) "faces a different burden" than a challenger under §706(2).  *Nat'l Ass'n of Home Builders v. Army Corps of Engineers*, 417 F.3d 1272, 1280 (D.C. Cir. 2005).  When a plaintiff seeks to "compel agency action unlawfully withheld or unreasonably delayed" under § 706(1), she claims that the agency has unlawfully neglected to take up a matter at all; courts therefore "determine if 'the agency has a duty to act and [if] it has 'unreasonably delayed' in discharging that duty.'"  *Id.*  A routine diversity-visa applicant who objects to the State Department's sluggish pace in processing applications could conceivably bring such a claim under § 706(1), although that claim might face significant hurdles.

Plaintiffs, however, did not bring such a claim.  Instead, they alleged an affirmative policy decision *not* to process their applications, and challenged that decision under § 706(2)(A)

---

defective in one or another way—such as by being "arbitrary, capricious," or "not in accordance with law."

[22] Defendants obscure this point through a highly misleading use of brackets.  *Compare SUWA*, 542 U.S. at 64 ("a claim under § 706(1) can proceed only where" certain conditions are met), *with* Mot. 23 (quoting the Supreme Court as stating that "a[n APA] claim … can proceed only where" those conditions are met).

as arbitrary, capricious, and otherwise unlawful.  *See* Am. Compl. ¶¶ 53-59; *see also* PI Op. 6

(accurately characterizing Plaintiffs' claim).  Although claims of this kind challenge "inaction"

in one sense, they are cognizable under § 706(2) as long as the decision not to act is "final"

within the meaning of the APA.  *See, e.g.*, *Hi-Tech Pharmacal Co. v. U.S. FDA*, 587 F. Supp. 2d

1, 9 (D.D.C. 2008) ("[I]f a failure to act amounts to consummated agency action that APA views

as final, notwithstanding the fact that the agency 'did' nothing, a party can seek relief under

Section 706(2)" (quotation marks omitted)); *All. To Save Mattaponi*, 515 F. Supp. 2d, at 10

(same); *see also* 5 U.S.C. § 551(13) (defining "agency action" to include "failure to act").

        Here, Plaintiffs plausibly and specifically alleged that Defendants' policy decision is

"final agency action," representing "the consummation of the State Department's process on this

matter."  Am. Compl. ¶ 55.  Defendants do not so much as mention finality, thereby forfeiting

the opportunity to contest it.  In any event, their policy clearly is final within the meaning of the

APA.  *See, e.g.*, *Hi-Tech Pharmacal. Co*., 587 F. Supp. 2d at 10 ("Judicial review of an agency's

failure to act under Section 706(2) is authorized [as final], then, when administrative inaction has

the same impact on the rights of the parties as an express denial of relief" (internal quotation

omitted).[23]

        Plaintiffs have thus brought a proper claim under § 706(2).  And "[a] challenge to agency

action [under § 706(2)], by contrast [to one under § 706(1)], is simply resolved according to the

_____

[23] Despite overlapping jargon, there is no tension between the "finality" of Defendants' policy
under the APA and this Court's recognition that Plaintiffs' applications have not been "finally
refused" for purposes of consular nonreviewability (PI Op. 16).  The policy is "final" under the
APA because Defendants will do no more on the matter.  At the same time, it is unprotected by
consular immunity because the actions Defendants *did* take never reached "the point where
consular immunity would bar judicial review" (*i.e.*, the actual adjudication of plaintiffs' visa
applications).  PI Op. 16 (quotation marks omitted); *see supra*, at 26.

APA." *Nat'l Ass'n of Home Builders*, 417 F.3d at 1280.  In other words, the reviewing court

proceeds directly to the question whether the challenged policy is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  For these

reasons, Defendants' various arguments in Section IV of their memorandum are irrelevant to the

APA claim that Plaintiffs actually pled.[24]

### B.    Plaintiffs Have Satisfied The Conditions For Mandamus Relief As Well.

While Defendants invoke the wrong body of law under the APA, they correctly state that

Plaintiffs must identify a "clear right to relief" and "clear duty to act" to support the mandamus

claim in this case.  PI Op. 12 (quoting *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005)); *see*

Mot. 7, 22-23.  But, as this Court has already recognized in applying those same standards,

Plaintiffs have done just that.  First, "Plaintiffs have a right to have their visa applications

processed in accordance with the INA."  PI Op. 12; *see id.* (citing governing regulations).  And

second, "State Department consular officers have a clear duty to do so."  *Id.*  Thus, if the State

Department's policy is at variance with the INA—as Plaintiffs contend—then "Plaintiffs' right to

have their applications processed in accordance with the law will have been violated by the State

Department's implementation of the Executive Order," and mandamus will be appropriate.  *Id.* at

13; *see also Patel*, 134 F.3d at 933 (ordering the United States Consulate in Bombay, India, to

process a pending diversity visa application under mandamus authority).

