**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HAMED SUFYAN OTHMAN | ) | |
| ALMAQRAMI., *et al.,* | ) | |
| on behalf of themselves and all | ) | |
| others similarly situated, | ) | Civil Action No. 1:17-cv-01533-TSC |
| | ) | |
| Plaintiffs/Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL R. POMPEO, *et al.*, | ) | |
| Defendants/Respondents. | ) | |

**MEMORANDUM IN OPPOSITION**
**TO MOTION TO DISMISS**

Samer E. Khalaf
Abed A. Ayoub
Iman Boukadoum
AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
1705 DeSales St. N.W., Suite 500
Washington, DC 20036
(202) 244-2990
Skhalaf@adc.org

Max Wolson (DC Bar #229562)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20043
(202) 216-0261
wolson@nilc.org

Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th St. N.W., 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

Matthew E. Price (DC Bar #996158)
Noah B. Bokat-Lindell (DC Bar #156032)
JENNER & BLOCK LLP
1099 New York Ave. N.W., Suite 900
Washington, DC 20001
(202) 639-6000
mprice@jenner.com
nbokat-lindell@jenner.com

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2600
ojadwat@aclu.org

Cody H. Wofsy
Spencer Amdur
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm St.
San Francisco, CA 94111
(415) 343-0770
cwofsy@aclu.org
samdur@aclu.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 2

    A.  The Diversity Visa Program. ...................................................................... 2

    B.  The Entry Suspension. ................................................................................ 4

    C.  The Challenged Policy................................................................................. 5

    D.  Plaintiffs' Lawsuit and the Preliminary Injunction..................................... 6

    E.  This Court's Ruling on Defendants' First Motion to Dismiss..................... 10

    F.  The D.C. Circuit's Reversal. ..................................................................... 11

ARGUMENT ........................................................................................................... 13

I.   Defendants' Policy Of Refusing To Process Plaintiffs' Visa Applications Is Unlawful......... 13

    A.  The Government May Refuse a Visa Only Upon a Ground Set Forth in the Governing Law and Regulations. .............................................................. 13

    B.  EO-2 Does Not Provide a Ground for Refusing to Process or Issue Visas. ...................... 15

        1.  Section 1182(f) Does Not Make Covered Individuals Ineligible for Visas. ................ 15

        2.  In Any Event, EO-2 Does Not Order Defendants to Suspend Visa Issuance. ............. 20

    C.  Defendants' Policy Illegally Bars Visa Processing Based on Nationality........................ 23

II.  Defendants' Alternative Arguments Are Unavailing. ........................................... 24

    A.  This Court Has the Equitable Power to Enforce Its September 2017 Order. ................... 25

        1.  Ordering Relief After the End of the Fiscal Year Is Both Permissible and Proper in This Case............................................................................... 26

        2.  Defendants Cannot Distinguish *Przhebelskaya* and *Paunescu*................... 29

    B.  The Doctrine of Consular Nonreviewability Does Not Apply. ......................... 33

        1.  Consular Nonreviewability Does Not Apply When No Consular Decision Has Been Rendered, and No Consular Decision Has Been Rendered in Plaintiffs' Cases. ................................................................................ 34

2.   Consular Nonreviewability Does Not Apply Because Plaintiffs Challenge a General Administrative Policy, Not an Exercise of Discretion. .................................37

C.  Plaintiffs Have Causes of Action Under the APA and the Mandamus Act. ......................40

1.   Plaintiffs Have an APA Cause of Action Under § 706(2). ..........................................40

2.   Plaintiffs Have Satisfied the Conditions for Mandamus Relief As Well....................43

CONCLUSION....................................................................................................................44

# TABLE OF AUTHORITIES[*]

**Page(s)**

CASES

*Advocate Health Care Network v. Stapleton*,
137 S. Ct. 1652 (2017) ............................................................................................18

*Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Pompeo*,
No. 18-CV-01388 (TSC), 2019 WL 367841 (D.D.C. Jan. 30, 2019) .....................36

*Ahmed v. DHS*,
328 F.3d 383 (7th Cir. 2003) ...........................................................................28, 32

*Allen v. Milas*,
896 F.3d 1094 (9th Cir. 2018) ................................................................................39

*Alliance to Save Mattaponi v. U.S. Army Corps of Engineers*,
515 F. Supp. 2d 1 (D.D.C. 2007) .....................................................................40, 41

*\*Almaqrami v. Pompeo*,
933 F.3d 774 (D.C. Cir. 2019) ....................................................................... passim

*American Hospital Association v. Price*,
867 F.3d 160 (D.C. Cir. 2017) .........................................................................29, 30

*Antone v. Block*,
661 F.2d 230 (D.C. Cir. 1981) ................................................................................31

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) .................................................................................................32

*Assassination Archives & Research Center v. CIA*,
48 F. Supp. 2d 1 (D.D.C. 1999) ..............................................................................25

*Baan Rao Thai Restaurant v. Pompeo*,
No. CV 19-0058 (ESH), 2019 WL 3413415 (D.D.C. July 29, 2019) .....................38

*Barton v. Barr*,
140 S. Ct. 1442 (2020) ............................................................................................19

*Beshir v. Holder*,
10 F. Supp. 3d 165 (D.D.C. 2014) ..........................................................................42

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Chun v. Powell*,
   223 F. Supp. 2d 204 (D.D.C. 2002) ...........................................................................38

*Cooper v. Harris*,
   137 S. Ct. 1455 (2017) ...............................................................................................31

*Coraggioso v. Ashcroft*,
   355 F.3d 730 (3d Cir. 2004) ......................................................................................29

*Corley v. United States*,
   556 U.S. 303 (2009) ...................................................................................................16

*Didban v. Pompeo*,
   ---F. Supp. 3d ---, No. 19-CV-881 (CRC), 2020 WL 224517 (D.D.C. Jan. 15, 2020)............34

*Emami v. Nielsen*,
   365 F. Supp. 3d 1009 (N.D. Cal. 2019) ....................................................................39

*Friends of Animals v. Sparks*,
   200 F. Supp. 3d 1114 (D. Mont. 2016) .....................................................................41

*Garcia v. Baker*,
   765 F. Supp. 426 (N.D. Ill. 1990) .............................................................................38

*Hi-Tech Pharmacal Co. v. U.S. FDA*,
   587 F. Supp. 2d 1 (D.D.C. 2008) .........................................................................41, 42

*Iddir v. INS*,
   301 F.3d 492 (7th Cir. 2002) ....................................................................................28

*In re Thornburgh*,
   869 F.2d 1503 (D.C. Cir. 1989) ................................................................................31

*INS v. Pangilinan*,
   486 U.S. 875 (1988).................................................................................................31

*International Union of Bricklayers & Allied Craftsmen v. Meese*,
   761 F.2d 798 (D.C. Cir. 1985) ..................................................................................37

*Jamal v. Pompeo*,
   No. CV 19-6967 JVS, 2019 WL 7865175 (C.D. Cal. Nov. 19, 2019) ......................39

*Jane Doe 1 v. Nielsen*,
   357 F. Supp. 3d 972 (N.D. Cal. 2018) ......................................................................39

*Kaufman v. Mukasey*,
   524 F.3d 1334 (D.C. Cir. 2008) ................................................................................42

*Keli v. Rice*,
    571 F. Supp. 2d 127 (D.D.C. 2008) ........................................................................29

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)..............................................................................................37

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
    543 U.S. 50 (2004)................................................................................................17

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) .......................................................................25, 33

*Legal Assistance for Vietnamese Asylum Seekers v. Department of State*,
    45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) .................. 37-38

*Malyutin v. Rice*,
    677 F. Supp. 2d 43 (D.D.C. 2009) ........................................................................38

*Mansur v. Albright*,
    130 F. Supp. 2d 59 (D.D.C. 2001) ........................................................................38

*Maramjaya v. USCIS*,
    No. 06-2158 (RCL), 2008 WL 9398947 (D.D.C. Mar. 26, 2008)...........................34

*Moghaddam v. Pompeo*,
    424 F. Supp. 3d 104 (D.D.C. 2020) ......................................................................34

*Motaghedi v. Pompeo*,
    No. 1:19-CV-01466-LJO-SKO, 2020 WL 489198 (E.D. Cal. Jan. 30, 2020)................34, 39

*Mulligan v. Schultz*,
    848 F.2d 655 (5th Cir. 1988) ................................................................................38

*Najafi v. Pompeo*,
    No. 19-CV-05782-KAW, 2019 WL 6612222 (N.D. Cal. Dec. 5, 2019) ..........................35, 39

*National Association of Home Builders v. U.S. Army Corps of Engineers*,
    417 F.3d 1272 (D.C. Cir. 2005) .......................................................................41, 42

*\*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v.
    Kerry*,
    168 F. Supp. 3d 268 (D.D.C. 2016) ................................................................34, 36, 42

*NLRB v. SW General, Inc.*,
    137 S. Ct. 929 (2017)............................................................................................17

*North Carolina Fisheries Association v. Gutierrez*,
    550 F.3d 16 (D.C. Cir. 2008) ............................................................................ 42-43

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ...........................................................................................40, 41

*Orlov v. Howard*,
    523 F. Supp. 2d 30 (D.D.C. 2007) ...........................................................................42

\*Patel v. Reno*,
    134 F.3d 929 (9th Cir. 1997) .............................................................34, 38, 43, 44

\*Paunescu v. INS*,
    76 F. Supp. 2d 896 (N.D. Ill. 1999) ..............................................................9, 26, 32

*Peacock v. Thomas*,
    516 U.S. 349 (1996) ................................................................................................32

\*Przhebelskaya v. U.S. Bureau of Citizenship & Immigration Services*,
    338 F. Supp. 2d 399 (E.D.N.Y. 2004) ...........................................................9, 26, 32

*Randall v. Meese*,
    854 F.2d 472 (D.C. Cir. 1988) .................................................................................33

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ................................................................................................22

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999) ...............................................................................34

*Singh v. Clinton*,
    618 F.3d 1085 (9th Cir. 2010) .................................................................................39

\*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...................................................................................... passim

*Trump v. Hawaii*,
    138 S. Ct. 377 (2017) ..............................................................................................10

*Trump v. IRAP*,
    137 S. Ct. 2080 (2017) ..............................................................................................8

*Trump v. IRAP*,
    138 S. Ct. 353 (2017) ..............................................................................................10

*U.S. ex rel. Newman v. City & Suburban Railway of Washington*,
    42 App. D.C. 417 (D.C. Cir. 1914) ...........................................................................29

*Valentini v. Shinseki*,
    860 F. Supp. 2d 1079 (C.D. Cal. 2012) ...................................................................40

*Van Ravenswaay v. Napolitano*,
    613 F. Supp. 2d 1 (D.D.C. 2009) ....................................................................38

*Wan Shih Hsieh v. Kiley*,
    569 F.2d 1179 (2d Cir. 1978) .......................................................................42

*Zhang v. Chertoff*,
    491 F. Supp. 2d 590 (W.D. Va. 2007) ...........................................................42

*Zixiang Li v. Kerry*,
    710 F.3d 995 (9th Cir. 2013) .......................................................................28

**STATUTES**

5 U.S.C. § 551(13) ...........................................................................................41

5 U.S.C. § 706(1) ..............................................................................40, 41, 42

*5 U.S.C. § 706(2) .............................................................................40, 41, 42

*5 U.S.C. § 706(2)(A) ........................................................................15, 41, 42

8 U.S.C. § 1151(e) ..............................................................................................2

*8 U.S.C. § 1152(a)(1)(A) .........................................................................23, 24

8 U.S.C. § 1153(c) ..........................................................................................2, 24

8 U.S.C. § 1153(c)(1) ..........................................................................................3

8 U.S.C. § 1153(c)(1)(E) .....................................................................................2

8 U.S.C. § 1153(c)(2) ........................................................................................14

8 U.S.C. § 1154(a)(1)(I)(ii)(II) ......................................................................3, 25

*8 U.S.C. § 1182 .......................................................................................passim

*8 U.S.C. § 1182(a) .....................................................................................14, 16

8 U.S.C. § 1182(a)(1) ........................................................................................15

8 U.S.C. § 1182(a)(1)(A)(i) ...............................................................................18

8 U.S.C. § 1182(a)(2) ........................................................................................15

8 U.S.C. § 1182(a)(3)(C)(i) ...............................................................................18

8 U.S.C. § 1182(a)(4)(B)(i) ...............................................................................17

8 U.S.C. § 1182(a)(7) ......................................................................................................15

*8 U.S.C. § 1182(f) ................................................................................................... passim

8 U.S.C. § 1182(l)(1) ......................................................................................................18

8 U.S.C. § 1201(c)(1) ........................................................................................................3

8 U.S.C. § 1201(g) ..........................................................................................6, 14, 15, 20