It is true that, when this Court made the findings of right and duty described above, the

Court contemplated that the Supreme Court would decide whether "the Executive Order violated

---

[24] Tellingly, each of the APA cases that Defendants cite addressed only § 706(1)—which, again, Plaintiffs have never invoked.  *See Kaufman v. Mukasey*, 524 F.3d 1334, 1338 (D.C. Cir. 2008); *Orlov v. Howard*, 523 F. Supp. 2d 30, 37 (D.D.C. 2007); *Beshir v. Holder*, 10 F. Supp. 3d 165, 176–77 (D.D.C. 2014); *Nine Iraqi Allies*, 168 F. Supp. 3d at 296.

the INA," and that the Supreme Court's opinion would resolve Plaintiffs' claims about visa issuance as well. *Id.* But the Supreme Court's failure to reach those questions does not change this Court's core analysis: If Defendants are not processing Plaintiffs' applications in accordance with the INA, they are breaching a clear duty and violating Plaintiffs' clear rights, and so mandamus relief is appropriate. That the merits determination must be made by this Court, rather than the Supreme Court, makes no difference.

Defendants do not acknowledge or engage this Court's holdings with respect to the "clear right" and "clear duty" prongs of the mandamus analysis. *See generally* Mot. 22-25. Instead, they recast Plaintiffs' mandamus claim as a demand that Defendants "further Plaintiffs' visa applications . . . *at the rate they would have preferred*." *Id.* at 23 (emphasis added). But that once again mistakes the nature of Plaintiffs' claim. Plaintiffs did not bring suit to challenge "the pacing of administrative processing" in general (Mot. 24); they objected to Defendants' specific and discrete policy decision to put their pencils down and cease processing Plaintiffs' applications entirely. *Cf. Patel*, 134 F.3d at 932 ("The Patels are challenging the consul's authority to suspend their visa applications, not challenging a decision within the discretion of the consul"). Thus, Plaintiffs demand only that consular officials discharge the clear duty this Court already identified: "process [Plaintiffs' visa applications] in accordance with the INA." PI Op. 12. It follows that, as long as Plaintiffs persuade the Court that Defendants' refusal to process their applications is contrary to the INA, mandamus relief will be appropriate.

## IV.    Defendants' Policy Of Refusing To Process Plaintiffs' Visa Applications Is Unlawful.

On the merits, the Court should deny Defendants' motion to dismiss because Plaintiffs have stated a valid claim for relief. The path to that conclusion is not long, and this Court has already traveled much of the way. *First*, as this Court held in September, Defendants may refuse

34

to issue a visa only by invoking a ground set forth in the governing law and regulations. *Second*, nationality is not a permissible ground; in fact, it is a specifically prohibited one. *Third*, it does Defendants no good to recharacterize their policy as resting on 'the fact that Plaintiffs are suspended from entry'—rather than the fact of their nationalities—because entry-suspension is also not a permissible ground for denying visas, and EO-2 does not even instruct Defendants to deny visas. Defendants' policy of refusing to process Plaintiffs' visa applications under the ordinary criteria thus contravenes the INA and breaches a clear duty owed to Plaintiffs.

### A.    The Government May Refuse a Visa Only Upon a Ground Set Forth in the Governing Law and Regulations.

The statute and governing regulations impose an affirmative obligation on Defendants to adjudicate visa applications and to issue diversity visas to those eligible to receive them. Entitled "Issuance or refusal mandatory," 22 C.F.R § 42.81(a) states: "When a visa application has been properly completed and executed . . ., the consular officer must either issue or refuse the visa under INA 212(a) or INA 221(g) or other applicable law. Every refusal must be in conformance with the provisions of 22 CFR 40.6." Section 40.6, in turn, states that "[a] visa can be refused *only* upon a ground specifically set out in the law or implementing regulations." 22 C.F.R § 40.6 (emphasis added). Thus, unless plaintiffs are ineligible under the statute or regulations, these regulations entitle them to receive visas. *See* PI Op. 12 (adopting the same analysis). And, notably, Defendants do not appear to dispute this basic rule. *See generally* Mot. 25-30.