8 U.S.C. § 1202(b) ............................................................................................................3

Immigration Act of 1990, Pub. L. No. 101-649, § 131, 104 Stat. 4978 ..........................2

**OTHER AUTHORITIES**

*22 C.F.R. § 40.6 ........................................................................................................3, 14

22 C.F.R. § 42.33(a) ..........................................................................................................2

22 C.F.R. § 42.33(a)(1) ......................................................................................................3

22 C.F.R. § 42.33(c) ..........................................................................................................2

22 C.F.R. § 42.33(f) ...........................................................................................................3

22 C.F.R. § 42.33(g) ..........................................................................................................3

22 C.F.R. §§ 42.61-.67 ......................................................................................................3

22 C.F.R § 42.81(a) ....................................................................................................14, 15

*22 C.F.R § 42.81(a) (2017) ......................................................................................3, 14, 15

4A Op. O.L.C. 133 (1979) ...............................................................................................22

Additional Requirements in the Case of Certain Nonimmigrant Aliens, 45 Fed. Reg. 24,436
    (Apr. 9, 1980) ........................................................................................................21-22

Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979) .....................................21

Exec. Order No. 13,769, 82 Fed Reg. 8977 (Jan. 27, 2017) ...........................................22

*Protecting the Nation From Foreign Terrorist Entry Into the United States, Exec. Order No.
    13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017) ................................................... passim

H.R., Office of Legislative Counsel, *House Legislative Counsel's Manual on Drafting Style*
    (Nov. 1995), https://www.llsdc.org/assets/sourcebook/manual_on_drafting_style.pdf ..........17

Refusal Procedures for Visas, 84 Fed. Reg. 16,610 (2019)..............................................................14

S., Office of Legislative Counsel, *Legislative Drafting Manual* (Feb. 1997),
   https://law.yale.edu/sites/default/files/documents/pdf/Faculty/SenateOfficeoftheLegislativeC
   ounsel_LegislativeDraftingManual%281997%29.pdf...........................................................17

Suspension of Privilege to Transport Aliens to the United States, 63 Fed. Reg. 56,869 (Oct. 23,
   1998) .......................................................................................................................................18

U.S. Department of State, *Visa Bulletin for July 2016* (June 8, 2016),
   https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2016/visa-bulletin-for-
   july-2016.htm............................................................................................................................3

## INTRODUCTION

Plaintiffs challenge a State Department policy that suspended the processing of diversity visas for all foreign nationals who were subject to an executive order that barred the entry of people from certain countries. To the extent this policy is now "defunct," as Defendants contend, Dkt. 81-1 ("Mot.") at 23, that just "removes an obstacle to [Plaintiffs'] ability to obtain an order instructing the government to process their applications and issue them visas." *Almaqrami v. Pompeo*, 933 F.3d 774, 783 (D.C. Cir. 2019). But to the extent Defendants still rely on the policy to defend suspending the processing of Plaintiffs' visas, the policy is unlawful. As this Court held in September 2017, a policy not to process certain visa applications must be based on a ground authorized by statute. An executive order barring entry is not an authorized ground for refusing to process visa applications. The statutory authority under which the executive order here was issued, 8 U.S.C. § 1182(f), allows only bars on *entry*; it does not affect visa eligibility, which is governed by other provisions. The Supreme Court decision relied on by Defendants, *Trump v. Hawaii*, in fact just underscores the distinction between entry and visa eligibility. Moreover, the executive order itself spoke only of a bar on entry; it did not purport to instruct Defendants to deny visas.

Defendants' policy is thus unauthorized by law, and Defendants' invocation of that illegal policy to refuse to process Plaintiffs' visa applications violated a clear duty spelled out by the Immigration and Nationality Act ("INA") and its implementing regulations. To be sure, if granted visas, Plaintiffs could not use them to enter the United States while the entry bar is in effect. But Section 1182(f) by its terms contemplates a temporary bar on entry, and if Plaintiffs were issued visas, they could use them to enter the United States if they were to receive waivers from the entry bar or if the bar were lifted while the visas remained valid—typically a six-month period.

Seeking to avoid a decision on the merits, Defendants try to erect three additional barriers to relief. All are easily surmounted, and the Court has already rejected them.

1

*First*, for the reasons already given in this Court's September 2017 opinion, the end of Fiscal Year 2017 is no impediment to reaching the merits here. By ordering Defendants before the end of the Fiscal Year to reserve visa numbers for Plaintiffs, the Court ensured it had the equitable power to force Defendants to process their visa applications even after the Fiscal Year ended. Indeed, that was the entire point of the Court's prior order. *Second*, this Court has already ruled that consular nonreviewability does not apply in this case. Plaintiffs are challenging a State Department policy, and, once that policy is set aside, simply asking that their visas be processed. Defendants do not engage with the grounds for this Court's prior holding or offer any persuasive reason to revisit it. *Third*, Defendants' arguments that Plaintiffs lack causes of action under the Administrative Procedure Act and the Mandamus Act misunderstand the statutory standards and misapply them to this case.

In sum, Defendants' policy of refusing to process Plaintiffs' visa applications on their merits contravenes the INA and breaches a clear duty owed to Plaintiffs.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Diversity Visa Program.

Congress created the diversity visa program in 1990 to promote immigration from countries with low rates of immigration to the United States. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 131, 104 Stat. 4978, 5000 (codified as amended at 8 U.S.C. § 1153(c)). The statute sets a target of 50,000 diversity immigrants per fiscal year. *See* 8 U.S.C. § 1151(e). To implement the program, the Secretary of Homeland Security first identifies countries and regions with low rates of immigration and applies a statutory formula to allocate available visas among those places. *See* 8 U.S.C. § 1153(c)(1)(E); 22 C.F.R. § 42.33(a). The State Department then conducts a lottery to select a small number of individuals from each place who may submit applications for the available visas. *See* 22 C.F.R. § 42.33(c). The number of lottery-entrants makes

2

the process intensely competitive. For Fiscal Year 2017, more than 19 million people entered the lottery, and 83,910 of them were selected to apply for visas—a success rate of one-half of one percent. *See* U.S. Dep't of State, *Visa Bulletin for July 2016* (June 8, 2016), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2016/visa-bulletin-for-july-2016.html.

Once selected, lottery winners must finalize their applications, be interviewed by a consular official, and complete other procedural steps. *See* 8 U.S.C. § 1202(b); 22 C.F.R. §§ 42.33(g), 42.61-.67. By statute and regulation, the government must then issue visas to applicants who satisfy the relevant statutory criteria. *See* 8 U.S.C. § 1153(c)(1); 22 C.F.R § 42.81(a) (2017) ("When a visa application has been properly completed and executed . . . , the consular officer must issue the visa, [or] refuse the visa[.]"); 22 C.F.R. § 40.6 ("A visa can be refused only upon a ground specifically set out in the law or implementing regulations."). Eligible lottery winners whose cases are processed by the end of the fiscal year (September 30) thus receive visas that allow them to immigrate and become lawful permanent residents. 8 U.S.C. § 1154(a)(1)(I)(ii)(II) (specifying that lottery-winners are "eligible to receive" diversity visas "only through the end of the specific fiscal year for which they were selected"); 22 C.F.R. § 42.33(a)(1). Once a visa is issued, it is generally valid for up to six months. *See* 8 U.S.C. § 1201(c)(1).

During the period between the lottery drawing and the end of the fiscal year, the State Department closely manages the worldwide application process in order to ensure that approximately 50,000 actual diversity visas are issued. *See* Dkt. 47-2 ("Oppenheimer Decl.") ¶¶ 4-7. The Department uses "visa numbers"—abstract placeholders for potential visas—for this purpose. *Id.* ¶¶ 4-5; *see* 22 C.F.R. § 42.33(f). Each of these "numbers" represents, in effect, a license for a consular post to go forward with processing one application. Defendants issue many more than 50,000 visa numbers per year, because they expect a significant fraction to go unused

for a variety of reasons. By monitoring and regulating the distribution of visa numbers to consular

posts, Defendants attempt to ensure that any deviation from the 50,000 target is relatively slight.

However, government statistics from recent years, *see* Dkt. 45, at 4, reflect that as few as 34,463

and as many as 54,115 diversity visas have been issued in a Fiscal Year:

| Fiscal Year | Visa Numbers Used |
|:---:|:---:|
| 2016 | 46,718 |
| 2015 | 49,377 |
| 2014 | 52,342 |
| 2013 | 52,571 |
| 2012 | 34,463 |
| 2011 | 51,118 |
| 2010 | 51,312 |
| 2009 | 48,036 |
| 2008 | 46,633 |
| 2007 | 40,076 |
| 2006 | 46,145 |
| 2005 | 48,151 |
| 2004 | 48,044 |
| 2003 | 50,810 |
| 2002 | 43,368 |
| 2001 | 45,450 |
| 2000 | 47,715 |
| 1999 | 54,115 |
| 1998 | 51,565 |

### B.     The Entry Suspension.

On March 6, 2017, President Trump issued Executive Order 13780, "Protecting the Nation

From Foreign Terrorist Entry Into the United States" ("EO-2"). 82 Fed. Reg. 13,209 (Mar. 6,

2017). Relying on his authority to "suspend the entry of … any class of aliens," 8 U.S.C. § 1182(f),

the President suspended "entry into the United States" by nationals of six countries—Iran, Libya,

Somalia, Sudan, Syria, and Yemen—while the government undertook a ninety-day review. EO-2,

§ 2(c), 82 Fed. Reg. at 13,213. In keeping with the President's statutory authority under § 1182(f),

the order did not purport to impose any limit on the processing or issuance of visas.

### C.     The Challenged Policy.

On June 28, 2017, shortly before the entry suspension became effective, the Secretary of State issued a cable to all consular posts purporting to "implement[]" EO-2, and announcing the policy challenged here. The cable purported to be "implementing" EO-2. In fact, however, the cable converted EO-2's bar on *entry* into a suspension of the processing and issuing of *visas*—casting aside "the basic distinction between admissibility determinations and visa issuance that runs throughout the INA." *Trump v. Hawaii,* 138 S. Ct. 2392, 2414 (2018) ("*Hawaii II*"); *see id.* at 2414 n.4 (noting that the "concepts of entry and admission . . . are used interchangeably in the INA," but that "issuance of a visa" is distinct).

Specifically, with respect to diversity visas, the cable instructs as follows:

8. (SBU) For Diversity Visa (DV) applicants already scheduled for interviews falling after the E.O. implementation date of 8:00 p.m. EDT June 29, 2017, post should interview the applicants. Posts should interview applicants following these procedures:

a.) Officers should first determine whether the applicant is eligible for the DV, without regard to the E.O. If the applicant is not eligible, the application should be refused according to standard procedures.

b.) If an applicant is found otherwise eligible, the consular officer will need to determine during the interview whether the applicant is exempt from the E.O.'s suspension of entry provision (see paragraphs 10-13), and if not, whether the applicant qualifies for a waiver (paragraphs 14 and 15).

c.) *DV applicants who are not exempt from the E.O.'s suspension of entry provision and who do not qualify for a waiver should be refused* 221(g) and the consular officer should request an advisory opinion from VO/L/A following current guidance in 9 FAM 304.3-1.

Based on the Department's experience with the DV program, we anticipate that very few DV applicants are likely to be exempt from the E.O.'s suspension of entry or to qualify for a waiver. [Consular Affairs] will notify DV applicants from the affected nationalities with scheduled interviews of the additional criteria to allow the potential applicants to determine whether they wish to pursue their application.

> 9. (SBU) The Kentucky Consular Center (KCC) will continue to schedule additional DV-2017 appointments for cases in which the principal applicant is from one of these six nationalities. While the Department is mindful of the requirement to issue Diversity Visas prior to the end of the Fiscal Year on September 30, direction and guidance to resume normal processing of visas following the 90-day suspension will be sent [in a separate cable].

Dkt. 2-2, at 5-6 (emphasis added).

Defendants thus established a special procedure governing diversity visa applications by lottery winners whose countries of origin were subject to entry suspension under EO-2. Under that procedure, Defendants would first determine whether such a diversity-visa applicant is "otherwise eligible," apart from EO-2. *Id.* at 3. If the applicant *was* otherwise eligible, she was then "refused" a visa unless and until she established that EO-2 did not bar her entry. *Id.*[1] Such a "refusal" means that: (1) the applicant had been deemed "otherwise eligible" for a diversity visa, Dkt. 2-2, at 5-6; but (2) was "ineligible to receive a visa" under the State Department policy purporting to implement EO-2; and (3) processing of her application was therefore suspended unless and until she could establish that EO-2 did not bar her entry (for example, if she could prove a family relationship or some other exception to EO-2). *See* Dkt. 36, PI Hr'g 25-26, 45-46 (government's explanation of the policy).