The next question, then, is what grounds of ineligibility the law and regulations recognize. These divide into two classes. First, Congress imposed an education or work-experience requirement on diversity-visa recipients in particular. *See* 8 U.S.C. § 1153(c)(2). There is no dispute that Plaintiffs satisfy that criterion. *See* Am. Compl. ¶ 42. Second, the law also provides that "[n]o visa … shall be issued to an alien if … such alien is ineligible to receive

a visa . . . under section 1182." 8 U.S.C. § 1201(g). This is the authority Defendants cited for

suspending Plaintiffs' applications. *See* Am. Compl. ¶ 32. It is also the sole authority

Defendants now invoke to justify that decision. *See* Mot. 29 ("the alien is denied a visa because

he is 'ineligible' to enter 'under [S]ection 1182'").

So what makes someone, in the words of § 1201(g), "ineligible to receive a visa . . .

under section 1182"? Section 1182(a) squarely answers that question: It says that "aliens who

are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to

be admitted to the United States: . . .", and it proceeds to enumerate a series of ten numbered

paragraphs that explicitly deem certain classes of people to be "inadmissible." These include, for

example, health-related grounds, 8 U.S.C. § 1182(a)(1); criminal grounds, *id.* § 1182(a)(2); and

documentation-related grounds, *id.* § 1182(a)(7). Putting these interlocking pieces together, a

diversity-visa applicant may be refused a visa if she either does not meet the education/work

requirement (not at issue here), or if she falls within one of § 1182(a)'s enumerated grounds.

Otherwise, a diversity visa "must" be issued under 22 C.F.R § 42.81(a).

### B.  Defendants' Policy Bars Issuance Of Visas Based On An Impermissible Ground.

The policy set forth in the State Department cable violates these statutes and regulations

because it imposes an additional requirement for visa issuance that is nowhere to be found in

§ 1182: namely, that an applicant be a national of a country other than Iran, Yemen, Somalia,

Sudan, Syria, or Libya. After identifying those six countries by name, the cable instructs

consular officials that "DV applicants [from those countries] who are not exempt from the E.O.'s

suspension of entry provision and who do not qualify for a waiver should be refused 221(g)."

Am. Compl. ¶ 31. Although this nomenclature is a bit opaque, such a "refusal" means that (1)

the applicant has been deemed "ineligible to receive a visa" under § 1201(g) by virtue of EO-2;

and (2) processing of her application will therefore be suspended unless and until she establishes that the EO does not bar her entry (such as by proving a family relationship). *See* ECF No. 36, PI Hr'g 25-26, 45-46 (government's explanation of the policy). That categorical, indefinite suspension policy is unlawful because it bars the issuance of visas on a ground other than those specifically set forth in the "law or implementing regulations." 22 C.F.R § 40.6.

Defendants' policy is also unlawful for the distinct, additional reason that it violates the INA's specific bar on "discriminat[ion] in the issuance of an immigrant visa because of [a] person's … nationality." 8 U.S.C. § 1152(a)(1)(A). Section 1152(a)(1)(A) completely bars such discrimination "[e]xcept as specifically provided" in four enumerated provisions, none of which is at issue here. *Id.* Thus, even if Defendants could suspend visa applications on grounds not recognized by § 1182(a)—which, as explained above, they cannot—they *still* could not suspend applications on the basis of nationality. Yet that is precisely what they are doing. For these reasons, Defendants' policy is "arbitrary, capricious, … [and] not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A). And, likewise, their adherence to that policy breaches a clear duty owed to Plaintiffs, making mandamus relief warranted as well.

### C.    Defendants' Defense Of Their Policy Fails.

Defendants' only defense of their policy is that they are not refusing to process Plaintiffs' visa applications based on Plaintiffs' nationalities, but rather based on their being subject to an executive order, pursuant to 8 U.S.C. § 1182(f), that allegedly bars the issuance of visas. Critically, the entire case rides on this point: If § 1182(f) is *not* a lawful ground for refusing to issue a visa—or if EO-2 did *not* exercise the President's alleged power under § 1182(f) to suspend the issuance of visas—Defendants' case collapses. They have not mounted or preserved

any other argument.  *See* Mot. 29 ("The State Department May Not Issue Visas To Persons

Barred Under Section 1182").[25]

Both planks of Defendants' defense fail.  First, an order under § 1182(f) is not among the

lawful grounds for refusing to issue a visa.  And second, even if an § 1182(f) order *could* have

that effect, EO-2 does not.