### D. Plaintiffs' Lawsuit and the Preliminary Injunction.

Plaintiffs are four nationals of Iran and Yemen (as well as their immediate family members) who won the diversity-visa lottery for Fiscal Year 2017. All promptly submitted their visa applications and completed their consular interviews. *See* Dkt. 49 ("PI Op.") at 5. But, pursuant to the policy described above, the processing of their visas was suspended—without respect to the merits of their applications or the statutory and regulatory criteria. *See* Dkt. 46 ("Am. Compl.")

---

[1] The cable's instruction that applicants should be "refused 221(g)" is a reference to section 221(g) of the INA, which bars the granting of a visa when the consular official has reason to believe the applicant is "ineligible to receive a visa." 8 U.S.C. § 1201(g).

¶¶ 37-41. None of Plaintiffs' visa applications were finally refused. PI Op. 16-17. Instead, each received letters after being interviewed by consular officials stating that they were currently ineligible for visas under EO-2 but asking them to "demonstrate a bona fide relationship with a U.S. person or entity to establish an exception to the Executive Order." Am. Compl. ¶ 40; *see id.* ¶¶ 37, 39; Dkt. 45-1, at 17 ("If you have documents to show that you have a qualifying relationship with a person or entity in the U.S. you can send them to our office by email. Upon receipt of your email, the consular officer will review it and make a determination on your case."); Dkt. 45-2, at 7-8 (requiring documentation of bona fide relationship); Dkt. 45-3, at 7 ("If you believe you have a relationship that would qualify you for a visa issuance, please send information to demonstrate that relationship, as explained above. If you do not have such a credible claim of a bona fide relationship with a person or entity in the United States, your application will remain in administrative processing during the 90-day period of this travel restriction."). Fearing that, because of the State Department's policy, their applications would not be processed on the merits before the end of the Fiscal Year when their eligibility would ordinarily expire, Plaintiffs brought suit on August 3, 2017. *See* Dkt. 1.[2]

As Plaintiffs underscored in their complaint, "[t]his case does not challenge the President's power to issue the Executive Order," but rather concerns only "the government's illegal decision to refuse to issue *visas* to individuals covered by the Executive Order's prohibition on *entry*." Am. Compl. ¶¶ 5, 7 (emphasis added).[3] Plaintiffs challenged that refusal under the Administrative

---

[2] Mr. Almaqrami was an original plaintiff, alongside others who have voluntarily dismissed their claims. The other three plaintiff families joined the suit on September 22, 2017. PI Op. 5 & n.5; Am. Compl. ¶¶ 12-19.

[3] *See also* Am. Compl. ¶ 10 ("Although other cases are currently pending that challenge the Executive Order's suspension of *entry*, Plaintiffs do not challenge that suspension of entry here. Instead, Plaintiffs are simply asking that their visa applications be processed consistent with the statute and regulations, so that

Procedure Act ("APA") and sought declaratory, injunctive, and mandamus relief. *Id.* ¶¶ 51, 53-67 & A-E. The operative complaint thus asks the district court to, among other things, (1) issue a writ of mandamus compelling Defendants to process Plaintiffs' visa applications notwithstanding the challenged policy, (2) enjoin Defendants from implementing that policy, and (3) enjoin Defendants to issue visas that would have been issued but for that policy. *Id.* Plaintiffs also moved for class certification, seeking to represent all winners of the Fiscal Year 2017 diversity visa lottery whose applications were refused for processing because their home countries were subject to EO-2. *See* Dkt. 3-1 ("Mot. for Class Cert.") at 5.

Plaintiffs also sought a preliminary injunction or emergency mandamus relief compelling Defendants to process their visa applications before the end of the fiscal year. At the time of Plaintiffs' motion in August 2017, the Supreme Court had granted certiorari in two cases involving challenges to the legality of EO-2 itself. *See Trump v. IRAP,* 137 S. Ct. 2080 (2017) ("*IRAP I").* The Supreme Court had also stayed, with respect to foreign nationals without a bona fide relationship to a U.S. person or entity, the lower courts' injunctions against enforcement of EO-2. *See id.* After this Court expressed concern that it might be improper to adjudicate Plaintiffs' claims on the merits while those cases were pending in the Supreme Court (and while the injunctions against EO-2 were stayed), Plaintiffs added an alternative request for relief:

> While Plaintiffs believe that the pending litigation in the Supreme Court is irrelevant to this case, if the Court disagrees, it could also reserve any unused visa numbers until after that case is resolved. … Reserving unused visa numbers would permit this Court to maintain the status quo in advance of the decision of the Supreme Court.

Dkt. 45 ¶ 7.

---

they can, if eligible, be issued visas before the September 30 deadline, or pursuant to a court order after the September 30 deadline. Plaintiffs do not seek an order ... striking down the Executive Order.").

On September 29, 2017, the day before the September 30 deadline, this Court granted Plaintiffs' motion in part and denied it in part. PI Op. 17. Because the Supreme Court's stay order in *IRAP I* remained in effect, the Court found it inappropriate to address the merits of this case and compel Defendants to process Plaintiffs' visa applications. *See id*. at 11. Instead, the Court "grant[ed] the alternative relief Plaintiffs request[ed] and order[ed] the State Department to reserve any unused visa numbers until after the Supreme Court's ultimate decision in *Trump*." *Id.* at 8; *see also id.* at 15 (directing Defendants to "hold those visa numbers to process Plaintiffs' visa applications in the event the Supreme Court finds the Executive Order to be unlawful"). This remedy, the Court explained, would "address[] the potential irreparable harm that Plaintiffs face." *Id.* at 13. If Plaintiffs' legal claims ultimately were vindicated, neither the end of the Fiscal Year, nor an argument that available visa numbers had been exhausted, would prevent Plaintiffs from receiving visas. *See id.* at 15.

This Court modeled this relief on two analogous cases in which courts had ordered the processing of diversity-visa applications, notwithstanding the passage of the statutory deadline, because those plaintiffs sought emergency relief before the deadline had passed. *See Przhebelskaya v. U.S. Bureau of Citizenship & Immigration Servs.*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004); *Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999). As the Court later explained, Defendants "fail[ed] to specifically argue that the courts in *Paunescu* and *Przhebelskaya* improperly ordered the adjudication of visa applications after the statutory deadline," and Defendants had thereby "concede[d] that under certain circumstances, equity permits a court to order the processing of visas after September 30." Dkt. 65 ("Mem. Op."), at 8 n.1. Defendants did not appeal the preliminary injunction ordering them to hold visa numbers for processing after the deadline.

As part of the same injunctive order, this Court also directed Defendants to report, after the end of the Fiscal Year, the number of visa numbers that were issued but went unused. PI Op. at 15. Defendants responded that 27,241 visa numbers had been returned unused, and that they had approved only 49,976 diversity immigrants for Fiscal Year 2017. Dkt. 52-1 ¶ 5. Defendants thereby confirmed that, by any measure, an adequate number of visas remained available for Plaintiffs to obtain visas in the Fiscal Year 2017 program.

### E.    This Court's Ruling on Defendants' First Motion to Dismiss.

In October 2017, just weeks after the district court ordered Defendants to hold visa numbers for Plaintiffs, the Supreme Court disposed of the challenges to EO-2 without reaching the merits. *See Trump v. Hawaii,* 138 S. Ct. 377 (2017) ("*Hawaii I*"); *Trump v. IRAP,* 138 S. Ct. 353 (2017) ("*IRAP II*"). Because the relevant provisions of EO-2 had "expired by [their] own terms," *Hawaii I,* 138 S. Ct. at 377, the Supreme Court vacated the appeals courts' judgments upholding injunctions against enforcement of those provisions and remanded for those courts to dismiss the appeals as moot.

Defendants then moved to dismiss this case for lack of subject-matter jurisdiction based on mootness.[4] They first argued that the September 30 statutory deadline barred them from issuing visas to Plaintiffs—notwithstanding this Court's preliminary injunction—and that the passage of time had therefore mooted the case. Dkt. 53-1, at 8-14. Defendants also argued that Plaintiffs' suit was, like the *Hawaii* and *IRAP* appeals before the Supreme Court, mooted by the expiration of EO-2. *Id.* at 15-17. Finally, Defendants argued that the preliminary injunction had conditioned any further relief for Plaintiffs on a decision by the Supreme Court invalidating EO-2; because the Supreme Court had not done that, Defendants said, this case was moot. *Id.* at 17.

---

[4] Defendants also raised merits arguments, but this Court did not reach those issues.

This Court granted Defendants' motion. Mem. Op. 1. The Court began by correctly rejecting the argument that the Fiscal-Year deadline barred the Court from ordering the State Department to process Plaintiffs' visa applications and (if appropriate) issue their visas. Because Plaintiffs had sought and obtained relief prior to the statutory deadline, the Court explained, it had the equitable power to order the State Department to process Plaintiffs' applications as the prior order contemplated and the law required. *Id.* at 7-9. "[I]f the court deemed it appropriate," the Court concluded, "it could order the State Department to process Plaintiffs' diversity visa applications, and the passing of the September 30 deadline did not moot Plaintiffs' claims." *Id.* at 10. The Court then ruled, however, that Plaintiffs' claims were mooted by the expiration of EO-2. *Id.* at 10-12. The Court acknowledged that "Plaintiffs do not challenge the Executive Order directly." *Id.* at 11. Nonetheless, the Court reasoned that because "section 2(c)'s expiration moots challenges to the Executive Order, it necessarily follows that challenges to a State Department[] policy promulgated pursuant to that section of the Executive Order are moot as well." *Id.*[5]

Plaintiffs appealed this Court's ruling. Dkt. 67. While the appeal was pending, the Supreme Court reversed injunctions against a later executive order banning nationals of certain countries from entering the United States ("EO-3"), holding that the plaintiffs were not likely to establish that EO-3 violated either the INA or the Establishment Clause. *Hawaii II*, 138 S. Ct. at 2415, 2423.

### F.     The D.C. Circuit's Reversal.

The D.C. Circuit reversed the finding that the case was moot. *Almaqrami*, 933 F.3d 774. It held that the question whether this Court "may lawfully take steps to grant plaintiffs relief" is a merits question, not a mootness question. *Id.* at 780.

---

[5] The Court deferred ruling on Plaintiffs' class certification motion until after resolving Defendants' motion to dismiss. *See* Tr. of 12/21/17 Hr'g at 21, Dkt. 70.

The Circuit contrasted this case with others in which visa-seekers do not file until after the statutory deadline, or in which the district court fails to act before that deadline. *Id.* Because this Court had granted "*some* relief—but not the visa—before October 1," this case fell within a category of suits in which this Court "might lawfully take steps to compel the government to process the plaintiff's application and issue her a diversity visa anyway." *Id.* The Circuit thus found it was "not 'implausible' that the district court here could rely on equity to take steps to compel the issuance of diversity visas, notwithstanding the end of FY 2017." *Id.* at 781.

As the D.C. Circuit noted, even Defendants "acknowledge[d] that courts have that power." *Id.* Defendants had argued only that "that power is limited to cases … in which the court orders the government to *process* a visa application." *Id.* But the Circuit rejected the line Defendants attempted to draw between "order[ing] the government to *process* a visa application" and ordering it to "*potentially process*" an application, which Defendants claimed was all that had happened here. *Id.* The Circuit found that this distinction "assigns more determinacy to the meaning of [this Court's preliminary injunction order] than it can bear." *Id.* Because that order could be read to leave open the possibility of future relief even absent a ruling from the Supreme Court, Plaintiffs' case remained live. *See id.* at 782.[6]

The D.C. Circuit also held that the expiration of EO-2 did not moot the case. *Id.* at 783. As the Circuit noted, Plaintiffs seek three forms of relief: a declaration that the State Department's guidance memo was illegal, an injunction against the memo's enforcement, and an order to

---

[6] The D.C. Circuit noted this Court's additional conclusion that it could not grant further relief because the Supreme Court had never found EO-2 unlawful. But Defendants "d[id] not defend this reasoning on appeal," and the D.C. Circuit disagreed that this was so clearly the way to read this Court's preliminary injunction order as to moot the case. *Almaqrami*, 933 F.3d 774, 781 n.2. After all, Plaintiffs never sought to challenge EO-2. Instead, their theory of the case is, and always has been, that EO-2, even if valid, suspends entry but does not authorize the denial of visas. And even though EO-2 has been withdrawn, Plaintiffs' visa applications remain unprocessed.

consular officials to process Plaintiffs' visa applications. *Id.* Even if the expiration of EO-2 caused the State Department policy to expire as well, the Circuit explained, that would not moot the case. To the contrary, it would "arguably remove[] an obstacle to the plaintiffs' ability to obtain an order instructing the government to process their applications and issue them visas pursuant to the INA." *Id.* Nor would the policy's expiration have any "effect on the potential viability of plaintiffs' theories of relief." *Id.* And in any event, this Court did not find—and Defendants did not argue before the Circuit—that the policy expired of its own accord along with EO-2. *Id.* Finally, the Circuit found that relief could secure Plaintiffs' immigration to the United States, since they "could qualify for an exemption or waiver" or the President could lift the entry ban. *Id.* at 784.