### 1.  Section 1182(f) Does Not Make Covered Individuals Ineligible For Visas.

As explained above, Defendants' policy is valid only if Plaintiffs are "ineligible to

receive a visa . . . under section 1182."  8 U.S.C. § 1201(g); *see supra*, at 35.  But Section 1182

specifies exactly who is "ineligible to receive a visa":

> **(a) Classes of aliens *ineligible for visas* or admission**
>
> Except as otherwise provided in this chapter, *aliens who are
> inadmissible under the following paragraphs are ineligible to
> receive visas* and ineligible to be admitted to the United States:
> …

8 U.S.C. § 1182 (emphasis added).  Defendants are thus left to argue that § 1182(f), authorizing

the President to suspend entry of aliens, *is* one of the "following paragraphs" referenced in

§ 1182(a).  *See* Mot. 30.  But there are two conclusive indications that this claim is wrong.

*First,* the plain language of § 1182(a) and § 1182(f) make clear that they address different

subject matter. Section 1182(a) specifically addresses who is "ineligible to receive visas."  By

---

[25] Defendants do also argue that § 1152(a)(1)(A), the statutory bar on nationality discrimination,
is trumped by the President's entry-suspension power under § 1182(f).  *See* Mot. 26-29. That is
wrong; however, because this argument goes to the legal merits of EO-2 itself, and Plaintiffs do
not take issue with it here.  In other words, *if* an entry suspension under § 1182(f) could be a
permissible ground for refusing to process visa applications, and *if* EO-2 wielded that authority
by ordering Defendants not to process visa applications, Plaintiffs do not here contend that EO-2
itself would nonetheless be invalid under § 1152(a)(1)(A).  This limitation on the scope of
plaintiffs' arguments renders Defendants' arguments in Section V.A of their memorandum
irrelevant, and it confirms that the issues presented for decision here do not overlap those in
pending litigation over the legal merits of the President's entry suspensions themselves.

contrast, § 1182(f) does not mention visas or visa eligibility at all; it speaks only to "entry." That textual contrast is stark and presumptively deliberate. *See Corley v. United States*, 556 U.S. 303, 315 (2009) (where "Congress used both [of two] terms in [a statute], we would not presume to ascribe this difference to a simple mistake in draftsmanship"). Thus, § 1182(f) by its own terms has nothing to do with visa issuance, only entry.

*Second*, treating § 1182(f) as a "following paragraph[]" contravenes controlling Supreme Court precedent. The Supreme Court has repeatedly explained that Congress "drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line," and that Congress "relie[s]" on this system "to make precise cross-references." *NRLB v. SW General, Inc.*, 137 S. Ct. 929, 938–39 (2017); *see Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). In that hierarchical scheme, "paragraph" does not bear the ordinary meaning taught in elementary schools. Rather, as the Court has instructed, a "paragraph" is a numbered unit of statutory text that forms a subpart of a subsection. "This hierarchy is set forth in drafting manuals prepared by the legislative counsel's offices in the House and the Senate," and it proceeds as follows: first "subsections (starting with (a))"; then "paragraphs (starting with (1))"; then "subparagraphs (starting with (A))"; and then "clauses (starting with (i))." *Koons Buick Pontiac*, 543 U.S. at 60. This careful scheme makes it impossible to treat § 1182(f)—a distinct subsection miles away from § 1182(a) in the statute—as one of the "following paragraphs" that comprise the meat of § 1182(a). Congress is entitled to assume that readers are familiar with the way statutes are written, and thus that they will apply its hierarchical cross-references in the ordinary way. *See Southwest General*, 137 S. Ct. at 938-39.[26]

---

[26] If there were any doubt, the use of "paragraph" as a term of art is evident throughout § 1182 (as it is throughout the U.S. Code). *See, e.g.*, 8 U.S.C. § 1182(a)(4)(B)(i) (listing factors to use in determining "whether an alien is admissible under this paragraph," i.e., paragraph (4)).