## ARGUMENT

### I. Defendants' Policy Of Refusing To Process Plaintiffs' Visa Applications Is Unlawful.

The Court should deny Defendants' motion to dismiss because Plaintiffs have stated a valid claim for relief. The path to that conclusion is not long, and this Court has already traveled much of the way. As this Court held in its September 2017 order, Defendants may refuse to process or issue a visa only by invoking a ground set forth in the governing law and regulations. But entry suspension under a § 1182(f) proclamation is not a permissible ground for refusing to process (or denying) visas. Indeed, EO-2 by its terms does not even instruct Defendants to refuse to process or to deny visas. Furthermore, refusing visa processing based on nationality, as Defendants' policy does, also is an impermissible ground; in fact, it is a specifically prohibited one. Defendants' policy thus contravenes the INA and breaches a clear duty owed to Plaintiffs to process their visas.

#### A. The Government May Refuse a Visa Only Upon a Ground Set Forth in the Governing Law and Regulations.

The statute and governing regulations impose an affirmative obligation on Defendants to adjudicate visa applications and to issue diversity visas to those eligible to receive them. Entitled

"Issuance or refusal mandatory" when this case was filed, 22 C.F.R § 42.81(a) (2017) stated: "When a visa application has been properly completed and executed . . ., the consular officer must either issue or refuse the visa under INA 212(a) or 221(g) or other applicable law. Every refusal must be in conformance with the provisions of 22 CFR 40.6."[7] Section 40.6, in turn, states that "[a] visa can be refused *only* upon a ground specifically set out in the law or implementing regulations." 22 C.F.R. § 40.6 (emphasis added). Thus, unless Plaintiffs are ineligible under the statute or regulations, these regulations entitle them to have their visas processed and, ultimately, granted. *See* PI Op. 12 (adopting the same analysis). Defendants do not appear to dispute this basic rule. *See generally* Mot. 37-43.

The next question, then, is what grounds of ineligibility the law and regulations recognize. These divide into two classes. First, Congress imposed an education or work-experience requirement on diversity-visa recipients in particular. *See* 8 U.S.C. § 1153(c)(2). Second, the law also provides that "[n]o visa … shall be issued to an alien if … such alien is ineligible to receive a visa . . . under section 1182." 8 U.S.C. § 1201(g). This is the authority on which Defendants rely to justify the challenged policy. *See* Mot. 41.

So what makes someone, in the words of § 1201(g), "ineligible to receive a visa … under section 1182"? Section 1182(a) squarely answers that question: It says that "aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States: …," and it proceeds to enumerate a series of ten numbered paragraphs that explicitly deem certain classes of people to be "inadmissible." These include, for

---

[7] The regulation was amended in 2019. It is now titled "Grounds for refusal," and provides: "When a visa application has been properly completed and executed …, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa." 22 C.F.R § 42.81(a). The change was "largely technical in nature." Refusal Procedures for Visas, 84 Fed. Reg. 16,610, 16,610 (2019).

example, health-related grounds, 8 U.S.C. § 1182(a)(1); criminal grounds, *id.* § 1182(a)(2); and documentation-related grounds, *id.* § 1182(a)(7). Putting these interlocking pieces together, a diversity-visa applicant may be refused a visa if she either does not meet the education/work requirement (not at issue here), or if she falls within one of § 1182(a)'s enumerated grounds. Otherwise, a diversity visa "must" be processed—and then issued—under 22 C.F.R § 42.81(a).

**B.      EO-2 Does Not Provide a Ground for Refusing to Process or Issue Visas.**

The State Department policy, however, was not based on any ground set forth in § 1182(a). Instead, it was based on EO-2, which purportedly is authorized by § 1182(f). But § 1182(f) authorizes a bar on entry. It does not authorize the suspension of visa processing. Moreover, EO-2 itself imposed only a bar on entry and did not purport to bar the issuance of visas. Thus, the State Department policy was not authorized by EO-2—neither by the statutory authority undergirding EO-2 nor by the terms of EO-2 itself. And Defendants have not offered any other argument defending the merits of their policy. *See* Mot. 37-43. For these reasons, Defendants' policy is "arbitrary, capricious, … [and] not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A). And, likewise, adhering to that policy to suspend the processing of Plaintiffs' visas breaches a clear duty owed to Plaintiffs, making mandamus relief warranted, as well.

**1.      Section 1182(f) Does Not Make Covered Individuals Ineligible for Visas.**

Defendants' policy is valid only if Plaintiffs are "ineligible to receive a visa . . . under section 1182." 8 U.S.C. § 1201(g); *see supra* Part I.A. But Section 1182 specifies exactly who is "ineligible to receive a visa":

> **(a) Classes of aliens ineligible for visas or admission**
>
> Except as otherwise provided in this chapter, *aliens who are inadmissible under the following paragraphs are ineligible to receive visas* and ineligible to be admitted to the United States:
>
> …

15

8 U.S.C. § 1182(a) (emphasis added). Section 1182(a) then includes numerous paragraphs listing various grounds of inadmissibility that render noncitizens ineligible for visas. Defendants do not argue that the State Department's policy implements any of these grounds of inadmissibility.

Instead, Defendants contend that § 1182(f), authorizing the President to suspend entry of aliens, *is* one of the "following paragraphs" referenced in § 1182(a). *See* Mot. 41. That provision reads, in full:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

8 U.S.C. § 1182(f).

Defendants' argument is wrong for several reasons. *First,* the plain language of § 1182(a) and § 1182(f) make clear that they address different subject matter. Section 1182(a) specifically addresses "Classes of aliens ineligible for visas or admission." By contrast, § 1182(f) does not mention visas or visa eligibility at all; both its title and its text speak only to "Suspension of entry." That textual contrast is stark and presumptively deliberate. *See Corley v. United States,* 556 U.S. 303, 315 (2009) (where "Congress used both [of two] terms in [a statute], … 'we would not presume to ascribe this difference to a simple mistake in draftsmanship'" (citation omitted)). As the Supreme Court recognized in *Hawaii II*, a "basic distinction between admissibility determinations and visa issuance … runs throughout the INA." 138 S. Ct. at 2414. Thus, § 1182(f) by its own terms has nothing to do with visa issuance, only entry.

16

*Second*, treating § 1182(f) as a "following paragraph[]" under § 1182(a) contravenes both controlling Supreme Court precedent and norms of congressional drafting. The Supreme Court has repeatedly explained that Congress "drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line," and that Congress "relie[s]" on this system "to make precise cross-references." *NLRB v. SW General, Inc.,* 137 S. Ct. 929, 938-39 (2017); *see Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 60 (2004). In that hierarchical scheme, "paragraph" does not bear the ordinary meaning taught in elementary schools. Rather, as the Supreme Court has instructed, a "paragraph" is a numbered unit of statutory text that forms a subpart of a subsection. "This hierarchy is set forth in drafting manuals prepared by the legislative counsel's offices in the House and the Senate," and it proceeds as follows: first "subsections (starting with (a))"; then "paragraphs (starting with (1))"; then "subparagraphs (starting with (A))"; and then "clauses (starting with (i))." *Koons Buick Pontiac,* 543 U.S. at 60.[8] This careful scheme makes it impossible to treat § 1182(f)—a distinct *subsection* separated from § 1182(a) by three intervening subsections, one with over a dozen of its own paragraphs—as one of the "following *paragraphs*" that comprise the meat of § 1182(a). Congress is entitled to assume that courts are familiar with the way statutes are written, and thus that they will apply its hierarchical cross-references in the ordinary way. *See SW General,* 137 S. Ct. at 938-39.[9]

---

[8] For examples of these congressional drafting guides, *see* H.R., Office of Legislative Counsel, *House Legislative Counsel's Manual on Drafting Style* 24 (Nov. 1995), https://www.llsdc.org/ assets/sourcebook/manual_on_drafting_style.pdf ("To the maximum extent practicable, a section should be broken into— (A) subsections (starting with (a)); (B) paragraphs (starting with (1)) …."); and S., Office of Legislative Counsel, *Legislative Drafting Manual* 10 (Feb. 1997), https://law.yale.edu/sites/default/ files/documents/pdf/Faculty/SenateOfficeoftheLegislativeCounsel_LegislativeDraftingManual%281997% 29.pdf (stating that "[a] section is subdivided and indented as follows," listing "(1) Paragraph" within "(a) Subsection," and admonishing that "[e]ach subdivision of a draft should express a single concept").

[9] If there were any doubt, the use of "paragraph" as a term of art is evident throughout § 1182 (as it is throughout the U.S. Code). *See, e.g.,* 8 U.S.C. § 1182(a)(4)(B)(i) (listing factors to use in determining "whether an alien is inadmissible under this paragraph," *i.e.*, paragraph (4)).

17

If people covered by a Presidential entry suspension under § 1182(f) were *also* supposed to be ineligible for visas, Congress could easily have said as much in § 1182(f). Or it could have made reference to those people in one of the ten paragraphs under § 1182(a). *See, e.g.*, § 1182(a)(3)(C)(i) (making certain people designated by the Secretary of State ineligible for visas). Or it could have included § 1182(f) as a new § 1182(a)(11). But it did not. Instead, Congress purposely drafted § 1182 to ensure that eligibility for a visa and eligibility for admission or entry remained distinct. *See Advocate Health Care Network v. Stapleton,* 137 S. Ct. 1652, 1659 (2017) ("When legislators did not adopt 'obvious alternative' language, 'the natural implication is that they did not intend' the alternative." (citation omitted)). Thus, even someone who arrives with a valid visa may be denied entry; conversely, some may enter even without a visa. *See, e.g.*, 8 U.S.C. § 1182(a)(1)(A)(i) (barring entry of those with communicable diseases), § 1182(l)*(1)* (waiving visa requirement for certain aliens seeking to enter only certain areas); *Hawaii II*, 138 S. Ct. at 2414.[10]

This case demonstrates why such a visa eligibility/entry distinction makes sense. Section 1182(f) presupposes the possibility of restrictions on entry that could be quite short in duration. By only limiting entry and not visa issuance, § 1182(f) prevents a scenario, as occurred here, where a temporary entry suspension prevents a visa applicant from obtaining a visa that could be used once the entry suspension is lifted.

*Third*, the divergent texts and structures of subsections (a) and (f) confirm that Defendants' reading is untenable. The numbered paragraphs under subsection (a) each follow the same pattern:

---

[10] In fact, the second sentence of § 1182(f) itself highlights the entry/visa distinction. That sentence authorizes the Attorney General to "suspend the entry of some or all aliens transported to the United States by [an] airline" if the airline does not comply with certain anti-fraud measures. § 1182(f). But nobody would think this *entry* regulation justifies revoking the *visas* of people who have traveled or intend to travel on that airline; they simply have to *enter* by a different means. *See generally* Suspension of Privilege to Transport Aliens to the United States, 63 Fed. Reg. 56,869 (Oct. 23, 1998) (discussing purposes of this provision).

They define a class and then state that any member of it ". . . is inadmissible." That fits perfectly with subsection (a)'s overall provision that "aliens who are inadmissible under the following paragraphs" are ineligible for visas (as well as entry). It also reflects that "Congress has employed the concept of 'inadmissibility' as a status" that blocks access to many immigration benefits "[f]ull stop." *Barton v. Barr*, 140 S. Ct. 1442, 1452 (2020). By contrast, § 1182(f) does not use the term "inadmissible" or discuss visa eligibility. It *separately* authorizes the President to "suspend the entry" of classes of noncitizens for a limited time. 8 U.S.C. § 1182(f). That authorization does not connect with subsection (a) at all, confirming that it is not one of the "following paragraphs" to which subsection (a) refers.

Defendants ignore the statutory text, and instead rely on a passage from *Hawaii II* stating that "Section 1182 defines the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa)." 138 S. Ct. at 2414 (cited by Mot. 38). According to Defendants, this means that grounds for inadmissibility *outside* of Section 1182(a)—such as Section 1182(f)—also makes noncitizens ineligible for visas. This argument misinterprets the Supreme Court's opinion. The Court merely stated that being admissible implies that one is also visa-eligible. But that does not mean, inversely, that all grounds for *in*admissibility make one visa-*in*eligible. A person might become inadmissible for a temporary period based on an § 1182(f) proclamation; but such a person can still receive a visa, which can later be used once the temporary entry restriction is lifted. Indeed, as noted above, a different reading would contravene the statutory text: Section 1182(a) links visa ineligibility expressly to those grounds for inadmissibility set forth in Section 1182(a), not elsewhere, and Section 1182(f) does not even speak of inadmissibility.