*Second*, the divergent texts and structures of subsections (a) and (f) confirm that Defendants' reading is untenable.  The numbered paragraphs under subsection (a) each follow the same pattern: They define a class and then state that any member of it ". . . is inadmissible." That fits perfectly with subsection (a)'s overall provision that "aliens who are inadmissible under the following paragraphs" are ineligible for visas (as well as entry).  But § 1182(f) does not use the term "inadmissible" at all, instead separately authorizing the President to "suspend the entry" of classes of noncitizens.  That authorization does not connect up with subsection (a) at all, confirming that it is not one of the "following paragraphs" to which subsection (a) refers.[27]

*Finally*, Defendants do not appear to argue that § 1182(f) *independently* makes someone "ineligible to receive a visa … under section 1182" for purposes of § 1201(g).  *See, e.g.*, Mot. 30 (resting on "Sections 1182(a) and 1201(g)").  Any such argument would fail for essentially the same reason just given.  Section 1182(a) specifically addresses who is "ineligible to receive visas": namely, "aliens who are inadmissible under the following paragraphs."  By contrast, § 1182(f) does not mention visas or visa eligibility at all; it speaks only to "entry."  That textual contrast is stark and presumptively deliberate.  *See Corley v. United States*, 556 U.S. 303, 315 (2009) (where "Congress used both [of two] terms in [a statute], we would not presume to ascribe this difference to a simple mistake in draftsmanship").

Furthermore, if people covered by a Presidential entry suspension under § 1182(f) were *also* supposed to be ineligible for visas, Congress could easily have made reference to them in one of the ten paragraphs under § 1182(a) and secured just that result.  *See, e.g.*,

---

[27] Defendants' reliance on *Castaneda-Gonzalez v. INS*, 564 F.2d 417 (D.C. Cir. 1977), is perplexing.  *See* Mot. 29-30.  In the cited discussion, the court simply explained that consular officials may not "issue visas to any alien who falls within one of the excludable classes described in section 212(a) [i.e., § 1182(a)]."  *Id.* at 426.  There is no dispute about that.

§ 1182(a)(3)(C)(i) (making certain people designated by the Secretary of State ineligible for visas); *see also Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("When legislators did not adopt 'obvious alternative' language, 'the natural implication is that they did not intend' the alternative"). Finally, other provisions of the INA confirm that eligibility for a visa and eligibility for admission or entry are meaningfully distinct. For example, even someone who arrives with a valid visa may be denied entry, and, conversely, entry is sometimes permitted even without a visa. *See, e.g.*, § 1182(a)(3)(C)(i) (barring entry for those with communicable diseases); § 1182(*l*)(1) (waiving visa requirement for certain aliens seeking to enter only certain areas).[28]

For all of these reasons, the fact of being suspended from *entry* under § 1182(f) cannot make someone "ineligible to receive a visa . . . under section 1182." 8 U.S.C. § 1201(g). And it therefore cannot serve as a lawful basis for refusing to process a visa application under the governing law and regulations, as Defendants' defense of their policy needs it to do.

### 2. In Any Event, EO-2 Does Not Order Defendants To Suspend Visa Issuance.

As explained above, as a matter of law, an order under § 1182(f) cannot alter visa eligibility. But even if such an order *could* do so, Defendants' theory would fail for the independent reason that EO-2 *did not* do so.

---

[28] In fact, the second sentence of § 1182(f) itself highlights the entry/visa distinction. That sentence authorizes the Attorney General to "suspend the entry of some or all aliens transported to the United States by [an] airline" if the airline does not comply with certain anti-fraud measures. § 1182(f). But nobody would think this *entry* regulation justifies revoking the *visas* of people who have traveled or intend to travel on that airline; they simply have to *enter* by a different means. *See generally* Suspension of Privilege to Transport Aliens to the United States, 63 Fed. Reg. 56,869 (Oct. 23, 1998) (discussing purposes of this provision).

Rather, in keeping with its statutory basis, EO-2 directs the suspension of *entry*.  The order is titled "Protecting the Nation From Foreign Terrorist *Entry* Into the United States."  Its findings repeatedly cite "the risk of erroneously permitting *entry* of a national of" certain countries.  EO-2, § 1(f), (h), (i), 82 Fed. Reg. at 13,211-12 (emphasis added).  And, most importantly, the operative language in Section 2(c) halts "the *entry* into the United States" of those within its scope.  *Id.* at 13,212 (emphasis added).  It does not purport to impose any limit on the process of issuing a visa.