Indeed, when read as a whole, the Supreme Court's reasoning in *Hawaii II* supports Plaintiffs' argument, not Defendants'. As the Supreme Court noted, § 1182's "restrictions come

into play at two points in the process of gaining entry (or admission) into the United States." *Hawaii II*, 138 S. Ct. at 2414 (footnote omitted). The Court then differentiated between grounds for inadmissibility set forth in Section 1182(a)—which made noncitizens ineligible for a visa— and Section 1182(f), which made noncitizens unable to enter. "First," the Court said, "any alien who is inadmissible under § 1182 (based on, for example, health risks, criminal history, or foreign policy consequences) is screened out as 'ineligible to receive a visa.'" *Id.* (quoting 8 U.S.C. § 1201(g)). The Court then continued, explaining that even if a noncitizen possessed a valid visa, "a visa does not entitle an alien to enter the United States 'if, upon arrival,' an immigration officer determines that the applicant is 'inadmissible under this chapter, or any other provision of law'— *including § 1182(f).*" *Id.* (quoting 8 U.S.C. § 1201(h)) (emphasis added). Thus, as the Court recognized, Section 1182(a) provides grounds for visa ineligibility, while § 1182(f) prohibits entry of covered people upon arrival, even if they have valid visas. That tracks "the basic distinction between admissibility determinations and visa issuance" that, as the Court recognized, "runs throughout the INA." *Hawaii II*, 138 S. Ct. at 2414.

For all of these reasons, being subject to suspension of *entry* under § 1182(f) cannot make someone "ineligible to receive a visa … under section 1182." 8 U.S.C. § 1201(g). EO-2, promulgated under § 1182(f), therefore cannot serve as a lawful basis for the State Department's policy of refusing to process visa applications from individuals subject to EO-2's entry ban.

### 2. In Any Event, EO-2 Does Not Order Defendants to Suspend Visa Issuance.

For the reasons just discussed, as a matter of law, a proclamation under § 1182(f) cannot alter visa eligibility. But even if one *could* do so, Defendants' theory would fail for the independent reason that EO-2 *did not* do so.

Rather, in keeping with its statutory basis, EO-2 directed the suspension of *entry*. The order was titled "Protecting the Nation From Foreign Terrorist *Entry* Into the United States." Its findings repeatedly cited "the risk of erroneously permitting *entry* of a national of" certain countries. EO-2, § 1(f), (h), (i), 82 Fed. Reg. at 13,211-12 (emphasis added). And, most importantly, the operative language in Section 2(c) halted "the *entry* into the United States" of those within its scope. *Id.* at 13,213 (emphasis added). It did not purport to impose any limit on the process of issuing a visa.

Visa issuance and entry are two different matters that involve independent components of the Executive Branch and are often widely separated in time and place. For Plaintiffs, who seek to immigrate to the United States on a permanent basis, the first step is receiving an immigrant visa from the relevant consular official—an employee of the State Department—at the official's office outside the United States. The second step, entry, may occur up to six months later. At that stage, a visa-holder must travel to the United States and seek admission from U.S. Customs and Border Protection ("USCIS"), a component of the Department of Homeland Security. These differences strongly suggest that an order governing entry did not also order an upheaval in visa processing. *See also supra* Part I.B.1 (explaining the distinct statutory treatments of these two subjects).

Two historical points corroborate that conclusion. First, Defendants' lead example of a precedent for EO-2—the 1980 suspension of visas for Iranians—cuts sharply against their position. *See* Mot. 39. In that case, President Carter's one-paragraph executive order, described as a "Delegation of Authority," simply "[d]elegat[ed]" to the Secretary of State and the Attorney General the statutory "authority conferred upon the President" to impose travel restrictions. Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979). The operative order actually *exercising* that statutory authority—the analogue to EO-2 today—*did* specifically address "[t]he issuance of immigrant and nonimmigrant visas to nationals of Iran." Additional Requirements in the Case of

Certain Nonimmigrant Aliens, 45 Fed. Reg. 24,436 (Apr. 9, 1980).[11] Yet, faced with that clear precedent, the current President elected not to alter visa practices in his own highly detailed order.

Second, the history of EO-2 itself demonstrates that the President's choice in this regard was deliberate. The relevant section of the predecessor order, Executive Order 13,769, employed a wholly different title: "*Suspension of Issuance of Visas* and Other Immigration Benefits to Nationals of Countries of Particular Concern." Exec. Order 13,769, § 3, 82 Fed Reg. 8977 (Jan. 27, 2017) (emphasis added). In contrast, EO-2 retitled the relevant section—apparently to make its limited scope clear—to read: "Temporary *Suspension of Entry* for Nationals of Countries of Particular Concern During Review Period." EO-2 § 2, 82 Fed. Reg. at 13,212.

Given the plain language of EO-2 and all of this contextual evidence, there is no basis to conclude it prescribed a suspension of visa issuance. That is particularly clear when, as explained above, an order under § 1182(f) could not lawfully have that effect. Just as courts assume that Congress "legislates in the light of constitutional limitations," *Rust v. Sullivan,* 500 U.S. 173, 191 (1991), this Court should resolve any residual doubt about the meaning of EO-2 by assuming that the President observed the statutory limitations on his authority. Visa issuance and entry are two different matters.

In sum, an entry suspension under § 1182(f) is not a ground for denying a visa under § 1182(a), and EO-2 did not suspend issuance of visas in any event. Therefore, Defendants' policy of refusing to process visas for applicants like Plaintiffs, who would be "otherwise eligible" but for EO-2's entry ban, Dkt. 2-2 at 5-6, violates the INA. Because Plaintiffs are eligible for visas on

---

[11]  For the textual reasons described above, Plaintiffs do not concede the legality of the 1979-1980 orders relating to Iran. *Cf.* 4A Op. O.L.C. 133, 140 (1979) (concluding only that the Iran orders "would *probably* be sustainable" (emphasis added)).

every criterion that the INA and its implementing regulations allow Defendants to take into account, Defendants have a clear duty to process Plaintiffs' visa applications and issue them visas.

Moreover, to the extent Defendants contend that the State Department policy is now "defunct," Mot. 23, that just "removes an obstacle to [Plaintiffs'] ability to obtain an order instructing the government to process their applications and issue them visas pursuant to the INA separate and apart from anything provided in the [cable]." *Almaqrami*, 933 F.3d at 783.

### C.    Defendants' Policy Illegally Bars Visa Processing Based on Nationality.

Defendants' policy violates the INA for another reason, as well. Not only does it suspend visa issuance on a ground nowhere to be found in § 1182(a), but it does so on a ground that the INA elsewhere expressly prohibits: namely, being a national of one of the six countries covered by EO-2. The INA bars "discriminat[ion] … in the issuance of an immigrant visa because of [a] person's … nationality," 8 U.S.C. § 1152(a)(1)(A), "[e]xcept as specifically provided" in four enumerated provisions, none of which is at issue here. *Id.*[12] Thus, even if Defendants could suspend visa applications on grounds not recognized by § 1182(a), they *still* could not suspend applications on the basis of nationality. Yet that is precisely what they are doing. Defendants' policy thus warrants relief under the APA and the Mandamus Act.

Defendants assert that the INA's ban on nationality discrimination does not apply here, relying on the Supreme Court's decision upholding EO-3 in *Hawaii II*. Mot. 37-38. But *Hawaii II* only confirms that Defendants' *policy*, which is supposedly based on EO-2, violates § 1152(a)(1)(A) by extending nationality discrimination to visa processing and issuance. As the Court emphasized, "§ 1152(a)(1)(A) prohibits discrimination in the allocation of immigrant visas

---

[12] Indeed, a belated recognition of this prohibition may explain why EO-2, in contrast to its predecessor, was limited to a bar on entry and did not address visa eligibility. *See supra* at 22.

based on nationality and other traits." *Hawaii II*, 138 S. Ct. at 2414. The Court held that § 1152(a)(1)(A) did not prohibit EO-3 because EO-3 effected an *entry* ban, not a ban on *visa issuance*. *See id.* ("[W]e reject plaintiffs' interpretation because it ignores the basic distinction between admissibility determinations and visa issuance that runs throughout the INA. … Had Congress instead intended in § 1152(a)(1)(A) to constrain the President's power to determine who may enter the country, it could easily have chosen language directed to that end."). The State Department cable, by contrast, bars *visa issuance*, to which § 1152(a)(1)(A)'s prohibition on discrimination *does* apply. Nor does it matter "that the DV Program already explicitly discriminates based on nationality in selecting lottery 'winners.'" Mot. 38. The diversity visa allocation scheme is located at 8 U.S.C. § 1153(c), and the INA's ban on nationality discrimination specifically exempts § 1153 from its ambit. *See* 8 U.S.C. § 1152(a)(1)(A). Thus, while diversity visas may therefore be allocated by nationality, § 1152(a)(1)(A) forbids any additional layering on of nationality-based visa restrictions from outside the exempted provisions—including from either § 1182(f) or a State Department cable. Thus, far from "extinguishing the merits of Plaintiffs' claims," Mot. 37, the Court's decision to uphold EO-3 in *Hawaii II* has little to do with those claims, except to strengthen Plaintiffs' arguments that Defendants' policy is illegal under the text of both § 1182(a) and § 1152(a)(1)(A).

## II.    Defendants' Alternative Arguments Are Unavailing.

Faced with clear law prohibiting Defendants' policy, Defendants spend much of their motion seeking to avoid a decision on the merits of that policy. Instead, they raise three alternative arguments for dismissal: first, that this Court lacks equitable power to follow up and enforce its own preliminary injunction; second, that consular nonreviewability bars Plaintiffs' claims; and third, that Plaintiffs lack a cause of action because they merely complain about Defendants' processing speed. Mot. 23-36. This Court has rejected each of these arguments before; it should

do so again. Absent some significant change, "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (explaining the basis for the law-of-the-case doctrine). In light of Defendants' failure to identify any intervening developments, the Court can and should simply adhere to its prior analysis of the issues that Defendants now ask to relitigate. *Cf. Assassination Archives & Research Ctr. v. CIA*, 48 F. Supp. 2d 1, 13 (D.D.C. 1999) (explaining, in reconsideration context, that a party is not entitled to "an opportunity to reargue facts and theories upon which a court has already ruled" (citation omitted)).

In any event, the Court's previous analysis was correct: this Court may order the relief Plaintiffs seek, and Defendants' attempts to distinguish prior cases ordering such relief do not withstand scrutiny. The Court retains equitable power over Defendants, despite the statutory deadline for visa issuance, because the Court acted before that deadline to preserve the status quo and now may act to enforce its prior order. Consular nonreviewability poses no barrier both because Defendants never finally denied Plaintiffs' visa applications and, independently, because Plaintiffs challenge Defendants' *authority* to refuse to process or grant Plaintiffs' applications rather than a particular decision to grant or deny a visa. And Plaintiffs have a cause of action under both the APA and the Mandamus Act to seek review of their applications without imposition of an illegal policy.

## A.     This Court Has the Equitable Power to Enforce Its September 2017 Order.

Defendants' principal argument rests on 8 U.S.C. § 1154(a)(1)(I)(ii)(II) ( "subclause (II)"), which specifies that lottery-winners are "eligible" to receive diversity visas "only through the end of the specific fiscal year for which they were selected." Defendants contend that subclause (II) makes relief in this case impossible. Even if they broke the law by refusing to process Plaintiffs'

applications, Defendants say, the Court should afford no remedy because they sat on the applications through the end of Fiscal Year 2017—which is to say, because they got away with it.

Unsurprisingly, courts have rebuffed such efforts to convert the wrong itself into a reason it cannot be remedied. They have consistently held—as this Court did—that they "may order the State Department to process visas past the statutory deadline where Plaintiffs have sought relief prior to the end of the fiscal year, as Plaintiffs have here." PI Op. 14-15 (citing, *inter alia*, *Przhebelskaya,* 338 F. Supp. 2d 399, and *Paunescu v. INS*, 76 F. Supp. 2d 896).