Visa issuance and entry are two different matters that involve independent components of the Executive Branch and are often widely separated in time and place.  For Plaintiffs, who seek to immigrate to the United States on a permanent basis, the first step is receiving an immigrant visa from the relevant consular official—an employee of the State Department—at the official's office outside the United States.  The second step, entry, may occur up to six months later.  At that stage, a visa-holder must travel to the United States and seek admission from U.S. Customs and Border Protection, a component of the Department of Homeland Security.  These differences strongly suggest that an order governing entry did not also order an upheaval in visa processing. *See also supra*, at 39 (explaining the distinct statutory treatments of these two subjects).

Finally, two historical points corroborate that conclusion.  First, Defendants' lead example of a precedent for EO-2—the 1980 suspension of visas for Iranians—cuts sharply against their position.  *See* Mot. 27.  In that case, President Carter's one-paragraph executive order, described as a "Delegation of Authority," simply "delegat[ed]" to the Secretary of State and the Attorney General the statutory "authority conferred upon the President" to impose travel restrictions.[29]  The operative order actually *exercising* that statutory authority—the analogue to

---

[29] Executive Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979).

EO-2 today—*did* specifically address "[t]he issuance of immigrant and nonimmigrant visas to nationals of Iran."  Additional Requirements in the Case of Certain Nonimmigrant Aliens, 45 Fed. Reg. 24,436 (Apr. 9, 1980).  Yet, faced with that clear precedent, the President elected not to order any such changes to visa practices in his own highly detailed order.[30]

Second, the history of EO-2 itself further demonstrates that the President's choice in this regard was deliberate.  The predecessor order, Executive Order 13,769, contained comparable operative language in the relevant Section but a different title.  The prior version read "*Suspension of Issuance of Visas* and Other Immigration Benefits to Nationals of Countries of Particular Concern."  Executive Order 13,769 § 3, 82 Fed Reg. 8977 (Jan. 27, 2017) (emphasis added).  In contrast, EO-2 retitled that section—apparently to make its limited scope clear—such that it now reads "Temporary *Suspension of Entry* for Nationals of Countries of Particular Concern."  EO-2 § 2, 82 Fed. Reg. at 13,212.

Given the plain language of the order and all of this contextual evidence, there is no basis to conclude it prescribes a suspension of visa issuance.  That is particularly clear when, as explained above, an order under § 1182(f) could not lawfully have that effect.  Just as courts assume "out of respect for Congress" that it "legislates in the light of constitutional limitations," *Rust v. Sullivan*, 500 U.S. 173, 191 (1991), this Court should accord the President the same respect and resolve any residual doubt about the meaning of EO-2 by assuming that he observed the statutory limitations on his authority.  Visa issuance and entry are two different matters.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.

---

[30] Plaintiffs do not concede the legality of the 1979-1980 orders relating to Iran.  *Cf.* 4A Op. O.L.C. 133, 140 (1979) (concluding only that the Iran orders "would *probably* be sustainable" (emphasis added)).

November 3, 2017

Respectfully submitted,

/s/  Matthew E. Price

Samer E. Khalaf (pro hac vice)
Abed A. Ayoub
Yolanda Rondon
AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
1705 DeSales Street, N.W., Suite 500
Washington, D.C. 20036
Tel: 202-244-2990
Skhalaf@adc.org

Matthew E. Price  (DC Bar # 996158)
Max J. Minzner (pro hac vice)
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
Tel. 202-639-6000
Fax: 202-639-6066
Email: mprice@jenner.com
        mminzner@jenner.com

Karen C. Tumlin
Esther Sung
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Blvd, Suite 1600
Los Angeles, CA 90010
(213) 639-3900
tumlin@nilc.org
sung@nilc.org

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org

Justin B. Cox
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
(678) 279-5441
cox@nilc.org

Cody H. Wofsy
Spencer E. Amdur
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN CIVIL LIBERTIES UNION
  OF THE DISTRICT OF COLUMBIA
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
202-457-0800
aspitzer@acludc.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that, on November 3, 2017, I served the foregoing Plaintiffs' Memorandum in Opposition to Motion to Dismiss on all counsel of record by filing it via this Court's CM/ECF system.

/s/ Matthew E. Price