### 1. Ordering Relief After the End of the Fiscal Year Is Both Permissible and Proper in This Case.

The rule allowing a court to order the processing of visas after the statutory deadline, so long as Plaintiffs sought relief and a court had acted prior to the end of the Fiscal Year, is eminently fair and rooted in settled legal principles. As this Court previously explained, *Przhebelskaya* and *Paunescu* provide the most relevant guidance here. In those cases, as in this one, the lottery-winners conscientiously sought judicial relief *before* the end of the Fiscal Year, and thus in their capacity as eligible visa recipients. And in *Przhebelskaya* and *Paunescu*, as in this case, the courts granted injunctive relief to the plaintiffs *before* the end of the Fiscal Year. *See Przhebelskaya*, 338 F. Supp. 2d at 402; *Paunescu*, 76 F. Supp. 2d at 898. As this Court explained, having laid those predicates, both courts recognized their power to make their orders effective by compelling adjudication after the end of the Fiscal Year, "even though doing so would conflict with the statutory limitations on visa issuance." PI Op. 12; *see id.* at 15 ("*Neither the expiration of the statutory deadline nor the fulfillment of the statutory quota extinguishes the Agency's obligation to comply with the court's order*." (quoting *Przhebelskaya*, 338 F. Supp. 2d at 403 (emphasis added by this Court))). Thus, unlike cases in which "the plaintiff files suit *after* the selection FY has ended," or in which "the court fails to act on [a] request until after September 30," if a plaintiff

timely files and "the court grants *some* relief—but not the visa—before October 1. … the court might lawfully take steps [after October 1] to compel the government to process the plaintiff's application and issue her a diversity visa anyway." *Almaqrami*, 933 F.3d at 780.

This Court's September 2017 order is, for all relevant purposes, the same as the predicate orders in *Przhebelskaya* and *Paunescu.* As the Court explained at that time, the point of preliminary relief is "to preserve the relative positions of the parties until a trial on the merits can be held." PI Op. 8 (quoting *Tex. Children's Hosp. v. Burwell,* 76 F. Supp. 3d 224, 235 (D.D.C. 2014)). The Court's order did that by laying a foundation for later adjudication of Plaintiffs' visa applications, if appropriate, even after the end of the Fiscal Year. *See id.* at 13 (explaining that the order "address[ed] the potential irreparable harm that Plaintiffs face" through the imminent lapsing of their eligibility). Defendants now contend that subclause (II) bars any post-deadline relief, notwithstanding the Court's order. But if Defendants were right about that, the order would *not* have frozen the status quo, as the Court intended; indeed, the order would have had no effect at all. The Court need not and should not accept a theory that renders its own prior order pointless.

Indeed, Defendants' proposed rule would have severe adverse effects for judges as well as visa applicants. It would require courts to issue *more* intrusive injunctions—mandatory injunctions to issue visas—to avoid mooting cases. And because courts would have to grant this mandatory relief by the end of the Fiscal Year, they would have to race from a filing to a final decision on the merits in, at most, twelve months' time (and likely far less). Defendants' rule would thus force courts to engage in more disruptive actions on shorter timeframes.

None of the authority Defendants cite supports their theory. Although Defendants point to several cases denying relief based on subclause (II), they can point to none in which relief has ever been denied to a lottery-winner who secured a judicial order before the end of the Fiscal Year.

Defendants rely principally upon *Iddir v. INS*, 301 F.3d 492 (7th Cir. 2002). In that case, "INS …
waited until after the prescribed time period to hear the plaintiffs' petitions," then "summarily
rejected the petitions, not on the merits, but on the grounds that time within which the petitions
had to be heard expired." *Id.* at 495. The district courts thus could not have granted relief before
the relevant Fiscal Years ended, and indeed dismissed the cases below. *Id.* at 494. The Seventh
Circuit therefore held that "the relief the appellants currently seek is illusory, because even if the
INS adjudicated the applications today, visas could not be issued." *Id.* at 500. But the case would
be different, the court said, if a court had acted "*while* the INS maintained the statutory authority
to issue the visas." *Id.* at 501 n.2. Indeed, "[a]llowing the INS to claim inability to issue visas at
that point would impinge the authority of the court." *Id.*

Thus, as a later Seventh Circuit panel stated, the *Iddir* court "recognized that the case would
have been different if it had been filed before the end of the visa year, while the INS still had
statutory authority to issue the visa, and if the district court had acted within that time period."
*Ahmed v. DHS*, 328 F.3d 383, 387 (7th Cir. 2003). The fact that this Court ordered Defendants to
hold visa numbers in reserve for future processing preserved its power to act after the Fiscal Year
was over. *Cf. Almaqrami*, 933 F.3d at 780 ("In such a case, after the selection FY has ended, the
court might lawfully take steps to compel the government to process the plaintiff's application and
issue her a diversity visa anyway.").

Likewise, the other cases on which Defendants rely either explicitly or implicitly
distinguish cases like this one. *See Zixiang Li v. Kerry*, 710 F.3d 995, 998, 1002 (9th Cir. 2013)
(denying as moot a claim to force Department of State to issue visas after neither the Department
*nor a court* had acted, because "[o]nce a visa number is gone, it cannot be recaptured absent an act
of Congress," and "some of the visa numbers they seek to recapture have already been allocated

to other individuals"); *Coraggioso v. Ashcroft,* 355 F.3d 730, 734 n.8 (3d Cir. 2004) (noting that if petitioner had "sought relief prior to the expiration of the 1998 fiscal year, our analysis may have been different," and that "[t]he Seventh Circuit has explicitly approved" cases to that effect); *U.S. ex rel. Newman v. City & Suburban Ry. of Wash.*, 42 App. D.C. 417, 420 (D.C. Cir. 1914) (refusing mandamus because "an express [time] limitation was placed upon the power of the [plaintiff] railway company to institute the condemnation proceedings" sought and the company did not act within that time); *see also Keli v. Rice,* 571 F. Supp. 2d 127, 135 (D.D.C. 2008) (distinguishing between cases in which courts had versus had not "order[ed] any injunctive relief *before* the applicable fiscal year ended"). The statutory deadline thus poses no barrier: this Court acted before FY 2017 ended and may exercise its equitable powers to enforce compliance with its prior order.

### 2.   Defendants Cannot Distinguish *Przhebelskaya* and *Paunescu.*

At earlier stages of this case, Defendants had conceded that *Paunescu* and *Przhebelskaya* "may appear to provide an exception to th[e] rule" they advocated, and had declined to argue that *Paunescu* and *Przhebelskaya* were wrongly decided. Dkt. 53-1, at 12; *see id.* at 12-14. Indeed, Defendants embraced those cases as valid exercises of a court's "inherent power." *Id.* at 14; *see Almaqrami*, 933 F.3d at 781 (admitting "courts have that power"). They simply sought to distinguish *Paunescu* and *Przhebelskaya* as cases in which "the court order[ed] the government to *process* a visa application" instead of to "to *potentially process* them." *Almaqrami*, 933 F.3d at 781; *see* Mem. Op. 9-10 (rejecting argument). Defendants have apparently abandoned that view. They now embrace two other tactics: first, they tar *Paunescu* and *Przhebelskaya* as inconsistent with D.C. Circuit precedent; and second, they try to distinguish between immigrants who seek relief while on U.S. soil and those who seek it while abroad. Neither gambit succeeds.

Defendants first assert that *Paunescu* and *Przhebelskaya* are "inconsistent," Mot. 26, with the D.C. Circuit's decision in *American Hospital Ass'n v. Price*, 867 F.3d 160 (D.C. Cir. 2017).

They quote that case's statement that, "just as a court may not require an agency to break the law, a court may not require an agency to render performance that is impossible." *Id.* at 167; *see* Mot. 25. Of course, Defendants' wooden reading of that language is at odds with *Przhebelskaya* and *Paunescu*, which—at least until now—Defendants have accepted, and which the D.C. Circuit did not question in this case. As for *American Hospital*, it is inapposite because, unlike in this case, the alleged illegality there may already have been impossible to remedy when the case was filed— something the lower court had failed to consider. In *American Hospital*, plaintiffs sought relief compelling an agency to clear a backlog of administrative appeals that had already accumulated. The D.C. Circuit faulted the District Court for "command[ing] the Secretary to perform an act … without evaluating whether performance was *possible*," or, at least, possible without settling the pending cases *en masse. Id.* at 162; *see id.* at 168. Thus, the error was failing even to grapple with the question of whether it was physically possible for the agency to comply with a court order. In contrast, this Court has already found that Defendants are entirely capable of lawfully processing Plaintiffs' visa applications—an act that was legally owed to Plaintiffs all along.

Defendants' use of *American Hospital* runs into another difficulty: the D.C. Circuit's ruling in this case. If *American Hospital* had in fact negated *Przhebelskaya* and *Paunescu*, Plaintiffs' claim to equitable relief would have been "implausible"—indeed, entirely foreclosed by binding precedent—and the D.C. Circuit would have declared this case moot. Yet, although Defendants pointed to *American Hospital* before both this Court and the D.C. Circuit to support its mootness argument, *see* Dkt. 53-1, at 10; Br. for the Appellees 23, 33, *Almaqrami v. Pompeo*, 933 F.3d 774 (No. 18-5156), the D.C. Circuit held that it is "*not* 'implausible' that [this Court] could rely on equity to take steps to compel the issuance of diversity visas, notwithstanding the end of FY 2017," *Almaqrami*, 933 F.3d at 781 (emphasis added).

Defendants also rely (Mot. 25) on *INS v. Pangilinan,* 486 U.S. 875 (1988), which involved a group of Filipino nationals who "filed [for U.S. citizenship] more than 30 years after the deadline" established by a since-expired naturalization statute, *id.* at 884. The Ninth Circuit nonetheless approved their naturalization as a matter of "equity." *Id.* at 883. In the language stressed by Defendants, the Supreme Court rebuked the lower courts for "disregard[ing] statutory and constitutional requirements and provisions" and "creat[ing] a remedy in violation of law." *Id.* at 883 (quotation marks and citations omitted). However, as with *American Hospital*, Defendants' literalistic reading of the quoted language would invalidate the results in *Przhebelskaya* and *Paunescu*, which Defendants have hitherto accepted. Moreover, the Court's admonitions in *Pangilinan* can only be understood in the context of that highly unusual case. "The only form of relief specifically disapproved by the *Pangilinan* Court," the D.C. Circuit has explained, "was the lower courts' asserted 'power to make someone a citizen of the United States.'" *In re Thornburgh,* 869 F.2d 1503, 1517 (D.C. Cir. 1989) (citation omitted); *see id.* at 1517 n.21 ("The *Pangilinan* Court understandably focused only on the constitutional and statutory limitations on the power of courts to confer citizenship."). But there is no dispute that courts may order immigration officials to follow their own regulations. This Court would pay *Pangilinan* "no respect" by "extend[ing] [it] far beyond the circumstances for which [it was] designed." *Cooper v. Harris,* 137 S. Ct. 1455, 1481 (2017).[13]

Defendants also argue, for the first time in this litigation, that *Przhebelskaya* and *Paunescu* are inapposite because they involved plaintiffs who were physically "within the United States." Mot. 26. Plaintiffs are aware of no court that has ever limited its equitable powers to exclude cases

---

[13] *Antone v. Block,* 661 F.2d 230 (D.C. Cir. 1981), is even further afield (Mot. 26). *Antone* simply held that a district court may not issue relief under the APA based on agency conduct that does not violate the APA in the first place. *See id.* at 235.

brought by individuals outside the United States. (Perhaps that is why Defendants do not cite any.) Certainly, neither *Paunescu*, 76 F. Supp. 2d at 901-03, nor *Przhebelskaya*, 338 F. Supp. 2d at 403-06, discussed their plaintiffs' presence in the United States as a factor in their decisions, much less a deciding factor. And the Seventh Circuit has articulated exactly the opposite of Defendants' position. *See Ahmed*, 328 F.3d at 388 ("The fact that Ahmed was a person living abroad seeking such a visa, and the parties in *Iddir* appear to have been in the United States on other grounds, is immaterial to this aspect of the case.").

The Court's equitable powers over *Defendants* do not depend on whether *Plaintiffs* are on American soil. Rather, it is Defendants' own acts—the issuance of a policy from the State Department's Foggy Bottom headquarters—and this Court's prior orders that authorize further relief here. First, "relief may be given in a court of equity ... to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citation omitted). This rule "reflects a long history of judicial review of illegal executive action, tracing back to England," *id.*, and is reflected in both the Mandamus Act and the APA. Second, the Court has the inherent power to enforce its own judgments. *See, e.g.*, *Peacock v. Thomas*, 516 U.S. 349, 356 (1996) ("Without jurisdiction to enforce a judgment entered by a federal court, 'the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.'" (citation omitted)). Both these powers rely on this Court's authority over *Defendants*, not on whether Plaintiffs seek visas from consular officials abroad or USCIS officials in the United States. For these reasons, Defendants' long recitation of the historical differences in immigration law between applicants from within the United States and without is largely

irrelevant. *See* Mot. 26-28.[14] So too is Defendants' unsupported invocation of "separation-of-powers and foreign affairs issue[s]." Mot. 27. If Plaintiffs are right on the merits, this Court has the equitable power to enforce its prior order by requiring Defendants to process Plaintiffs' visas.

### B.     The Doctrine of Consular Nonreviewability Does Not Apply.

As with the question of this Court's equitable power, Defendants give the Court no substantial reason to reopen the question of consular nonreviewability in this case. They simply ask the Court to "revisit" its prior decision holding that consular nonreviewability does not apply, Mot. 28; PI Op. 15-17—and, implicitly, this Court's later decision adhering to that ruling, Mem. Op. 12 n.3. Yet Defendants make only legal arguments that they made (or, at a minimum, could have made) before. Under these circumstances, there is no reason for the Court to answer the same purely legal question a different way after deciding it the opposite way. *See LaShawn A.*, 87 F.3d at 1393 ("Inconsistency is the antithesis of the rule of law."). The Court should therefore decline to take up Defendants' renewed nonreviewability arguments at all.

If the Court does address reviewability again, however, it should confirm both of its prior holdings. The Court first held that consular immunity "does not apply" because "the government has not made a final visa decision" in Plaintiffs' cases. PI Op. 15. As explained below, the Court correctly stated the legal rule and correctly applied it to this case. The Court also held that consular immunity does not apply because Plaintiffs challenge a State Department *policy* rather than solely the results of their visa applications. PI Op. 17. This reasoning, too, is correct.

---

[14] Indeed, the entire upshot of the historical discussion Defendants pull from *Randall v. Meese*, 854 F.2d 472 (D.C. Cir. 1988), is that immigrants seeking permanent resident status from within the United States get two bites at the apple—first with immigration officers and second in deportation proceedings—while those seeking such status from abroad can rely only on the consular route, *id.* at 474-75. This difference has no bearing on the court's equitable powers in either context.

1.   **Consular Nonreviewability Does Not Apply When No Consular Decision Has Been Rendered, and No Consular Decision Has Been Rendered in Plaintiffs' Cases.**

As Judge Kessler has explained at length, "the doctrine of consular nonreviewability is not triggered until a consular officer has made a *decision* with respect to a particular visa application." *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) ("*Nine Iraqi Allies*"); *see* PI Op. 15-16 (following *Nine Iraqi Allies*). That limitation is rooted in the purposes of the nonreviewability doctrine: In light of "the political nature of *visa determinations*," "a consular official's *decision to issue or withhold a visa* is not subject to judicial review." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (emphasis added). But "[w]hen the Government simply declines to provide a decision in the manner provided by Congress, it is not exercising its prerogative to grant or deny applications." *Nine Iraqi Allies*, 168 F. Supp. 3d at 290-91. Accordingly, such refusals to process applications are reviewable, even when a consular officer's ultimate judgment on an application's merits is not. *See id.*; *see also Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997) (holding that "jurisdiction exists to consider whether the consulate has the authority to suspend the visa applications"); *Maramjaya v. USCIS*, No. 06-2158 (RCL), 2008 WL 9398947, at *4 (D.D.C. Mar. 26, 2008) (holding that the doctrine of consular nonreviewability did not apply where the "case ha[d] not procedurally progressed to the point where consular immunity would bar judicial review"). Case law since this Court's previous decision only reinforces this distinction.[15]

---

[15] *See, e.g.*, *Motaghedi v. Pompeo*, No. 1:19-CV-01466-LJO-SKO, 2020 WL 489198, at *6 (E.D. Cal. Jan. 30, 2020) ("Plaintiffs do not appear to challenge the grant or denial of waivers. … Plaintiffs appear to challenge the pre-waiver *implementation* of PP 9645, which falls outside the doctrine of consular nonreviewability."); *Didban v. Pompeo*, ---F. Supp. 3d ---, No. 19-CV-881 (CRC), 2020 WL 224517, at *4 (D.D.C. Jan. 15, 2020) ("As other courts in this district have held, 'the doctrine of consular nonreviewability is not triggered until a consular officer has made a *decision* with respect to a particular visa application.'" (quoting *Nine Iraqi Allies*, 168 F. Supp. 3d at 290)); *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 114 (D.D.C. 2020) ("[T]he consular nonreviewability doctrine applies only to decisions actually made by

As this Court already determined, this case falls squarely within the exception to nonreviewability described above. *See* PI Op. 16-17. Specifically, in its September 2017 order, the Court considered the parties' arguments and explained that Plaintiffs' applications had not "been finally refused," but rather remain "pending." *Id.* Plaintiffs had been asked for additional information and told that they could still obtain a visa if they established an exception to EO-2's entry ban. *See supra* at 6-7. "The State Department's most recent communications with Plaintiffs, coupled with its representations to the court," showed that they still had a chance of receiving visas when this Court ordered Defendants to reserve them visa numbers. PI Op. at 17.

In their October 2017 memorandum, Defendants did not contest that determination or attempt to identify any intervening development. Dkt. 53-1, at 17-21. Yet Defendants now claim that Plaintiffs' visas *were* in fact refused, making an argument which they could have raised but did not raise back in 2017. The State Department's Foreign Affairs Manual says that consular officers must either issue a visa or refuse it after executing a visa application. Mot. 33 (quoting 9 FAM § 504.11-2(A)(a)). Because Plaintiffs' "administrative processing … was complete" by summer 2017, Defendants reason, Plaintiffs' applications must have been denied and the exception to consular nonreviewability does not apply. Mot. 33-34 (quoting Am. Compl. ¶¶ 38, 40). *But see supra* at 6-7. This argument fails for three reasons.

First, Defendants' argument assumes that they were acting in accordance with the Manual, but they were not. Indeed, Plaintiffs have always contended that Defendants' policy *violates* the regulation that the quoted section of the Manual implements, precisely because the policy

---

consular officers …. But when the suit challenges inaction, 'as opposed to a decision taken within the consul's discretion,' there is jurisdiction." (quoting *Patel*, 134 F.3d at 931-32)); *Najafi v. Pompeo*, No. 19-CV-05782-KAW, 2019 WL 6612222, at *5 (N.D. Cal. Dec. 5, 2019) ("Here, consular nonreviewability does not apply because [p]laintiffs are not challenging the consular officer's decision, but the lack thereof, as well as the procedures by which PP 9645 is being implemented.").

suspended visa processing without making a final decision. *See* Am. Compl. ¶¶ 61-62. This Court has recognized that mandamus is therefore warranted if Defendants' policy prevents Plaintiffs' visas from being "processed in accordance with the INA." PI Op. 12 (citing 22 C.F.R. § 42.81(a)). Defendants' citation of the Manual only further proves that "the Government's duty to decide Plaintiffs' applications is non-discretionary," and that Defendants' failure to do so is mandamus-worthy. *Nine Iraqi Allies*, 168 F. Supp. 3d at 293 n.22, 296.

Second, as this Court has noted in a different case, "administrative processing is not a final adjudication but a mandatory intermediate step." *Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Pompeo*, No. 18-CV-01388 (TSC), 2019 WL 367841, at *10 (D.D.C. Jan. 30, 2019). Completion of processing does not automatically convert to a denial. And as this Court already pointed out in its September 2017 decision, consular officials sought further information from Plaintiffs even after declaring administrative processing complete, showing "that Plaintiffs' visa applications have not been finally refused." PI Op. 17; *see supra* at 6-7 (describing communications to Plaintiffs requesting additional information to establish eligibility under an exception to EO-2).

Third, Defendants' argument proves too much. If the mere inclusion of a directive in the Manual could dictate when a visa was deemed granted or denied, the State Department could insert any number of provisions into the Manual that would deprive visa applicants of meaningful review. For instance, the State Department might add a provision mandating that all visa applications are deemed denied if not granted within five days of the initial application. Then, if visa applicants challenged such a provision as violating the INA, Defendants could assert that consular nonreviewability barred courts from reviewing those challenges because the plaintiffs' visas had already been denied under the very provisions being challenged. And because wholesale

challenges to such a policy are also barred by consular nonreviewability under Defendants' view, *but see infra* Part II.B.2, visa applicants would have no means to remedy even the most arbitrary restrictions on the visa process. Defendants provide no support for such a doctrinal extension.

Because consular officers have still never rendered final decisions on Plaintiffs' cases, consular nonreviewability does not bar their claims.

> **2.    Consular Nonreviewability Does Not Apply Because Plaintiffs Challenge a General Administrative Policy, Not an Exercise of Discretion.**

This Court also ruled that the consular nonreviewability doctrine has no application here for a second, independent reason: "Plaintiffs challenge the State Department's policy, not the discretion of a specific consular officer in applying the policy." PI Op. 17. That holding is correct as well, and it too should be reaffirmed.

The D.C. Circuit has addressed this very issue, and it drew precisely the same distinction as this Court. Specifically, in *International Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985) ("*Bricklayers*"), the court of appeals acknowledged *Kleindienst v. Mandel*, 408 U.S. 753 (1972)—which Defendants term the "seminal" case supporting their view (Mot. 30)—and explained that it "concerned challenges to a decision by a consular officer on a particular visa application." 761 F.2d at 801. In *Bricklayers*, by contrast, the plaintiffs "d[id] not challenge a particular determination in a particular case of matters which Congress has left to executive discretion," but rather took issue with "internal agency guidelines" for processing visa applications. *Id.* at 800-01. The *Bricklayers* court concluded that *Mandel* "ha[d] no application" to that scenario. *Id.* at 801. "The federal courts have jurisdiction over this type of case," the court explained, "to assure that the executive departments abide by the legislatively mandated procedures." *Id.*; *see also Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 45 F.3d 469 (D.C. Cir. 1995) (resolving on the merits a nationality-discrimination challenge to a

State Department policy of refusing to process visa applications), *vacated on other grounds*, 519 U.S. 1 (1996); *Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir. 1988) (consular nonreviewability does not apply where plaintiffs "are not challenging the discretion of consuls" in applying regulations but rather "the authority of the Secretary of State" to issue them).

Here, too, Plaintiffs challenge a State Department policy of general application, rather than any case-specific judgments about their visa applications. In fact, Defendants do not even argue that Plaintiffs' challenge falls outside of *Bricklayers*' ambit—because, notwithstanding this Court's prime reliance on that case (PI Op. 17), Defendants decline to mention it at all. They are likewise silent about *Patel v. Reno*, 134 F.3d 929, which, as this Court recognized, is to the same effect. *See* PI Op. 17. Defendants' silence about this Court's grounds for rejecting their position all but concedes the correctness of the Court's prior analysis.

Rather than engaging with the controlling precedent on-point, Defendants offer context-free quotations from district court cases involving fact-bound complaints about visa decisions. *See* Mot. 32-33. A review of each of these cases will show that, in context, not one is inconsistent with the distinction between policy-based claims and individualized disputes that this Court and the D.C. Circuit have drawn.[16] But even if their dicta could be read to suggest otherwise, *Bricklayers* takes precedence as a binding D.C. Circuit decision.

---

[16] *See Baan Rao Thai Rest. v. Pompeo*, No. CV 19-0058 (ESH), 2019 WL 3413415, at *1 (D.D.C. July 29, 2019) (plaintiffs objected to denial of E-2 employment visa based on their not having met "all of the requirements of an E-2 essential employee as specified in 9 FAM 402.9-7"); *Malyutin v. Rice*, 677 F. Supp. 2d 43, 44, 46-47 (D.D.C. 2009) (plaintiff objected to visa denial based on insufficient ties to his home country); *Van Ravenswaay v. Napolitano*, 613 F. Supp. 2d 1, 3 (D.D.C. 2009) (plaintiff claimed charge of drug trafficking was "based on completely wrong information"); *Mansur v. Albright*, 130 F. Supp. 2d 59, 60 (D.D.C. 2001) (plaintiff objected to discretionary visa revocation that was based on new "information" received by State Department); *Chun v. Powell*, 223 F. Supp. 2d 204, 206 (D.D.C. 2002) (plaintiff objected to denial of visitor visa based on insufficient proof of "strong ties to a residence abroad"); *Garcia v. Baker*, 765 F. Supp. 426, 427 (N.D. Ill. 1990) (plaintiff objected to visa denial based on finding of prior immigration fraud).

Defendants also point to the Ninth Circuit's recent decision in *Allen v. Milas*, 896 F.3d 1094, 1107 (9th Cir. 2018), which agreed with the D.C. Circuit's determination in *Saavedra Bruno* that an unsuccessful visa applicant could not use the APA to challenge the denial of his visa. But *Allen* further supports the distinction between individual visa decisions and wholesale policies that underlay the *Bricklayers* and *Patel* decisions. Just as *Saavedra Bruno* does not purport to overrule—and in fact does not even mention—*Bricklayers*, *Allen* does not purport to overrule *Patel*. Rather, *Allen* distinguishes *Patel* and other Ninth Circuit cases in which plaintiffs allege "that '[t]he consular officer had no authority' to conduct the act complained of." *Id.* at 1108 & n.4 (quoting *Wong v. Department of State*, 789 F.2d 1380, 1386 (9th Cir. 1986)); *see also Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Patel*, stating that "the government ha[d] correctly abandoned its [consular nonreviewability] argument" on appeal in a case where plaintiffs "challenged the authority of the Department of State, rather than an exercise of its discretion"). Indeed, many decisions issued since this Court's last ruling—both in this district and within the Ninth Circuit—continue to recognize the distinction between the review of an agency policy and individual consular officers' visa decisions.[17]

---

[17] *See, e.g.*, *Motaghedi*, 2020 WL 489198, at *6 ("[T]o the extent Plaintiffs' claims challenge large-scale patterns of agency behavior, the doctrine of consular nonreviewability does not apply for this additional reason."); *Najafi*, 2019 WL 6612222, at *5; *Jamal v. Pompeo*, No. CV 19-6967 JVS (DFMX), 2019 WL 7865175, at *4 (C.D. Cal. Nov. 19, 2019) ("Plaintiffs are challenging systemic practices with respect to the waiver program, not individualized determinations for any one of their specific applications. … [N]o review of any individual consular officer decisions is required; what is at stake is 'the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion.'" (citation omitted)); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1018-19 (N.D. Cal. 2019) ("[P]laintiffs are challenging systemic practices with respect to the waiver program, and not individualized determinations for any specific person. … Those issues do not require review of an individual consular officer's decision."); *Jane Doe 1 v. Nielsen*, 357 F. Supp. 3d 972, 996 n.13 (N.D. Cal. 2018) ("[T]he consular nonreviewability doctrine cases are misplaced … Plaintiffs here do not seek review of individual adjudications made by DHS but ask only for the Court to determine whether DHS complied with its legal obligations.").

In sum, because consular officials have not rendered final decisions in Plaintiffs' cases, and because Plaintiffs challenge a general policy rather than an exercise of discretion, consular nonreviewability does not apply.

### C.   Plaintiffs Have Causes of Action Under the APA and the Mandamus Act.

In their final effort to avoid a merits finding against them, Defendants argue that, in order to state a claim under the APA or the mandamus statute, Plaintiffs must "point to a plainly defined duty of the State Department to readjudicate their visa applications by the end of the fiscal year." Mot. 34; *see id.* at 34-36 (Section III). But neither the APA nor the mandamus statute imposes the requirement Defendants imagine, and Plaintiffs have a valid cause of action under each.

### 1.   Plaintiffs Have an APA Cause of Action Under § 706(2).

Defendants first argue that Plaintiffs' APA claim must fail because, according to Defendants, it does not "assert[] that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 63-64 (2004) ("*SUWA*"); *see* Mot. 34. This argument rests on a simple misunderstanding of Plaintiffs' APA claim. Defendants' argument assumes that Plaintiffs' APA claim is under 5 U.S.C. § 706(1), concerning agency inaction. That is wrong. Plaintiffs brought suit under 5 U.S.C. § 706(2), challenging agency action (the promulgation of the State Department policy).[18] *See* Am. Compl. ¶ 54. As courts have consistently recognized, "*SUWA* addresses only attempts to 'compel agency action' pursuant to § 706(1) and does not reach claims encompassed within § 706(2)." *Alliance to Save Mattaponi v. U.S. Army Corps of Eng'rs,* 515 F. Supp. 2d 1, 10 (D.D.C. 2007) (citation omitted); *see, e.g., Valentini v. Shinseki,* 860 F. Supp. 2d 1079, 1097 (C.D. Cal. 2012) ("the holding in *SUWA* is

---

[18] Section 706(1) directs courts to "compel agency action unlawfully withheld or unreasonably delayed." Section 706(2) directs them to "hold unlawful and set aside agency action" that is defective in one or another way—such as by being "arbitrary, capricious," or "not in accordance with law."

inapplicable to challenges under § 706(2)(A)"); *Friends of Animals v. Sparks,* 200 F. Supp. 3d 1114, 1124 (D. Mont. 2016) ("The analysis in *SUWA* does not apply to § 706(2)(A) claims.").[19]

Defendants' misunderstanding of Plaintiffs' claim undermines their entire argument that Plaintiffs have not met their burden. A challenger under § 706(1) "faces a different burden" than a challenger under §706(2). *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,* 417 F.3d 1272, 1280 (D.C. Cir. 2005). When a plaintiff seeks to "compel agency action unlawfully withheld or unreasonably delayed" under § 706(1), she claims that the agency has unlawfully neglected to take up a matter at all; courts therefore "determine if 'the agency has a duty to act and [if] it has 'unreasonably delayed' in discharging that duty.'" *Id.* (citation omitted). A routine diversity-visa applicant who objects to the State Department's sluggish pace in processing applications could conceivably bring such a claim under § 706(1), although that claim might face significant hurdles.

Plaintiffs, however, did not bring such a claim. Instead, they alleged an affirmative policy decision *not* to process their applications, and challenged that decision under § 706(2)(A) as arbitrary, capricious, and otherwise unlawful. *See* Am. Compl. ¶¶ 53-59; *see also* PI Op. 6 (accurately characterizing Plaintiffs' claim). Although claims of this kind challenge "inaction" in one sense, they are cognizable under § 706(2) as long as the decision not to act is "final" within the meaning of the APA. *See, e.g., Hi-Tech Pharmacal Co. v. U.S. FDA,* 587 F. Supp. 2d 1, 8-9 (D.D.C. 2008) ("[I]f a failure to act amounts to consummated agency action that APA views as final, notwithstanding the fact that the agency 'did' nothing, a party can seek relief under Section 706(2)." (quotation marks and citations omitted)); *Alliance to Save Mattaponi,* 515 F. Supp. 2d at 10 (same); *see also* 5 U.S.C. § 551(13) (defining "agency action" to include "failure to act").

---

[19] Defendants obscure this point through a highly misleading use of brackets. *Compare SUWA,* 542 U.S. at 64 ("a claim under § 706(1) can proceed only where" certain conditions are met), *with* Mot. 34 (quoting the Supreme Court as stating that "a[n APA] claim … can proceed only where" those conditions are met).

Here, Plaintiffs plausibly and specifically alleged that Defendants' policy decision is "final agency action," representing "the consummation of the State Department's process on this matter." Am. Compl. ¶ 55. Defendants do not so much as mention finality, thereby forfeiting the opportunity to contest it. In any event, their policy clearly is final within the meaning of the APA. *See, e.g., Hi-Tech Pharmacal*, 587 F. Supp. 2d at 10 ("Judicial review of an agency's failure to act under Section 706(2) is authorized [as final], then, when administrative inaction has the same impact on the rights of the parties as an express denial of relief" (quotation marks and citations omitted).[20]

Plaintiffs have thus brought a proper claim under § 706(2). And "[a] challenge to agency action [under § 706(2)], by contrast [to one under § 706(1)], is simply resolved according to the APA." *Nat'l Ass'n of Home Builders,* 417 F.3d at 1280. In other words, the reviewing court proceeds directly to the question whether the challenged policy is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For these reasons, Defendants' various arguments in Part III of their memorandum are irrelevant to the APA claim that Plaintiffs actually pled.[21] The Court should order Defendants to set aside their policy and process Plaintiffs' applications under the INA's standards. *See North Carolina Fisheries Ass'n v.*

---

[20] Despite overlapping jargon, there is no tension between the "finality" of Defendants' policy under the APA and this Court's recognition that Plaintiffs' applications have not been "finally refused" for purposes of consular nonreviewability (PI Op. 16). The *policy* is "final" under the APA because Defendants will do no more on the matter. But Defendants have not finally denied Plaintiffs' *visa applications*. Instead, they applied the illegally promulgated policy to suspend the processing of those applications until such time as Plaintiffs could demonstrate a bona fide exception to the entry ban.

[21] Tellingly, the APA cases that Defendants cite addressed only § 706(1)—which, again, Plaintiffs have never invoked. *See Kaufman v. Mukasey,* 524 F.3d 1334, 1338 (D.C. Cir. 2008); *Orlov v. Howard,* 523 F. Supp. 2d 30, 37 (D.D.C. 2007); *Beshir v. Holder,* 10 F. Supp. 3d 165, 176–77 (D.D.C. 2014); *Nine Iraqi Allies,* 168 F. Supp. 3d at 296; *see also Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1180, 1182 (2d Cir. 1978) (discussing APA without specifying section relied upon, and finding no jurisdiction because INA did not require the relief sought); *Zhang v. Chertoff,* 491 F. Supp. 2d 590, 595 n.2 (W.D. Va. 2007) (declining to "address Plaintiffs' arguments regarding mandamus jurisdiction or the Administrative Procedures Act").

*Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) ("[W]hen a court reviewing agency action determines that an agency made an error of law … the case must be remanded to the agency for further action consistent with the corrected legal standards." (citation omitted)).

### 2.     Plaintiffs Have Satisfied the Conditions for Mandamus Relief As Well.

While Defendants invoke the wrong body of law under the APA, they correctly state that Plaintiffs must identify a "clear right to relief" and "clear duty to act" to support the mandamus claim in this case. PI Op. 12 (quoting *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005)); *see* Mot. 22, 34-36. But, as this Court has already recognized in applying those same standards, Plaintiffs have done just that. First, "Plaintiffs have a right to have their visa applications processed in accordance with the INA." PI Op. 12; *see id.* (citing governing regulations). And second, "State Department consular officers have a clear duty to do so." *Id.* Thus, if the State Department's policy is at variance with the INA—as Plaintiffs contend—then "Plaintiffs' right to have their applications processed in accordance with the law will have been violated by the State Department's implementation of the Executive Order," and mandamus will be appropriate. *Id.* at 13; *see also Patel*, 134 F.3d at 933 (ordering the United States Consulate in Bombay, India, to process a pending diversity visa application under mandamus authority).

Defendants do not acknowledge or engage this Court's holdings with respect to the "clear right" and "clear duty" prongs of the mandamus analysis. *See generally* Mot. 34-36. Instead, they recast Plaintiffs' mandamus claim as a demand that Defendants "readjudicate Plaintiffs' visa applications *at the rate they would have preferred." Id.* at 35 (emphasis added). Defendants are shadowboxing. Plaintiffs do not base their claim on the sluggishness of consular officials' actions. Indeed, such a claim would contradict the State Department cable itself, which directs officers to decide eligibility *first* before moving on to the application of EO-2. It is therefore backwards to say that Plaintiffs complain about the delay in processing. Defendants already *did* process

Plaintiffs' applications, as a *predicate* to applying EO-2. They determined that the Plaintiffs were "otherwise eligible" before then applying the challenged policy to suspend further processing of the visa applications. Dkt. 2-2 at 6.

Plaintiffs are challenging that suspension. *Cf. Patel,* 134 F.3d at 932 ("The Patels are challenging the consul's authority to suspend their visa applications, not challenging a decision within the discretion of the consul."). Thus, Plaintiffs demand only that consular officials discharge the clear duty this Court already identified: "process[] [Plaintiffs' visa applications] in accordance with the INA." PI Op. 12. It follows that, if Plaintiffs are correct that Defendants' refusal to process their applications contravenes the INA, mandamus relief will be appropriate.

Defendants' "pacing" argument only illustrates the absurdity of Defendants' *own* claims. In effect, they assert the power to adopt a policy of intentionally delaying processing visa applications as long as they like—even until the statutory deadline passes—and then blocking any lawsuits against them by recasting lack of authority claims as unreasonable delay claims. But the APA, the Mandamus Act, and this Court's prior decisions all counsel the opposite: Plaintiffs have a right to have their visa applications processed, and this Court has the equitable power to force Defendants to do so.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

June 19, 2020

Respectfully submitted,

/s/ Matthew E. Price

Samer E. Khalaf
Abed A. Ayoub
Iman Boukadoum
AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
1705 DeSales St. N.W., Suite 500
Washington, DC 20036
(202) 244-2990
Skhalaf@adc.org

Matthew E. Price (DC Bar # 996158)
Noah B. Bokat-Lindell (DC Bar #156032)
JENNER & BLOCK LLP
1099 New York Ave. N.W., Suite 900
Washington, DC 20001
(202) 639-6000
Fax: 202-639-6066
mprice@jenner.com
nbokat-lindell@jenner.com

Max Wolson (DC Bar #229562)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, DC 20043
(202) 216-0261
wolson@nilc.org

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2600
Fax: (212) 549-2654
ojadwat@aclu.org

Arthur B. Spitzer (D.C. Bar # 235960)
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
915 15th St. N.W., 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

Cody H. Wofsy
Spencer Amdur
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm St.
San Francisco, CA 94111
(415) 343-0770
Fax: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org

*Counsel for Plaintiffs*

45

**CERTIFICATE OF SERVICE**

I certify that, on June 19, 2020, I caused the foregoing Plaintiffs' Opposition to Motion to Dismiss to be served on all counsel of record via CM/ECF.

/s/ Matthew E. Price
Matthew E. Price